# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **DISABILITY RIGHTS TEXAS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:21-cv-00211-DCG** |
| | § | |
| **GREG ALLEN, IN HIS OFFICIAL** | § | |
| **CAPACITY AS THE POLICE CHIEF OF** | § | |
| **THE EL PASO POLICE DEPARTMENT,** | § | |
| | § | |
| *Defendant*. | § | |

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

**BETH L. MITCHELL**
State Bar No. 00784613
bmitchell@drtx.org
**LISA SNEAD**
State Bar No. 24062204
lsnead@drtx.org
DISABILITY RIGHTS TEXAS
2222 W. Braker Lane
Austin, Texas 78758
(512) 454-4816 (Austin Office)
(512) 454-3999 (Austin Fax)

**JENNIFER REIF**
State Bar No. 24072762
jreif@drtx.org
DISABILITY RIGHTS TEXAS
1500 McGowen, Suite 100
Houston, Texas 77004
(713) 974-7691 (Houston Office)
(713) 974-7695 (Houston Fax)

---

## ATTORNEYS FOR PLAINTIFF DISABILITY RIGHTS TEXAS

---

## Table of Contents

Table of Authorities.................................................................................................................ii

I. SUMMARY OF ARGUMENT...............................................................................................1

II. STANDARD OF REVIEW ......................................................................................................2

III. STATEMENT OF MATERIAL FACTS ...............................................................................2

    A. The Civil Role of Peace Officers in Evaluating and Transporting Individuals with Mental Illness in Texas. ........................................................................................................... 2

    B. EPPD Encountered E.C. While Conducting a Civil Emergency Detention for Transport to a Mental Health Facility. ........................................................................................................... 4

    C. DRTx's Investigation into the Complaint of Abuse of E.C. ................................................... 6

IV. ARGUMENT AND AUTHORITIES....................................................................................7

    A. The History of the P&A System Establishes the Basis for DRTx's Authority to Access Otherwise Confidential Records. .......................................................................................... 7

    B. The Plain Language of the P&A Acts, Their Regulations, and Case Law Establish that DRTx is Entitled to the Records at Issue as a Matter of Law. ........................................................... 8

        1. *DRTx is mandated to investigate abuse of "individuals with mental illness."* ..................................... 8

        2. *PAIMI empowers DRTx with broad records-access authority to investigate the abuse and neglect of individuals with mental illness.* ..................................................................................... 10

            a. *The statutory definition of "records" is non-exhaustive and non- constrained.* .................................... 11

            b. *Agency interpretation of "records" includes "all records" related to detention and transportation by law enforcement.* ....................................................................................................... 12

            c. *Excluding peace officer emergency detention transport-related records from the PAIMI Act would "render as meaningless" DRTx's mandate to investigate abuse of individuals with mental illness.* .................. 14

            d. *The PAIMI Act also requires access to investigative reports.* ....................................................... 15

    C. DRTx's Duty to Maintain Records' Confidentiality Bolsters the Conclusion that it is Entitled to EPPD Records. ......................................................................................................... 16

    D. DRTx Is Entitled to a Permanent Injunction Enjoining Defendant from Denying DRTx's Immediate Access to E.C.'s Records. ...................................................................................... 18

        1. *Defendant's conduct has irreparably harmed DRTx and there is no other adequate remedy at law besides the prayed-for injunction.* ...................................................................................... 18

        2. *Balancing the burdens on each party and considering the public interest favors the Court's granting DRTx's request.* .......................................................................................................... 19

CONCLUSION.............................................................................................................................20

CERTIFICATE OF SERVICE ...................................................................................................21

**Table of Authorities**

**Cases**

*Advocacy, Inc. v. Tarrant County Hospital District*,
No. 4:01-CV-062-BE, 2001 WL 1297688 (N.D. Tex. Oct. 11, 2001) ........................................17

*Alabama Disability Advocacy Program v. SafetyNet Youthcare, Inc.*,
65 F.Supp.3d 1312 (S.D. Ala 2014),
*reconsidered in part on other grounds in* 2015 WL 566946 (S.D. Ala. 2015) ........................................9

*American Surety Co. v. Marotta*,
287 U.S. 513 (1933) ........................................11

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ........................................2

*Center for Legal Advocacy v. Hammons*,
323 F.3d 1262 (10th Cir. 2003) ........................................11, 12

*Connecticut Office of Protection & Advocacy for Persons with Disabilties v. Hartford Board of Education*,
464 F.3d 229 (2nd Cir. 2006) ........................................9, 11, 12

*Disability Rights Ohio v. Buckeye Ranch*,
375 F.Supp.3d 873 (S.D. Ohio 2019) ........................................18, 20

*Disability Rights Texas v. Bishop*,
-- F.Supp.3d .--, No. 1:21-CV-124-H, 2022 WL 2817983 (N.D. Tex. July 19, 2022) .......*passim*

*Disability Rights Wisconsin, Inc. v. State of Wisconsin Department of Public Instruction*,
463 F.3d 719 (7th Cir. 2006) ........................................17

*Dunn v. Dunn*,
163 F. Supp. 3d 1196 (M.D. Ala. 2016) ........................................10

*eBay Inc., et al. v. MercExchange, LLC*,
547 U.S. 388 (2006) ........................................18

*FMC Corp. v. Holliday*,
498 U.S. 52 (1990) ........................................8

*Halliburton, Inc. v. Administrative Review Board*,
771 F.3d 254 (5th Cir. 2014) ........................................10

*Hamilton v. United Healthcare of Louisiana, Inc.*,
310 F.3d 385 (5th Cir. 2002) ........................................10

*Iowa Protection & Advocacy Services v. Rasmussen*,
206 F.R.D. 630 (S.D. Iowa 2001) ........................................11, 19

*K-Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ........................................................................................................8

*Kisor v. Wilkie,*
    139 S.Ct. 2400 (2019) ..................................................................................................13

*Matter of Disability Rights Idaho Request for Ada County Coroner Records Request Relating to the Death of D.T.,*
    168 F.Supp.3d 1282 (D. Idaho 2016) .......................................................................17

*MCI Telecomm. Corp. v. AT&T Co.,*
    512 U.S. 218 (1994) ......................................................................................................10

*Mississippi Protection & Advocacy System, Inc. v. Cotten,*
    929 F.2d 1054 (5th Cir. 1991) .....................................................................................8

*Perrin v. United States*,
    444 U.S. 37 (1979) ........................................................................................................10

*Protection & Advocacy for Persons with Disabilities v. Armstrong,*
    266 F.Supp.2d 303 (D. Conn 2003) ...................................................................... 9, 19

*St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*,
    78 F.3d 202 (5th Cir. 1996) .........................................................................................11

*The Advocacy Center v. Stalder*,
    128 F. Supp. 2d 358 (M.D. La. 1999) .................................................................... 8, 19

*White v. Black*,
    190 F.3d 366 (5th Cir. 1999) .......................................................................................14

*Wisconsin Coalition for Advocacy, Inc. v. Czaplewski,*
    131 F.Supp.2d 1039 (E.D. Wisc. 2001) .....................................................................19

**Statutes**

29 U.S.C. § 794e .....................................................................................................................1

42 C.F.R. § 51.41(c) ..............................................................................................................16

42 C.F.R. § 51.41(c)(2) ..........................................................................................................15

42 U.S.C. § 10801, *et seq.* .......................................................................................................1

42 U.S.C. § 10801(a)(1) ................................................................................................... 7, 20

42 U.S.C. § 10801(a)(3) ................................................................................................... 7, 20

42 U.S.C. § 10801(a)(4) .............................................................................................. 8, 10, 20

42 U.S.C. § 10801(b)(2)(B)................................................................8

42 U.S.C. § 10802(1)................................................................13

42 U.S.C. § 10802(4)(B)(i)(II) (1986)................................................9

42 U.S.C. § 10802(4)(B)(i)(II) (2000)..........................................9, 13

42 U.S.C. § 10802(4)(B)(ii)................................................................9

42 U.S.C. § 10805(a)(1)..............................................................6, 8

42 U.S.C. § 10805(a)(1)(A)................................................................8

42 U.S.C. § 10805(a)(3)................................................................8

42 U.S.C. § 10805(a)(4)................................................1, 8, 10, 14

42 U.S.C. § 10805(a)(4)(A)........................................................7, 10

42 U.S.C. § 10805(a)(4)(B)................................................................6

42 U.S.C. § 10806................................................................8, 10

42 U.S.C. § 10806(a)........................................................1, 16, 17

42 U.S.C. § 10806(b)(3)(A)..........................................11, 13, 15

42 U.S.C. § 10826(b)................................................................12

42 U.S.C. § 15001, *et seq.*................................................................1

42 U.S.C. § 15001(a)(5)................................................................20

42 U.S.C. § 15043(a)(1)................................................................8

42 U.S.C. § 15043(a)(2)(H)................................................................9

42 U.S.C. § 15043(a)(2)(I)..........................................................1, 8, 10

42 U.S.C. § 15043(a)(2)(J)..........................................................1, 8, 10

42 U.S.C. § 15043(c)................................................................8, 10, 11

42 U.S.C. §§ 10801(b)(2)(B)................................................................8

TEX. HEALTH & SAFETY CODE § CH. 573................................................3, 4

TEX. HEALTH & SAFETY CODE § 573.001................................................2, 3

TEX. HEALTH & SAFETY CODE § 573.001(a) ................................................................ 3, 12, 13

TEX. HEALTH & SAFETY CODE § 573.001(c) ................................................................... 3

TEX. HEALTH & SAFETY CODE § 573.001(d) ................................................................... 3

TEX. HEALTH & SAFETY CODE § 573.003 ........................................................................ 2

TEX. HEALTH & SAFETY CODE § 573.005 ........................................................................ 2

TEX. HEALTH & SAFETY CODE § 573.012(a) .................................................................... 4

TEX. HEALTH & SAFETY CODE § 573.012(b) .................................................................... 3

TEX. HEALTH & SAFETY CODE § 573.012(d) ................................................................. 2, 3

TEX. HEALTH & SAFETY CODE § 573.012(i) ..................................................................... 4

TEX. HEALTH & SAFETY CODE §573.012(e) .................................................................. 2, 3

**Regulations**

42 C.F.R. § 51.12 ............................................................................................................. 13

42 C.F.R. § 51.31(i) ........................................................................................................... 1

42 C.F.R. § 51.41(c) ........................................................................................................ 16

42 C.F.R. § 51.41(c)(1) .................................................................................................... 12

42 C.F.R. § 51.41(c)(2) ............................................................................................... 15, 16

42 C.F.R. § 51.45(a)(1) ............................................................................................... 16, 17

45 C.F.R. § 1326.21(f) ....................................................................................................... 1

**Other Authorities**

62 Fed. Reg. 53548-01 (Oct. 15, 1997) ........................................................................... 13

MERIAM WEBSTER DICTIONARY (11th ed. 2021) ...................................................... 10, 11, 12

S. Rep. No. 106-196 (2000) .............................................................................................. 9

S. Rep. No. 99-109 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361 ............................... 7, 8, 17

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Disability Rights Texas (DRTx) respectfully moves this Court for summary judgment on all counts in its Original Complaint (ECF No. 1). In support thereof, DRTx submits the following memorandum of law:

## I. SUMMARY OF ARGUMENT

DRTx submits this Motion for Summary Judgment and Brief in Support against Defendant Police Chief Greg Allen, acting in his official capacity, for violating DRTx's federal right to access records necessary to investigate a complaint of abuse of a person with mental illness (E.C.) who was shot and tased by El Paso Police Department (EPPD) officers who were evaluating and detaining him for transport to a mental health facility under a civil mental health emergency detention. Defendant's conduct has prevented and is preventing DRTx from conducting its federally-mandated investigation into this alleged abuse of an individual with a disability.

The plain language of DRTx's federal mandates in the Protection and Advocacy (P&A) Acts,[1] the purpose of the Acts, their regulations and agency guidance, and courts' interpretations of the P&A Acts all conclusively establish that records of persons with mental illness who are in the process of being evaluated, detained, and transported to a mental health facility by peace officers are precisely the kind of records DRTx is entitled to access to accomplish its mandated investigation. DRTx's special right of access includes records otherwise considered confidential by law. 42 U.S.C. §§ 10805(a)(4) and 10806(a); 42 U.S.C. § 15043(a)(2)(I)-(J); 42 C.F.R. § 51.31(i) ("State law must not diminish the required authority" of the P&A system), 45 C.F.R. § 1326.21(f) (same).

---

[1] The "P&A Acts" are the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, 42 U.S.C. § 10801, *et seq.*; the Developmental Disabilities Assistance and Bill of Rights (PADD) Act, 42 U.S.C. § 15001, *et seq.*; and the Protection and Advocacy for Individual Rights (PAIR) Act, 29 U.S.C. § 794e.

As DRTx meets the federal statutory requirements for accessing the requested records and there are no genuine issues of material fact with respect to DRTx's claims, DRTx is entitled to its requested declaratory and injunctive relief as a matter of law.

## II.     STANDARD OF REVIEW

Summary Judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). A party opposing a properly supported summary judgment motion bears the burden of establishing the existence of a genuine issue of material fact. *Id.* at 249-50. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to return a [judgment] for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (internal citations omitted).

## III.     STATEMENT OF MATERIAL FACTS

### A.     The Civil Role of Peace Officers in Evaluating and Transporting Individuals with Mental Illness in Texas.

In Texas, *only* peace officers are authorized to civilly involuntarily detain individuals with mental illness in the community and transport them to a mental health facility for further evaluation and mental health treatment.[2] TEX. HEALTH & SAFETY CODE §§ 573.001, 573.012(d), (e).[3] Peace officers serving this civil function have the authority to detain and transport a person with mental

---

[2] Exhibit A, Deposition of EPPD CIT Officer Maria Delgado (Dep. CIT Ofcr. Delgado) p16 ln5-9, p16 ln22–p17 ln1. Officer Delgado is an officer on the specially-trained Crisis Intervention Team and has had extensive additional training on the laws, rules, polices, and practices governing interacting with individuals with mental illness. *Id.* at p20 ln17-p21 ln1.

[3] While no one else can detain someone in the community, the Mental Health Code provides two infrequently used alternative means for transport: (1) in the unlikely event the person has a guardian appointed, a guardian can transport the person, and (2) if a law enforcement agency has a written agreement with emergency medical services, emergency medical services can transport a person. TEX. HEALTH & SAFETY CODE §§ 573.003, 573.005. Neither of these situations was present in this case.

2

illness pursuant to either a peace officer's warrantless detention or a magistrate's order for emergency detention.[4] *Id.* Collectively, these two means to evaluate and detain persons with mental illness for transport to a mental health facility are referred to as "emergency detentions."[5] *See id.* at Cн. 573.

A peace officer's warrantless detention occurs when an officer encounters a person they believe has mental illness who, because of that mental illness, is believed to pose a substantial risk of serious harm to themselves or others unless the officer immediately detains them for transport to a mental health facility.[6] *Id.* at § 573.001(a). The peace officer can make these two determinations—that the person has a mental illness and is acting in a way that is dangerous to themselves or others—based on their own evaluation of the person or based upon a third party's report the police officer has evaluated and determined is credible.[7] *Id.* at § 573.001(c). Once they detain the person, the peace officer *must* transport them to a mental health facility for further evaluation.[8] *Id.* at § 573.001(d).

Under a magistrate's warrant for emergency detention, a magistrate has determined there is reasonable cause to believe the person has a mental illness and, because of that mental illness, poses a substantial risk of serious harm to themselves or others.[9] *Id.* at § 573.012(b). The warrant directs a peace officer to immediately apprehend and transport the individual to a mental health facility for further evaluation and treatment.[10] *Id.* at § 573.012(d), (e).

---

[4] *Id.* at p15 ln15-19, p16 ln17-21; Exhibit B, Deposition of EPPD Officer Daisy Gonzales (Dep. Ofcr. Gonzalez) p17 ln8-13, p19 ln14-18; Exhibit C, Deposition of EPPD Officer Richard Escobar (Dep. Ofcr. Escobar) p12 ln25-p13 ln4, p13 ln12-16.

[5] Exhibit A, Dep. CIT Ofcr. Delgado p14 ln23– p15 ln2; Exhibit B, Dep. Ofcr. Gonzalez p16 ln11-15; Exhibit C, Dep. Ofcr. Escobar p12 ln4-11.

[6] Exhibit A, Dep. CIT Ofcr. Delgado p15 ln3-9; Exhibit B, Dep. Ofcr. Gonzalez p16 ln20-p17 ln1; Exhibit C, Dep. Ofcr. Escobar p12 ln12-18.

[7] Exhibit A, Dep. CIT Ofcr. Delgado p15 ln10-14; Exhibit C, Dep. Ofcr. Escobar p12 ln19-24.

[8] Exhibit A, Dep. CIT Ofcr. Delgado p15 ln15-19; Exhibit B, Dep. Ofcr. Gonzalez p17 ln8-13; Exhibit C, Dep. Ofcr. Escobar p12 ln25-p13 ln4.

[9] Exhibit A, Dep. CIT Ofcr. Delgado p16 ln10-16; Exhibit B, Dep. Ofcr. Gonzalez p18 ln3-9; Exhibit C, Dep. Ofcr. Escobar p13 ln5–11.

[10] Exhibit A, Dep. CIT Ofcr. Delgado p16 ln17-21; Exhibit B, Dep. Ofcr. Gonzalez p19 ln14-18; Exhibit C, Dep. Ofcr. Escobar p13 ln12-16.

An emergency detention is a civil matter—the person is not under arrest or charged with a crime, the Mental Health Code sets forth the laws governing the conduct of peace officers during emergency detentions, and documents filed in connection with the emergency detention are filed in the civil/probate court (if any). *Id.* at CH. 573; § 573.012(a), (i).

EPPD officers regularly conduct emergency detentions. For example, in the year 2020, EPPD officers responded to 3,079 emergency detentions.[11] The vast majority of these were peace officer's warrantless detentions, with only 107 of 3,079 resulting from a magistrate's warrant.[12] All EPPD officers are trained on how to interact with individuals with mental illness as well as evaluate, detain, and transport them under both types of emergency detentions.[13]

**B.      EPPD Encountered E.C. While Conducting a Civil Emergency Detention for Transport to a Mental Health Facility.**

In the late afternoon of May 22, 2020, E.C.'s mother called EPPD to request an emergency detention of E.C.[14] She requested officers transport E.C. to a mental health facility and told them there

---

[11] Exhibit E, Defendant Greg Allen, in his Official Capacity as the Police Chief of the El Paso Police Department's Objections and Responses to Plaintiff's First Set of Interrogatories (Def. Resp. Interr.) Answer to Question 5(c).

[12] *Id.* at Answer to Question 5(g).

[13] Exhibit A: Dep. CIT Ofcr. Delgado p13 ln16-p14 ln16, p18 ln17-p19 ln9; Exhibit B: Dep. Ofcr. Gonzalez p11 ln4-10, p11 ln11-p12 ln13, p14 ln10-p15 ln14; Exhibit C: Dep. Ofcr. Escobar p10 ln13-16, p10 ln20-p11 ln21, p14 ln18-p15 ln9. EPPD also has a designated group of officers accompanied by employees from the local mental health authority whose primary assignment is responding to calls for mental health assistance called the Crisis Intervention Team (CIT). Exhibit F, CIT Officer and Communication Dispatch Guidelines for CIT (Bates COEP651); Exhibit G, CIT Internal Position Announcement (Bates COEP653) at "General Purpose;" Exhibit A, Dep. CIT Ofcr. Delgado p22 ln3-14, p23 ln4-12. There are not enough CIT Officers to handle all mental health calls—for example, in 2020, CIT officers responded to only 1,307 of the 3,079 emergency detentions—so rank-and-file officers respond to persons with mental illness and evaluate, detain, and transport them to mental health facilities under emergency detentions in the regular course of their duties. Exhibit E, Def. Resp. Interr. Answer to Question 5(c); Exhibit A, Dep. CIT Ofcr. Delgado p24 ln23-p25 ln2.

[14] Exhibit H, EPPD Event Information for May 22-23, 2020 (Event Info) (Bates COEP673) Event Remark at 5/22/20 17:42:56 ("Emerg. Det. Order for Son [E.C.]…"); Exhibit I, EPPD Event Chronology for May 22-23, 2020 (CAD) (Bates COEP681) Entry at 5/22/20 17:42:56 ("Emerg. Det. Order for Son [E.C.]…"); *Id.* at 17:43:14 (providing caller information and noting "Mother").

was a magistrate's warrant for E.C.'s detention and transport to a mental health facility.[15] Officers were dispatched to E.C.'s home.[16] Though there was some confusion whether officers were dispatched to transport E.C. pursuant to a peace officer's warrantless detention or a magistrate's warrant,[17] the officers who were initially dispatched to E.C.'s home understood they were there to civilly detain E.C. for transport to a mental health facility.[18] Officers Escobar, Gonzalez, and Martinez arrived first.[19]

Shortly after these officers entered the home to detain E.C. for transport to a mental health facility, E.C. retreated into a bathroom with a knife.[20] When the Crisis Intervention Team (CIT) arrived, consisting of Officer Delgado and local mental health authority specialist Moya, "Officer Escobar asked the CIT specialist what CIT does in this sort of situation. It was explained to [O]fficer Escobar that CIT specialist and officer would wait [E.C.] out and attempt to communicate with him to have him drop the knife and exit the room."[21] The CIT members began to do just that—speak to E.C. through the door to try to have him come out so that they could transport him to a mental health facility.[22] Officer Delgado spoke aloud to him and, after learning from family members that E.C. did not speak but communicated through a tablet, CIT Specialist Moya began additionally communicating with him by text message.[23] After these attempts to have E.C. come out did not immediately work,

---

[15] Exhibit H, Event Info (Bates COEP673) Event Remark at 5/22/20 17:43:06 ("Wants him taken to UBH or Rio Vista" Hospitals); Exhibit I, CAD (Bates COEP681) Entry at 5/22/20 17:43:06 (same); Exhibit C, Dep. Ofcr. Escobar p18 ln16-21.

[16] Exhibit I, CAD (Bates COEP681) Entry at 5/22/20 17:55:52 (first unit dispatched); Exhibit E: Def. Resp. Interr. at Answer to Question 2 (CIT was dispatched).

[17] Exhibit A, Dep. CIT Ofcr. Delgado p32 ln21-p33 ln1.

[18] *Id.* at p34 ln1-4; Exhibit B, Dep. Ofcr. Gonzalez p25 ln7–17; Exhibit C, Dep. Ofcr. Escobar p19 ln4-9; Exhibit J, EPPD Incident/Investigation Report for May 22, 2020 (Police Report) at 2 ("Mission Valley Units were dispatched to [E.C.'s home] in reference to executing an emergency detention order.").

[19] Exhibit C, Dep. Ofcr. Escobar p18 ln22-p19 ln3.

[20] *Id.* at p19 ln11-19; Exhibit B, Dep. Ofcr. Gonzalez p26 ln6-11.

[21] Exhibit K, Emergence Health Network TASCI Triage Assessment Notes from May 22, 2020 written by Briana Monrreal/Moya (EHN Notes) at 2.

[22] *Id.*;  Exhibit A, Dep. CIT Ofcr. Delgado p40 ln11-18.

[23] Exhibit K, EHN Notes at 2; Exhibit A, Dep. CIT Ofcr. Delgado p41 ln3-22.

the ranking officer on scene ordered officers to breach the bathroom in order to ensure E.C.'s safety.[24] When EPPD officers breached the bathroom, their continuing purpose for doing so was to detain and transport E.C. to a mental health facility under an emergency detention.[25] E.C. refused to come out of the bathroom and was shot with a bean-bag gun, taser, and firearm,[26] causing injuries that several hours later, on May 23, 2020, required transporting E.C. directly to a hospital where he required surgery for the gunshot wounds to his hands.[27] Due to his actions while resisting being detained for transport to a mental health facility, E.C. was criminally charged, though charges have been dropped.[28]

### C. DRTx's Investigation into the Complaint of Abuse of E.C.

A few days after the incident, DRTx received a complaint that EPPD officers abused E.C. during the course of emergency detaining him for transport to a mental health facility.[29] DRTx received this complaint as the designated P&A organization for the State of Texas that is mandated, pursuant to the P&A Acts, to investigate complaints of abuse and/or neglect of persons with disabilities including mental illness.[30] 42 U.S.C. § 10805(a)(1).

DRTx opened an investigation and requested records from EPPD in furtherance of its investigation and pursuant to its federal P&A authority.[31] The requested records are "all

---

[24] Exhibit B, Dep. Ofcr. Gonzalez p26 ln25–p27 ln8; Exhibit C, Dep. Ofcr. Escobar p21 ln14-19.

[25] Exhibit C, Dep. Ofcr. Escobar p21 ln20-25.

[26] Exhibit A, Dep. CIT Ofcr. Delgado p43 ln12-15; Exhibit B, Dep. Ofcr. Gonzalez p27 ln25-p28 ln3; Exhibit K, EHN Notes at 2.

[27] Exhibit I: CAD (Bates COEP730-732) Entry at 5/23/20 at 04:03:06 (E.C. has gunshot wound); *Id.* at 04:07:46 (medics located entry and exit wounds from gunshots); *Id.* at 04:16:02 (medics advised will be transporting him to Del Sol Hospital); Exhibit L, Del Sol Hospital Records after Interaction with EPPD on May 22-23, 2020 at 2, 7 (describing extensive injuries to hands); *Id.* at 11 (hands required surgery).

[28] Exhibit P: *State v. E.C.*, Cause No. 20200D06531 in the 384th District Court of El Paso, Texas, Motion and Order Dismissing Charges.

[29] Plaintiff's Original Complaint (ECF No. 1) (Complaint) ¶¶ 1, 22.

[30] Complaint ¶¶ 2, 8, 23; Defendant's Original Answer to Plaintiff's Civil Complaint (ECF No. 5) (Answer) at § 2 ¶ 8 (admits DRTx is the designated P&A for Texas and has Congressional mandate to protect and advocate for the civil rights of persons with disabilities).

[31] Complaint ¶ 22. After attempting to talk to E.C., DRTx originally requested records under 42 U.S.C.

records…from the incident on or around May 22, 2020" including but not limited to the full police report, the dispatch call details and summary, body camera footage, and all documents related to E.C.'s emergency detention.[32] EPPD provided the limited public report and (after a Texas Attorney General opinion) search warrants, but otherwise has refused to provide the requested records necessary for DRTx to conduct its federally-mandated investigation.[33] As Police Chief for the EPPD, Defendant Allen is the duly-appointed administrator of the EPPD and its officers, employees, and contractors and is responsible for their training, supervision, and conduct, as well as for ensuring EPPD complies with federal and state laws including the P&A Acts.[34]

Because none of the foregoing material facts are in dispute and the law as set forth below establishes DRTx's right to the requested records, this Court should award DRTx summary judgment as a matter of law as to both its prayed-for declaratory and injunctive relief.

## IV.    ARGUMENT AND AUTHORITIES

**A.    The History of the P&A System Establishes the Basis for DRTx's Authority to Access Otherwise Confidential Records.**

Congress enacted the P&A Acts and charged P&As with their duties following extensive congressional investigations into conditions affecting persons with mental illness and developmental disabilities that uncovered pervasive and rampant abuse. S. Rep. No. 99-109, at 2-3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1362-63. Specifically, Congress found that "individuals with mental illness are vulnerable to abuse and serious injury" and are "subject to neglect, including lack of treatment…[and] health care…." 42 U.S.C. § 10801(a)(1), (3). Congress explicitly found that other

---

§ 10805(a)(4)(B), providing access to records of a person who lacks capacity to consent to release of their records and does not have a guardian. Exhibit M, July 23, 2020 Original DRTx Request for Records (Original Request). During the course of this suit, E.C. regained capacity and has consented for DRTx to access his records. Exhibit N, E.C.'s Signed Release of Information for EPPD. DRTx is now entitled to records based on consent of a person under 42 U.S.C. § 10805(a)(4)(A).

[32] Exhibit M, Original Request.

[33] Joint Case Management Report (ECF No. 9) at § 3 Def. Defenses (admits to withholding records).

[34] Complaint (ECF No. 1) ¶ 9; Answer (ECF No. 5) § 2 ¶ 9.

7

systems were inadequate to investigate, monitor, and protect the rights of individuals with mental illness. *Id.* at (a)(4); *see also* S. Rep. No. 99-109, at 4, 7 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1364, 1367. Based on these findings, Congress mandated that P&A systems investigate abuse, neglect, injury, and deaths of persons with disabilities. 42 U.S.C. § 10805(a)(1). The P&A's investigatory powers are, accordingly, broad in order to accomplish these goals. *Disability Rights Tex. v. Bishop,* -- F.Supp.3d.--, No. 1:21-CV-124-H, 2022 WL 2817983, at *4 (N.D. Tex. July 19, 2022).

As the P&A system for Texas, DRTx's federal mandate is not simply pro forma, rather it must operate as an effective P&A system for Texans with disabilities. *See Miss. Prot. & Advoc. Sys., Inc. v. Cotten*, 929 F.2d 1054, 1058 (5th Cir. 1991).[35] Congress thus equipped P&As like DRTx to effectively fulfill their investigative mandate by providing them "with two distinct investigatory powers…subject to PAIMI: monitoring-access authority and records-access authority." *Bishop*, -- F.Supp.3d --, 2022 WL 2817983 at *4; 42 U.S.C. §§ 10805(a)(3), (4), 10806; 42 U.S.C. § 15043(a)(2)(I) –(J), (c).

**B.    The Plain Language of the P&A Acts, Their Regulations, and Case Law Establish that DRTx is Entitled to the Records at Issue as a Matter of Law.**

**1.    *DRTx is mandated to investigate abuse of "individuals with mental illness."***

The PAIMI Act mandates DRTx "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system…." 42 U.S.C. §§ 10801(b)(2)(B); 10805(a)(1)(A). Under the plain language[36] of the PAIMI Act, an "individual with mental illness" has

---

[35] The court was examining PADD Act language at 42 U.S.C. § 6042 (now at 42 U.S.C. § 15043(a)(1)) that states: "the State must [shall] have *in effect* a system to protect and advocate the rights of individuals with developmental disabilities." (emphasis added). The court reasoned that use of the term "in effect" describes the barebones minimum required of the state system; therefore, the system must be an effective system. *Cotten*, 929 F.2d at 1058. *See also, The Advocacy Ctr. v. Stalder*, 128 F. Supp. 2d 358, 367 (M.D. La. 1999)("The PAIMI Act requires an 'effective' system of advocacy.").

[36] When interpreting a statute, courts should first look to the plain language of the statute itself as it is presumed that Congress expresses its intent through the ordinary meaning of its language. *FMC Corp. v. Holliday*, 498 U.S. 52, 57 (1990), *quoting Park n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985)("[We] begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."); *K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)("In ascertaining the plain meaning of the statute, the court must look to the

always explicitly included a person with mental illness "who is in the process of being admitted to a facility rendering care or treatment, *including persons being transported to such a facility.*" *Compare* 42 U.S.C. § 10802(4)(B)(i)(II) (1986) *with* 42 U.S.C. § 10802(4)(B)(i)(II) (2000) (same) (emphasis added); *see also Prot. & Adv. for Persons with Disabilities v. Armstrong*, 266 F.Supp.2d 303, 308, 322 (D. Conn 2003) (affirming authority of P&A to access records of person who died while being transported). As set forth above, it is undisputed that Texas state law delegates to peace officers, including EPPD officers, transport of people with mental illness to mental health facilities on emergency detentions.

In 2000, Congress considered the "tremendous advances in treatment services for mental illness [since PAIMI's original passage that] have allowed persons with mental illness to receive needed treatment in the community" and accordingly amended the PAIMI Act, broadening the scope of who could be served under the Act. S. Rep. 106-196, 26 (2000). An "individual with mental illness" now also specifically includes an individual "who lives in a community setting, including their own home." 42 U.S.C. § 10802(4)(B)(ii). The 2000 amendments were also intended to ensure that P&As would have the same authority as provided pursuant to the PADD Act, which directs that a P&A shall be authorized to investigate suspected abuse or neglect at *any* location providing services or support to a person with a disability. S. Rep. 106-196, 26 (2000); 42 U.S.C. § 15043(a)(2)(H).

Courts interpreting "individual with a mental illness" after the 2000 Amendments have rejected limiting the authority of P&As to investigating complaints about and accessing records only for individuals in residential facilities, finding that "Congress's clearly expressed intent [was] to provide protection and advocacy services for individuals with mental illness living in their *own homes.*" *Conn. Office of Prot. & Adv. for Persons with Disab. v. Hartford Bd. of Educ.*, 464 F.3d 229, 240 (2nd Cir. 2006)(emphasis added) (Sotomayor, J. writing for a unanimous court).[37]

---

particular statutory language at issue.").

[37] *See also Ala. Dis. Adv. Prgm v. SafetyNet Youthcare, Inc.*, 65 F.Supp.3d 1312, 1323 (S.D. Ala 2014),

Thus, under the plain language of both the original and amended PAIMI Acts, consistent with legislative history and affirmed by courts, DRTx's mandate to investigate a complaint of abuse of a person with mental illness does not begin at a facility door, rather it begins wherever the person with the disability may be subject to abuse or neglect—while in the process of being transported to a mental health facility and/or in their own home. On May 22, 2020, E.C. was a person with mental illness living in the community whom officers were detaining for transport to a mental health facility and about whom DRTx received a complaint alleging abuse/excessive force. E.C. is, therefore, an "individual with mental illness" whose alleged abuse DRTx is mandated to investigate.

### 2. *PAIMI empowers DRTx with broad records-access authority to investigate the abuse and neglect of individuals with mental illness.*

Congress equipped P&As to effectively fulfill their investigative mandate by providing them with "unfettered access to 'all records'" of persons with disabilities, a tool "critical to the efficacy of efforts to protect and advocate" for individuals with disabilities. *Dunn v. Dunn*, 163 F. Supp. 3d 1196, 1211-12 (M.D. Ala. 2016) discussing 42 U.S.C. §§ 10805(a)(4), 10806; *see also* 42 U.S.C. § 15043(a)(2)(I)–(J), (c). Hence, the PAIMI Act's grant of access to "*all records*" of an individual with mental illness, like E.C. 42 U.S.C. § 10805(a)(4)(emphasis added); *see also* 42 U.S.C. § 15043(a)(2)(I)*; Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254, 266 (5th Cir. 2014)("[W]e think Congress meant what it said. 'All means all.'")(citation omitted). Thus, where the ordinary meaning of "all" means "the whole amount, quantity, or extent of;"[38] the plain language of the PAIMI Act provides DRTx with access to "the whole amount" or entirety of the records of a person with mental illness.

---

*reconsidered in part on other grounds in* 2015 WL 566946 (S.D. Ala. 2015) (noting that PAIMI protects individuals with mental illness "even [in] the patient's own home.").

[38] MERIAM WEBSTER DICTIONARY, Definition of "All" (2021) *available at* https://www.merriam-webster.com/dictionary/all. Fundamental canons of statutory construction instruct that in the absence of a statutory definition, courts give terms their ordinary meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979); *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 391 (5th Cir. 2002). To help clarify the ordinary meaning of words, it is common practice to consult dictionary definitions. *MCI Telecomm. Corp. v. AT&T Co.,* 512 U.S. 218, 225 (1994).

a. ***The statutory definition of "records" is non-exhaustive and non-constrained.***

Turning to the word "records," the PAIMI Act itself provides guidance on the types of documents that constitute "records" that P&As are entitled to access. Under PAIMI, "records"

> *includes* reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

42 U.S.C. § 10806(b)(3)(A)(emphasis added); *see also* 42 U.S.C. § 15043(c) (similar definition under PADD Act). By using the term "includes," Congress made clear that the term "records" is non-exhaustive and should not be constrained based on the examples listed in the definition. *See Bishop*, -- F.Supp.3d --, 2022 WL 2817983 at *5-6; *Iowa Prot. & Adv. Servs. v. Rasmussen*, 206 F.R.D. 630, 637 (S.D. Iowa 2001) (the words "but not be limited to" in the regulations describing P&A's access to records "in no way intends to limit what a [P&A] system is entitled to under the statute.").[39] Indeed, the argument that "records" under the PAIMI Act means only the three listed items—reports prepared by staff of a facility, reports prepared by an investigative agency, and discharge records—has been consistently rejected. *See Bishop*, -- F.Supp.3d --, 2022 WL 2817983 at *6; *Ctr. for Legal Advoc. v. Hammons*, 323 F.3d 1262, 1270 (10th Cir. 2003)("records" includes not only patient records, but also hospital records); *Hartford Bd. of Educ.*, 464 F.3d at 244-45 ("records" includes contact information for individuals with mental illness and their guardians).

Because "records" is not exhaustively defined in the PAIMI Act, courts must look to the ordinary meaning of the term "record." Modern usage of "record" includes "something that recalls or relates past events [and] an official document that records the acts of a public body or officer."[40]

---

[39] S*ee also American Surety Co. v. Marotta*, 287 U.S. 513, 517 (1933); *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206-07 (5th Cir. 1996)("including" is generally given an *expansive* reading, even without the additional if not redundant language of 'without limitation") (emphasis added).

[40] MERIAM WEBSTER DICTIONARY, Definition of "Record" (2021) *available at* https://www.merriam-

Based on this definition, official documents that record the acts of EPPD peace officers in the course of evaluating and/or detaining a person for transport under an emergency detention are clearly "records" under the PAIMI Act.

### b. *Agency interpretation of "records" includes "all records" related to detention and transportation by law enforcement.*

Though courts in cases like *Bishop, Hammons,* and *Hartford Board of Education* have repeatedly concluded that Congress's intent for the meaning of the word "records" under the PAIMI Act was for it to be non-exhaustive and not constrained is clear, assuming *arguendo* this were not the case, the regulations are consistent with the dictionary definition of "records" and state

> information and individual records…which *shall* be available to [DRTx] under the Act *shall include, but not be limited to*: information and individual records obtained in the course of providing intake, assessment, evaluation, supportive and other services, including medical records….

42 C.F.R. § 51.41(c)(1)(emphasis added). Where Congress expressly delegated rule-making authority to Health and Human Services (HHS), 42 U.S.C. § 10826(b), and this interpretation is a permissible interpretation in light of Congress's intent for effective P&A systems with broad records access, the regulations are entitled to deference. *See Bishop,* -- F.Supp.3d. --, 2022 WL 2817983 at *2-3, *10 (analyzing PAIMI regs under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.* 467 U.S. 837 (1984) and finding inclusion of video within definition of "records" was entitled to deference.)

When EPPD officers interact with, detain, and/or transport a person with mental illness to a mental health facility under an emergency detention, the records of their evaluating, assessing,[41] and

---

webster.com/dictionary/record.

[41] During the incident, officers were directed to evaluate E.C.'s safety in the bathroom out of concern that he was acting in a way that was dangerous to himself. Exhibit B, Dep. Ofcr. Gonzalez p26 ln25–p27 ln4; Exhibit C, Dep. Ofcr. Escobar p21 ln1-19. More generally, officers conducting a peace officer's warrantless detention are specifically required to evaluate the person to determine whether the officers believe they are a person with mental illness and that they are dangerous to themselves or others because of that mental illness. TEX. HEALTH & SAFETY CODE § 573.001(a).

providing "other services"[42] are "records" under the PAIMI Act.[43] Indeed, even if the regulation

providing for access to records of "services" were ambiguous, HHS's interpretive guidance to the

original PAIMI regulations is explicit that "*records of transporting entities*" are included in "all records" to

which P&As have full access. 62 Fed. Reg. 53548-01, 53559-60 (Oct. 15, 1997)(emphasis added). This

is a reasonable interpretation and is entitled to deference if the Court determines the law and rule are

ambiguous as to transportation being a "service."[44]

The fact that peace officers have other traditional law enforcement duties related to detection

or prosecution of crime does not change the analysis or make law enforcement records exempt from

the P&A Acts. Law enforcement is a service to the community,[45] and the PAIMI Act explicitly

expanded the persons whose abuse DRTx was mandated to investigate to include those in the

community. Where "abuse" under the PAIMI Act explicitly includes acts causing "injury," "the use

of excessive force" and "striking" someone,[46] DRTx has a duty to investigate incidents of excessive

---

[42] Reading this language along with the PAIMI Act's inclusion of persons being transported necessarily leads to the conclusion that "transport" is a "service" under the PAIMI Act.

[43] Even if one looks back to the non-exhaustive definition of records under 42 U.S.C. § 10806(b)(3)(A), there is reference to records from entities that provide "care and treatment." "Care and Treatment" is a term of art under the PAIMI Act regulations that means "services provided to…identify…mental illness…such as mental health screening [and] evaluation…even if only 'as needed.'" 42 C.F.R. § 51.2. Where EPPD officers conduct evaluations and provide services in furtherance of treatment, like transportation during an emergency detention, they are providing "care and treatment" under the PAIMI Act, affirming that their records are included within the records the P&A is entitled to access.

[44] The interpretive guidance regarding "records of transport" is a permissible interpretation of the regulations given the original PAIMI Act's inclusion of individuals being transported as persons whose abuse the P&A is mandated to investigate. 42 U.S.C. § 10802(4)(B)(i)(II); *see also Kisor v. Wilkie,* 139 S.Ct. 2400, 214-15 (2019) (where regulation is genuinely ambiguous and agency's interpretation is reasonable, reflects its authority, is expertise-based, and reflects fair and considered judgement, taking into account reliance interests and unfair surprise, agency's interpretation of its own regulation is entitled to deference.)

[45] "Service" means "the work performed by one that serves" and "contribution to the welfare of others." MERIAM WEBSTER DICTIONARY, Definition of "Service" (2021) *available at* https://www.merriam-webster.com/dictionary/service; EPPD's mission statement includes "provid[ing] services with integrity and dedication…" EL PASO TEXAS: POLICE DEPARTMENT HOMEPAGE *available at* https://www.elpasotexas.gov/police-department.

[46] 42 U.S.C. § 10802(1).

13

force by police interacting with and transporting individuals in mental health crisis in the community and to advocate to reduce or eliminate similar incidents in the future. To fulfill these duties, DRTx must be able to access the requested records. *See Bishop,* -- F.Supp.3d --, 2022 WL 2817983 at *8.

The fact that the records that result from an emergency detention like a police report and 911 recording are "general" law enforcement records made in the regular course of business also do not exempt them from the P&A Acts. The *Bishop* court, considering DRTx's access to jail records, explicitly rejected the argument that "records" under the PAIMI Act are only those created for care, treatment, or investigation, and instead affirmed DRTx's right to access records made in the normal course of business that were necessary for DRTx's abuse investigation. *Id.* at *4.

Here, EPPD officers' interaction with E.C. on May 22, 2020 indisputably began with officers acting in their civil, emergency detention transport-to-a-facility role. DRTx's authority to access E.C.'s records, and others like him, is established from the moment of the 911 call and/or the moment the magistrate signs the warrant for emergency detention. Subsequent criminal justice interests that arise do not change DRTx's authority.[47] Holding otherwise would violate the plain language of the PAIMI Act affording DRTx access to "all records." 42 U.S.C. § 10805(a)(4).

c. ***Excluding peace officer emergency detention transport-related records from the PAIMI Act would "render as meaningless" DRTx's mandate to investigate abuse of individuals with mental illness.***

Excluding peace officer emergency detention transport-related records from the auspices of the PAIMI Act would "render as meaningless" PAIMI's inclusion of "persons being transported to" a facility in the definition of "individual with mental illness," in violation of canons of basic statutory construction. *See White v. Black*, 190 F.3d 366, 368 (5th Cir. 1999). As noted above, *only* peace officers

---

[47] Indeed, if P&A access turned on whether charges were subsequently filed against someone who was abused or injured during an emergency detention, peace officers would be incentivized to file charges against anyone whose records they wanted to shield from P&A access. Such a "shield" would be contrary to the purpose of the P&A's existence and would create an absurd result.

in Texas have the authority to detain and transport individuals for mental health treatment. If peace officer records from emergency detentions are categorically excluded from "records" under the PAIMI Act, the requirement that DRTx investigate the abuse or neglect of "persons being transported to" a facility would be surplusage in the PAIMI Act as DRTx would be wholly unable to ever effectively investigate the abuse of a person with mental illness in the process of being transported for mental health treatment in Texas. Such a reading would likewise render meaningless Congress's 2000 amendments expanding PAIMI Act authority to investigate abuse and neglect to individuals living in the community for the same reasons. In other words,

> Congress sought to empower P&A organizations to 'investigate incidents of abuse and neglect of individuals with mental illness' generally and not only those incidents that are in a therapeutic…context. And given that abuse or neglect of individuals with mental illness can occur in many different settings, it is incredible that Congress would categorically exclude a broad range of non-therapeutic…conduct that constitutes abuse or neglect from a P&A organization's records-access authority. Such a result is clearly absurd….

*Bishop*, -- F.Supp.3d --, 2022 WL 2817983 at *8 (citations omitted). Where excluding law enforcement records from "records" under PAIMI creates an absurd result, this Court should this argument.

### d. *The PAIMI Act also requires access to investigative reports.*

While DRTx is entitled to the records created during or around the time of an emergency detention as discussed above, the PAIMI Act definition of "records" also includes "reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury…that include the steps taken to investigate such incidents…."[48] 42 U.S.C. § 10806(b)(3)(A). The regulations have reasonably interpreted this language to include not only the final report, but any report that describes abuse, neglect, or injury; the steps taken to investigate the incident; and the records and supporting

---

[48] As set forth above, because Congress intended P&As to investigate abuse of persons being transported to a mental health facility and in the community and "record" is not constrained to the exact items listed in 42 U.S.C. § 10806(b)(3)(A), the investigative reports DRTx is entitled to access are not limited to only those investigating abuse, neglect, or injury "occurring at a facility."

information relied upon in creating the report including personnel records, witness statements, and descriptions of evidence. 42 C.F.R. § 51.41(c)(2). DRTx is thus also entitled to any and all investigative reports and related documents that result if an emergency detention call is investigated by a police internal affairs department or other investigative body, either inside or outside of EPPD.[49]

Applied to E.C., EPPD Internal Affairs conducted an investigation into E.C.'s emergency detention[50] which resulted in his being injured after being shot with a bean-bag gun, taser, and firearm. The investigation was summarized in a report.[51] This investigation report describing the injury of E.C., steps taken to investigate the incident, and any supporting documents including personnel records, witness statements, and physical and documentary evidence reviewed are thus also "records" of a person with mental illness that DRTx is entitled to access.

In light of the foregoing, DRTx is entitled to "all" records EPPD creates or obtains in the course of conducting an emergency detention for transport to a mental health facility, including the full police report, 911 call recordings, photographs, body camera and other video,[52] all statements or reports given by or to EPPD employees, and internal affairs investigations, including but not limited to those from EPPD's response to E.C. in May 2020 that begins as an emergency detention. DRTx is therefore entitled to its requested declaratory relief as a matter of law.

### C.    DRTx's Duty to Maintain Records' Confidentiality Bolsters the Conclusion that it is Entitled to EPPD Records.

DRTx's statutory duty of confidentiality fully addresses any concerns about law enforcement interests that might be implicated by DRTx's accessing peace officer records. Specifically, in exercising

---

[49] For example, in accordance with this section, the Texas Rangers provided their report to DRTx.

[50] Exhibit E, Def. Resp. Interr. Answer to Question 4(c) (EPPD Internal Affairs conducted an "investigation into Officer Involved Shooting Review Team/ Use of Force Investigation").

[51] *Id.* at Answer to Question 4(f).

[52] The definition of "records" in the regulations specifically includes "records" in video, audio, and photographic form. 42 C.F.R. § 51.41(c); *see also Bishop,* -- F.Supp.3d -- , 2022 WL 2817983 at *7 (Texas federal court affirmed "records" under PAIMI Act includes jail security videos).

its P&A authority, a P&A is bound to maintain the confidentiality of records to the same extent as the original holder of the records (i.e. EPPD) is required by federal or state law. 42 U.S.C. § 10806(a); 42 C.F.R. § 51.45(a)(1); *see also Advoc. Inc. v. Tarrant Cnty. Hosp. Dist.*, No. 4:01-CV-062-BE, 2001 WL 1297688 at \*5 (N.D. Tex. Oct. 11, 2001); *Bishop,* -- F.Supp.3d --, 2022 WL 2817983 at \*11. Congress indicated that the purpose of these provisions is to ensure that P&As maintain the confidentiality of such records "in compliance with applicable State, Federal and local laws and the rules of any involved organization or institution which has legal responsibility for the records." S. Rep. No. 99-109, at 10 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1370.

Courts have recognized that releasing records to DRTx is not the same as releasing records to the public. The P&A Acts provide a careful balance between state concerns like criminal justice or confidentiality[53] and the need for P&A systems to access all records relevant to an investigation of abuse, neglect, injury, or death of a person with a disability. Indeed, at least one federal district court has explicitly rejected the assertion that turning records over to a P&A can compromise law enforcement functions, noting

> The Coroner's speculation that disclosing its records will somehow compromise criminal investigations statewide misunderstands the effect of PAIMI access. The P&A does not confiscate the coroner's records, make them unavailable to the criminal justice system, or in any way interfere with the coroner's ability to do her job. Access means only that, and nothing precludes a…coroner's office from continuing to fulfill its statutory duties while also complying with PAIMI.

*Matter of Disability Rights Idaho Request for Ada County Coroner Records Request Relating to the Death of D.T.*, 168 F.Supp.3d 1282, 1295-96 (D. Idaho 2016).

---

[53] Any confidentiality concerns are addressed by E.C.'s signed release of information authorizing DRTx to access his records. Moreover, several courts have noted that, due to the confidentiality requirement common to both the P&A and the holder of records, a P&A's possession of the information is no more troubling in terms of privacy than the original holder's possession. *Dis. Rts. Wisc., Inc. v. State of Wisc. Depart. of Public Instruc.,* 463 F.3d 719, 729 (7th Cir. 2006); *See also Bishop,* -- F.Supp.3d --, 2022 WL 2817983 at \*12.

Providing DRTx with records from law enforcement involved in emergency detentions like E.C.'s would in no way impede EPPD's investigation into any alleged crime that occurred during the emergency detention, either by the person being detained or anyone else, as DRTx could not and would not release the records to anyone to whom EPPD itself would not release them.

**D. DRTx Is Entitled to a Permanent Injunction Enjoining Defendant from Denying DRTx's Immediate Access to E.C.'s Records.**

Having established the merits of DRTx's claim, that it is entitled to a declaration of its authority to access peace officer records related to the emergency detention and transport of persons with mental illness, DRTx turns to the remaining permanent injunction requirements.

A plaintiff seeking a permanent injunction must demonstrate, in addition to succeeding on the merits, that it has suffered irreparable injury, there is no adequate remedy at law, "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and the public interest is not disserved by the injunction. *eBay Inc., et al. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

**1. *Defendant's conduct has irreparably harmed DRTx and there is no other adequate remedy at law besides the prayed-for injunction.***

Defendant's refusal to produce E.C.'s records prevents DRTx from investigating the allegation of abuse of E.C. and constitutes an irreparable injury for which there is no other adequate remedy at law. Numerous courts, including a Texas federal district court, have agreed that full, robust access to records is necessary for a P&A to conduct a thorough investigation and that denial of records constitutes an injury to that interest. *Bishop*, -- F.Supp.3d --, 2022 WL 2817983 at *12 ("A host of federal authority holds that irreparable harm exists when a P&A system is unable to fulfill its investigative mandate under federal law…" quoting *J.H. ex rel Gray v. Hinds Cnty.*, No. 3:11-CV-327-DPJ-FKB, 2011 WL 3047667 at *2 (S.D. Miss. July 25, 2011)(collecting cases)).[54]

---

[54] See also *Disability Rights Ohio v. Buckeye Ranch*, 375 F.Supp.3d 873, 897 (S.D. Ohio 2019) ("[T]here is

Courts have also consistently determined P&As have no other adequate remedies at law to address their injuries other than injunctions like DRTx has prayed for here. *See, e.g., Bishop,* -- F.Supp.3d --, 2022 WL 2817983 at * 12 ("[I]t is obvious that monetary damages are inadequate to compensate for a P&A organization's inability to access records that it is entitled to under federal law…").[55]

## 2. *Balancing the burdens on each party and considering the public interest favors the Court's granting DRTx's request.*

The remaining considerations for a permanent injunction likewise establish DRTx's entitlement to one. The burden on DRTx if it is not given access to E.C.'s records is substantial; as set forth above, without the requested records it cannot fulfill its mandate under federal law to investigate a serious complaint of abuse. Conversely, the burden on Defendant is minimal—Defendant has already preserved the requested records[56] and, as discussed above, DRTx has a federal duty to keep the records confidential. Indeed, there can be no undue burden associated with requiring an official to comply with a law they are already bound to follow. *Stalder*, 128 F.Supp.2d at 368; *see also, Wisc. Coalition for Advocacy, Inc. v. Czaplewski*, 131 F.Supp.2d 1039, 1052 (E.D. Wisc. 2001) (Releasing records to P&A would have the opposite effect of harm as complying with law would protect defendants from action related to violating cited regulations).

The public interest is likewise benefitted by release of the requested records to DRTx. El Paso faces a significant and pressing problem concerning its police interaction with individuals during mental health crises. Between 2014 and 2018, at least four lawsuits were filed involving the use of deadly force by El Paso police officers during mental health crises where three men were killed and

---

no dispute that a P&A system's 'inability to meet its federal statutory mandate to protect and advocate the rights of disabled people constitutes irreparable harm.'"); *Rasmussen*, 206 F.R.D. at 635 (S.D. Iowa 2001) (without regard to whether the investigation will ultimately confirm abuse, P&A is still irreparably harmed by being prevented from full access to records).

[55] *See also Stalder*, 128 F.Supp.2d at 367-68 (No adequate legal remedy available to remedy denial of records); *Armstrong*, 266 F.Supp.2d at 311, 322 (P&A had no adequate remedy at law to redress denial of records and was entitled to summary judgment and permanent injunction).

[56] Exhibit O, Email dated August 16, 2022 Confirming Records are Preserved.

one was shot multiple times.[57] E.C.'s case is yet one more example of EPPD officers' using deadly force against an individual experiencing a mental health crisis. DRTx plays an important public interest role by investigating incidents of abuse by police interacting with and transporting individuals during emergency detentions and advocating to reduce or eliminate similar incidents in the future. Indeed, the findings of the P&A Acts concerning the rampant abuse of persons with disabilities and the inadequacy of existing oversight entities are proof that it is in the public's interest for DRTx to complete its mandated investigation. 42 U.S.C. § 10801(a)(1), (3), (4); 42 U.S.C. § 15001(a)(5); *see also Buckeye Ranch*, 375 F.Supp.3d at 897 ("Congress has expressed that the public interest is satisfied by allowing P&A systems…access to [ ] records.").

Given the irreparable harm to DRTx, the lack of adequate remedy, the substantial burden DRTx faces if the permanent injunction is not granted, the nonexistent burden to Defendant, and the public's interest in ensuring that persons with disabilities are free from abuse and neglect, this Court should grant DRTx's requested permanent injunction enjoining Defendant from continuing to deny DRTx access to E.C.'s records.

## CONCLUSION

For the foregoing reasons, DRTx requests this Court grant its Motion for Summary Judgment and declare that Defendant's policy/practice of refusing to provide DRTx with any and all requested records of individuals with mental illness being detained and transported on mental health emergency detentions conducted by EPPD officers violates the P&A Acts. This Court should accordingly enter a permanent injunction enjoining Defendant from continuing to refuse DRTx access to E.C.'s emergency detention records in pursuit of its statutory obligation to investigate the complaint of abuse.

---

[57] Robert Moore, *El Paso taxpayers spend more than $1.7 million to defend police in four deadly force lawsuits*, EL PASO MATTERS, July 28, 2020, *available at* https://elpasomatters.org/2020/07/28/el-paso-taxpayers-spend-more-than-1-7-million-to-defend-police-in-four-deadly-force-lawsuits/.

DATED September 16, 2022.

Respectfully Submitted,

_[signature]_

**BETH L. MITCHELL**
State Bar No. 00784613
bmitchell@drtx.org
**LISA SNEAD**
State Bar No. 24062204
lsnead@drtx.org
DISABILITY RIGHTS TEXAS
2222 W. Braker Lane
Austin, Texas 78758
(512) 454-4816 (Austin Office)
(512) 454-3999 (Austin Fax)


**JENNIFER REIF**
State Bar No. 24072762
jreif@drtx.org
DISABILITY RIGHTS TEXAS
1500 McGowen, Suite 100
Houston, Texas 77004
(713) 974-7691 (Houston Office)
(713) 974-7695 (Houston Fax)


## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2022, a true and correct copy of the foregoing document was electronically filed using the Court's CM/ECF filing system, thus providing notice of electronic filing to the following:

**KYLE LASLEY**
Assistant City Attorney
State Bar No. 11966950
LasleyMK@elpasotexas.gov

**EVAN D. REED**
Assistant City Attorney
State Bar No. 24093018
ReedED@elpasotexas.gov
**AYANA I. ESTRADA**
Assistant City Attorney
State Bar No. 24115051
EstradaAI@elpasotexas.gov

**KARLA N. NIEMAN**
City Attorney
niemankm@elpasotexas.gov
EL PASO CITY ATTORNEY'S OFFICE
P.O. Box 1890
El Paso, Texas 79950-1890
Office: (915) 212-0033
Fax: (915) 212-0034

**ATTORNEYS FOR DEFENDANT**

BETH MITCHELL