UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **DISABILITY RIGHTS TEXAS**, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | |
| **PETER PACILLAS,** *in his official capacity* | § | **EP-21-CV-00211-DCG** |
| *as the interim Police Chief of the El Paso* | § | |
| *Police Department*, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Disability Rights Texas ("DRTx") moves for summary judgment on its claim against Defendant Peter Pacillas in his official capacity as the interim Chief of the El Paso Police Department ("EPPD").[1]  Mot., ECF No. 19; Reply, ECF No. 33.  Invoking 42 U.S.C. § 1983, DRTx requests declaratory and injunctive relief for Pacillas's alleged violation of the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801–10851, the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"),[2] 42 U.S.C. §§ 15001–15045, and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e (collectively, the "Protection and Advocacy Acts" or "P&A Acts").[3] Mot. at 20; Compl., ECF No. 1 ¶¶ 32–44.  Pacillas opposes DRTx's Motion.  Resp., ECF No. 31.

---

[1] DRTx originally sued then-Chief of EPPD Greg Allen.  Chief Allen has since passed away. Under Federal Rule of Civil Procedure 20(d), the Court automatically substituted Peter Pacillas as the proper defendant.  FED. R. CIV. P. 20(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.").

[2] PADD stands for Protection and Advocacy for Persons with Developmental Disabilities.

[3] Pacillas does not challenge DRTx's implicit assertion that § 1983 supplies an appropriate avenue for relief.  For a discussion on why DRTx can seek relief for Pacillas's alleged violation of the P&A Acts under § 1983, see *Prot. & Advoc. for Pers. with Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 312–13 (D. Conn. 2003); *Advoc. Ctr. v. Stalder*, 128 F. Supp. 2d 358, 365–66 (M.D. La. 1999).

Like so many others, this case arises from an interaction-gone-wrong between law enforcement officers and an individual with mental illness.[4]  E.C., who is DRTx's client, was experiencing a mental health crisis.  At E.C.'s mother's request, EPPD dispatched officers to his home.  EPPD officers arrived intending to apprehend and transport E.C. to a mental health facility.  But that did not happen.  After a short standoff, EPPD officers discharged three different weapons, striking and injuring E.C. with tasers, beanbags, and a bullet.  DRTx, invoking its investigatory authority under the P&A Acts, is investigating this incident as probable abuse and neglect that EPPD officers committed against E.C.  As part of its investigation, DRTx has requested certain records from EPPD related to the incident.  EPPD is withholding those records and asserting that DRTx lacks the authority under the P&A Acts to obtain them.

The Court first concludes there is no genuine dispute of material fact for a jury to resolve.  The Court then determines that the P&A Acts don't authorize DRTx to investigate abuse and neglect that EPPD officers allegedly committed against E.C.  The Court therefore **DENIES** DRTx's Motion.

---

"[E]ven if [DRTx's] § 1983 claim was defective in some way, . . . there is ample case law to support [DRTx's] [ ] power . . . to pursue its claims in a judicial forum simply under [PAIMI]."  *Armstrong*, 266 F. Supp. 2d at 313.

[4] *See, e.g.*, *Edmiston v. Culberson County*, 580 F. Supp. 3d 411, 418–20, 425 (W.D. Tex. 2022) (describing jail officers' alleged failure to administer a suicide screening for John Robert Schubert, Jr, an individual suspected of then-experiencing a mental health crisis; Mr. Schubert committed suicide while being held in jail); *Langiano v. City of Fort Worth*, No. 4:21-cv-00808-O, 2022 WL 6813630, at *3–4 (N.D. Tex. Sept. 10, 2022) (describing alleged incident where officers entered Tracy Langiano's motel room, a person who allegedly had a mental illness, was suicidal, and had a gun; an officer shot Mr. Langiano five times and he survived); *Sanchez v. Gomez*, EP-17-CV-133-PRM, 2020 WL 1036046, at *1–2 (W.D. Tex. Mar. 3, 2020) (describing alleged officer-involved killing of Erik Emmanuel Salas-Sanchez, an individual with mental illness); *Feliz v. El Paso County*, 441 F. Supp. 3d 488, 494–96 (W.D. Tex. 2020) (describing alleged failure of deputies and officers of the El Paso County Sherriff's Department to provide proper care, after a physical altercation, to Robert Gallegos, an individual whom the "Jail Annex psychologist [had] diagnosed" with a "cognitive disorder"; Mr. Gallegos died).

Because the Court concludes there is no genuine dispute of material fact, the Court is considering entering summary judgment in Pacillas's favor under Federal Rule of Civil Procedure 56(f)(1).  FED. R. CIV. P. 56(f)(1).  Before doing so, however, the Court will give the parties an opportunity to object within 14 days.[5]

## I.    BACKGROUND

### A.  Protection and Advocacy Acts

In the 1980s, acting in response to what Congress characterized as widespread mistreatment of people with mental illness, Congress took several steps to better understand the problem and enhance protections for those individuals.  *See, e.g.*, S. REP. NO. 99-109, at 1–3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1361–63; *see also* Amanda Peters, *Lawyers Who Break the Law: What Congress Can Do to Prevent Mental Health Patient Advocates from Violating Federal Legislation*, 89 OR. L. REV. 133, 133–45 (2010) (reviewing history of treatment of people with mental illness and the enactment of PAIMI).  Included in those steps was a nine-month investigation into the "conditions in state-operated facilities" that provided inpatient services for people with mental illness.  S. REP. NO. 99-109, at 1–3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1361–63.  After that investigation, Congress found, among other things, that "individuals with mental illness are vulnerable to abuse and serious injury" and that "State systems for monitoring compliance with respect to the rights of individuals with mental illness var[ied] widely and [we]re frequently inadequate."  42 U.S.C. § 10801(a)(1), (4).

---

[5] FED. R. CIV. P. 56(f) (allowing courts to *sua sponte* issue "summary judgment for a nonmovant" but only "[a]fter giving notice and a reasonable time to respond"); *see also Jackson v. Doubleback Transp.*, No. 1:17-00386-KD-B, 2019 WL 1993547, at *9 (S.D. Ala. May 6, 2019) (discussing the court's plan to enter summary judgment in favor of the nonmovant and providing the nonmovant "an opportunity to respond").

So Congress identified a remedial measure.  Each of the state-operated facilities Congress investigated had some type of internal advocacy system for patients, but Congress found that some facilities "were unable to investigate complaints adequately for various reasons" and that advocates had "limited authority" to "investigate certain complaints under state definitions of abuse and neglect."  S. REP. NO. 99-109, at 2–3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1362–63.  Advocates' limited authority, according to Congress, was "a serious impediment to effective protection of patients."  *Id.* at 1363.  Congress thus concluded there was "a need for an advocacy system independent of any service provider."  *Id.* at 1362.

Enter PAIMI.  Under its Spending Clause authority, Congress enacted PAIMI to (1) "ensure that the rights of individuals with mental illness are protected" and (2) help states "establish and operate a protection and advocacy system for individuals with mental illness."  42 U.S.C. § 10801(b), Pub. L. No. 99-319, Title I, § 101 (1986).  To receive funding under the Act, states must establish a protection and advocacy system ("P&A system" or "P&A organization").[6] 42 U.S.C. § 10804; *see also Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 250 (2011).  A state may choose to establish either a private nonprofit entity or a public institution as its P&A organization.[7] 42 U.S.C. §§ 10805(c)(1), 15044.  P&A organizations have a mission to, among other things, "investigate incidents of abuse and neglect of individuals with mental illness if the

---

[6] P&A organizations find their roots in a few congressional acts.  For example, to receive funding under the PADD Act, a state must "have in effect a system to protect and advocate the rights of individuals with developmental disabilities."  42 U.S.C. §§ 15043(a)(1), 15023, 15024.  PAIMI "extends the mission of P & A systems to include the mentally ill."  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 250 (2011); *see also* 42 U.S.C. § 10801(b)(2).

[7] Texas established DRTx as its P&A organization.  Compl., ECF No. 1 ¶ 8 (alleging DRTx is Texas's P&A organization); Answer, ECF No. 5 ¶ 8 (admitting that fact); *see also* Disability Rights Texas, *How We Began*, https://disabilityrightstx.org/en/about-us/how-we-began/ (last visited June 1, 2023).

incidents are reported to the [P&A] system or if there is probable cause to believe that the incidents occurred." *Id.* §§ 10801(b)(2)(B), 10805(a)(1)(A); *see also id.* § 15043(a)(2)(B).

As originally enacted, PAIMI limited P&A organizations' mission to protecting and advocating for people with mental illness living in residential or overnight facilities, such as mental health hospitals. Pub. L. No. 99-319, Title I, § 102(3)(B), 100 Stat. 478, 479 (1986) (covering "an inpatient or resident in a facility rendering care or treatment"). But after PADD and PAIMI's successes,[8] Congress twice expanded PAIMI's scope, once in 1988 and again in 2000. In 1988, Congress added to P&A organizations' purview the protection and advocacy of individuals with mental illness who are "in the process of being admitted" or are "being transported" to a mental health facility. *Compare* Pub. L. No. 99-319, Title I, § 102(3), 100 Stat. 478, 478–79 (1986), *with* Pub. L. No. 100-509, Title I, § 102(2)(C), 102 Stat. 2543, 2543 (1988).[9] The 2000 amendment "extend[ed] the responsibilities of the Protection and Advocacy program" to people with mental illness not living in inpatient or residential facilities. *See* S. REP. NO. 106-196, at 8 (1999); 42 U.S.C. § 10802(4)(B)(ii). P&A organizations can now advocate for

---

[8] *See, e.g.*, S. REP. NO. 106-196, at 25 (1999) ("This program has, since its inception in 1986, improved services for [persons with serious mental illness] through its proactive work on behalf of [those] individuals."); *id.* at 25–26 (explaining that although "[o]ver the past twenty years tremendous advances in treatment services for mental illness have allowed persons with mental illness to receive needed treatment in the community," amendments were needed to "expand[] the authority of [P&A systems]" because "there ha[d] not been a mechanism to ensure that [persons living in the community] [we]re receiving the care and advocacy services they need[ed]").

[9] "The intent of these changes [wa]s simply to extend coverage under the Act . . . ." S. REP. NO. 100-454, at 7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3217, 3223.

persons with mental illness who "live[] in a community setting, including their own home."[10]  42 U.S.C. § 10802(4)(B)(ii).[11]

To ensure P&A organizations would effectively accomplish their missions, Congress specified their privileges and authorities by statute.  First, Congress provided P&A organizations independence from state agencies that provide treatment or services to individuals with mental illness.  *Id.* § 10805(a)(2).  Second, Congress authorized P&A organizations to "pursue administrative, legal, and other appropriate remedies" on behalf of individuals with mental illness, *id.* § 10805(a)(1)(B), to access facilities that provide care or treatment, *id.* § 10805(a)(3), and to access their clients' records, *id.* §§ 10805(a)(4), 10806.

DRTx demands documents from EPPD under the PAIMI's record-access provision, which gives P&A organizations "access to all records of any individual who is a client of the system."  42 U.S.C. § 10805(a)(4); *see also Stewart*, 563 U.S. at 250–51 ("[A P&A system] must

---

[10] To implement P&A organizations' expanded mission, Congress added to the definition of "mentally ill individual," now "individual with mental illness."  *Compare* Pub. L. No. 99-319, Title I, § 102(3), 100 Stat. 478, 479 (1986), *with* Pub. L. No. 106-310, Title XXXII, § 3206(b)(1)(b)(iv), 114 Stat. 1101, 1194 (2000).  Before 2000, that definition focused on long-term residents of facilities providing care or treatment to people with mental illness; or, more specifically, to persons in an "inpatient or resident in a facility," persons "being admitted" or "being transported" to a facility, or persons "involuntarily confined in a municipal detention facility."  *Compare* Pub. L. No. 99-319, Title I, § 102(3), 100 Stat. 478, 478–79 (1986), *and* Pub. L. No. 100-509, Title I, § 102(2)(C), 102 Stat. 2543, 2543 (1988), *with* Pub. L. No. 106-310, Title XXXII, § 3206(b)(1)(b)(iv), 114 Stat. 1101, 1194 (2000).

[11] Regarding the 2000 amendment, the Senate Committee on Health, Education, Labor, and Pensions said that while "[t]he P&A systems would still give priority to those individuals residing in facilities that provide mental health services," the systems "would also be able to work on behalf of persons living at home" so long as the annual appropriation for the program is $30,000,000 or more.  S. REP. NO. 106-196, at 25–26 (1999).  The Act directly reflects the Committee's intention: "The definition of 'individual with mental illness' contained in section 10802(4)(B)(iii) [sic] of this title shall apply, and thus an eligible system may use its allotments under this subchapter to provide representation to such individuals, only if the total allotment under this subchapter for any fiscal year is $30,000,000 or more." 42 U.S.C. § 10804(d).  Although that subsection cross-references 42 U.S.C. § 10802(4)(B)(iii), that provision does not exist.  The Court assumes Congress intended to reference section 10802(4)(B)(ii). The Court has not found an unenacted section 10802(4)(B)(iii) in the legislative history.

be given access to all records of individuals who may have been abused as well as other records that are relevant to conducting an investigation." (quotations omitted)).

### B. Factual Background[12]

Because this case raises novel questions about the scope of P&A organizations' authorities, some context is helpful. The Court will discuss the role EPPD plays in the community with respect to individuals with mental illness before turning to the incident that brought about this case.

#### 1. EPPD's Role in the Community

In Texas, peace officers have the authority, under certain circumstances, to involuntarily detain people with mental illness.[13] Officers can detain people with mental illness with or without a warrant, subject to certain statutory requirements.[14] Officers' power is fairly broad. In the warrantless context, for example, only peace officers have the authority to detain someone with a mental illness.[15] Whether an officer detains someone with or without a warrant, the

---

[12] The Court takes these facts from the summary judgment record and views them in the light most favorable to the nonmovant—here, Pacillas. *E.g.*, *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020).

[13] TEX. HEALTH & SAFETY CODE §§ 573.001, 573.012(d)–(e).

[14] *Id.* §§ 573.001 (detention without a warrant), 573.012 (detention with a warrant); *see also* Officer Maria Delgado Dep., Mot. Ex. A, ECF No. 23 at 14:23–15:2, 16:5-9.

To detain someone with mental illness under a warrant, an officer must obtain that warrant from a judge or magistrate. To issue such a warrant, the judge or magistrate must find that (1) the subject of the warrant has a mental illness, (2) there's a substantial risk they will seriously harm themselves or others, (3) the risk of harm is imminent, and (4) "restraint cannot be accomplished without emergency detention." TEX. HEALTH & SAFETY CODE § 573.012(b).

To detain someone without a warrant, an officer must have "reason to believe," and actually believe, that the person has a mental illness and "because of that mental illness there is a substantial risk" the person will seriously harm themselves or others. *Id.* § 573.001(a); *see also* Delgado Dep. at 15:3-14.

[15] *See* EPPD Procedures Manual § 409.9, Mot. Ex. D, ECF No. 20-4, *also available at* https://elpaso.municipalcodeonline.com/book?type=publicpolice#name=409_Mentally_Ill_Persons (last

officer must immediately transport the person to a mental health facility.[16]  EPPD calls the

detention of a person with mental illness "emergency detention" and a warrant authorizing an

emergency detention an "emergency detention order" ("EDO").[17]

EPPD's own policies further explain how its officers should interact with people with

mental illness.  The Department's Procedures Manual includes instructions on emergency

detention: "When officers have reason to believe a person poses a substantial risk of harm to

themselves or others . . . they may take that person into custody for the purpose of obtaining an

evaluation of the person's mental health and potential need for involuntary hospitalization."[18]

Consistent with Texas law, the Department's Procedures Manual instructs EPPD officers to

transport the person to a "psychiatric facility."[19]

---

visited June 6, 2023) ("Texas State law does not provide for any emergency detention of a person without
a warrant except under the authority of a Peace Officer.").

[16] TEX. HEALTH & SAFETY CODE. §§ 573.001(d) (requiring officer to "immediately . . . transport
the apprehended person to . . . the nearest appropriate inpatient mental health facility"), 573.012(e)
(similar); *see also* Delgado Dep. at 15:15-19.

In the case of warrantless detention, peace officers also have the authority to "transfer the
apprehended person to emergency medical services personnel of an emergency medical services
provider."  TEX. HEALTH & SAFETY CODE § 573.001(d)(2).

[17] *See, e.g.*, TEX. HEALTH & SAFETY CODE § 573.012(a); EPPD Procedures Manual § 409.3
(describing procedures for "obtaining an emergency detention warrant" as well as procedures for
"emergency detention without a warrant").

[18] EPPD Procedures Manual § 409.4.

[19] *Id.* §§ 409.3(B), 409.4, 409.7 (subsection specifically addressing transport of persons with
mental illness).

EPPD also trains its officers on how to interact with people with mental illness.[20]  This training includes instruction on emergency detention (with and without a warrant),[21] as well as the responsibility to take the detained person to an appropriate mental health facility.[22]

EPPD also has Crisis Intervention Teams ("CITs"), which are specially trained to "respond to incidents involving citizens with behavioral or mental health problems."[23]  CITs are made up of an EPPD officer and a civilian from a local mental health authority, Emergence Health Network.[24]  Among their many responsibilities, CIT officers are expected to handle calls for emergency detention.[25]  Broadly, part of a CIT's mission is "to prevent somebody's mental [health] crisis [from] turning into an incident."[26]  That said, EPPD officers, even CIT officers, do

---

[20] Delgado Dep. at 13:16-19, 13:25–14:16; Officer Daisy Gonzalez Dep., Mot. Ex. B, ECF No. 23 at 11:4–12:13; Officer Richard Escobar Dep., Mot. Ex. C, ECF No. 23 at 10:13–11:21; Officer Richard Escobar Aff., Resp. Ex. E at 2, ECF No. 31 ("I received trainings involving how to manage distress calls of individuals who may have a mental illness.  Those trainings are provided as a reminder to focus on de-escalating and to reach out to [Crisis Intervention Teams] for assistance."); Officer Daisy Gonzalez Aff., Resp. Ex. F at 2, ECF No. 23 (same).

[21] Delgado Dep. at 18:17–19:4; Gonzalez Dep. at 12:2-13 (general training in interaction with people with mental illness), 16:11–19:18 (familiarity with emergency detention procedures); Escobar Dep. at 12:2–14:14.

[22] *E.g.*, Delgado Dep. at 15:15-19 ("Q. Okay.  And once an officer has detained someone under the peace officer's warrantless detention, the peace officer must transport the person to the nearest appropriate mental health facility; is that right?  A. Correct."), 16:17-21 ("Q. Okay.  And the magistrate's warrant directs a peace officer to apprehend and transport the individual to the nearest appropriate mental health facility, correct?  A. Correct."), 18:25–19:9; Gonzalez Dep. at 17:8–18:2, 19:14-18; Escobar Dep. at 12:25–13:4, 13:12-16.

[23] *E.g.*, Internal Position Announcement: Crisis Intervention Team Officer, Mot. Ex. G at 1–2, ECF No. 20-7 (requiring CIT officers to "complete the CIT Training Curriculum").

[24] *E.g.*, Delgado Dep. at 23:3-22.

[25] *Id.* at 22:8-14, 24:18-22 (explaining that CIT officers respond "only to calls that are about mental health"); CIT Officer Guidelines, Mot. Ex. F at 1–2, ECF No. 20-6; *see also* Internal Position Announcement: Crisis Intervention Team Officer at 1–2.

[26] Delgado Dep. at 24:3-8; *see also* CIT Officer Guidelines at 2 ("CIT Officers are trained negotiators and may be the only trained negotiators in the field in a barricaded or crucial incident event and if they are aware of an incident unfolding should make it a priority to respond to the scene.").

not provide medical care or treatment when executing an EDO.[27]  Officers do, however,

transport any person they have detained under an emergency detention to a mental health

facility.[28]

### 2.  The Incident between EPPD and E.C.

On or around May 22, 2020, E.C. began experiencing a mental health crisis.[29]  Whatever

was happening led E.C.'s doctor to apply for an EDO from the El Paso County magistrate

court.[30]  E.C.'s mother then called 911 asking EPPD officers to pick up E.C. on the EDO and

transport him to a hospital or mental health facility.[31]  Dispatch called officers to the scene and

---

[27] Officer Maria Delgado Aff., Resp. Ex. D at 2, ECF No. 23 ("When responding to a mental health crisis I am not there as a mental health provider, I am not there to provide care or treatment, and I am not there to diagnose."); Gonzalez Aff. at 2 (same).

[28] *E.g.*, Delgado Aff. at 2 ("When responding to a distress call by a person who suffers a mental illness my role in the process is to take them into custody so I can transport them to the appropriate facility where they can receive care and treatment."); Escobar Aff. at 3 (same); Gonzalez Aff. at 2 (same).

[29] *See* Compl. ¶ 19 (alleging E.C. had a "psychiatric crisis" to which EPPD responded); Answer, ¶ 19 (admitting that fact); Warrant for Emergency Detention, Resp. Ex. B, ECF No. 32.

[30] Warrant for Emergency Detention at 1–2 (indicating that the magistrate signed the warrant on May 21, 2022); Crisis Intervention Team TASCI Triage Assessment Notes, Mot. Ex. K, ECF No. 23 ("[E.C.'s mother] reported [E.C.'s] doctor filed an EDO due to [E.C.'s] psychotic episodes.").

[31] Resps. & Objs. Pl.'s Interrogs., Mot. Ex. E at 1, ECF No. 23 (First Interrogatory); EPPD Event Chronology, Mot. Ex. I at 1, ECF No. 23 (noting that E.C.'s mother called about an "emerg[ency] det[ention] order for [her] son [E.C.]" and that she "want[ed] him taken to UBH or Rio Vista" hospital); Delgado Dep. at 32:10-16 ("From what I remember, I believe the mom had called 911 requesting assistance, saying that her son's doctor filed for a warrant, and that it had gotten approved."); Escobar Dep. at 18:16-21 ("Q. Okay.  And dispatch also told you, at that time, when you were responding, that, in addition to there being a magistrate's warrant, that EC's mother had called to have EPPD transport her son to a mental health facility, correct?  A. Yes."); Delgado Aff. at 1–2 ("My partner and I were called to the scene because the family of E.C. called 911 requesting help with E.C.  They communicated to dispatch that they had requested an Emergency Detention Order from a magistrate."); Escobar Aff. at 1–2 ("E.C.'s family called and told dispatch about an EDO they had requested."); Gonzalez Aff. at 1–2 (describing that a "family member . . . made the call" to dispatch to inform dispatch of an emergency detention order for E.C.).

told them that the call was for a "PCO,"[32] a term EPPD officers previously used to refer to an EDO.[33]

Apart from the EDO, E.C. had an outstanding arrest warrant from 2019 for resisting arrest.[34]  Notably, however, the summary judgment record—even when construed in the light most favorable to Pacillas—reflects that EPPD officers entered E.C.'s home to execute an EDO, not the 2019 warrant, as the Court will further explain.

EPPD Officer Richard Escobar arrived at E.C.'s home first.[35]  EPPD Officer Daisy Gonzalez and her partner arrived next.[36]  When all three entered the home to execute the EDO, E.C., who had a knife, retreated to a bathroom.[37]  Still, the officers' mission was to transport E.C. to a mental health facility.[38]

---

[32] Delgado Dep. at 32:10-16; Gonzalez Dep. at 20:13-20 ("Q. And you were dispatched to the call in reference to an emergency detention . . . is that correct?  A. Yes.  Q. Did dispatch provide you with any other information about the call that day?  A. No, ma'am.").

[33] *See, e.g.*, Delgado Dep. at 17:7–18:2; Gonzalez Dep. at 18:3-12, 19:8-10.

[34] El Paso Municipal Court Warrant Search, Resp. Ex. C, ECF No. 32.

[35] Escobar Dep. at 18:22-24; *see also* Gonzalez Dep. at 20:21–21:4.

[36] Gonzalez Dep. at 20:21–21:4; *see also* Escobar Dep. at 18:25–19:3.

[37] Escobar Dep. at 19:4-19 (agreeing that he entered E.C.'s home "to apprehend E.C." and "transport him to a mental health facility under" the emergency detention order and saying that he intended to accomplish this "as calmly as possible" in accordance with his training); Gonzalez Dep. at 21:5-7, 25:6-11, 25:21-23.  In her deposition, Officer Gonzalez first disputed that she entered E.C.'s home to execute the emergency detention order.  Gonzalez Dep. at 21:8-11; *see also id.* at 24:1-25.  She later clarified, however, that she was there to "evaluat[e] [E.C.] for the emergency detention," to "take EC to a mental health facility," and that she entered the house to support Officer Escobar, *id.* at 25:13-23; 26:1-5, who was there to execute the emergency detention order, *e.g.*, Escobar Dep. at 19:4-19.

[38] *E.g.*, Delgado Dep. at 34:20-25:

Q. [. . .] So, even after you heard that EC had a knife and had gone into the bathroom, were you still – the purpose of your response was still to apprehend and transport him pursuant to that magistrate's warrant of emergency detention?

A. Yes.

In accordance with that mission and EPPD's policies, EPPD had dispatched a Crisis Intervention Team to E.C.'s home.[39]  The CIT, consisting of Officer Maria Delgado and mental health Specialist Briana Moya,[40] began communicating with E.C.[41]  Due to E.C.'s mutism he was experiencing at the time, the CIT communicated with him over text message.[42]  The CIT attempted to calm E.C. and convince him to exit the bathroom without the knife.[43]

Things took a turn once Sergeant Grijalva arrived on the scene.[44]  After the CIT had been talking with E.C. for 30 minutes (give or take), Sergeant Grijalva commanded the CIT to stop trying to coax E.C. out of the bathroom[45] and ordered EPPD officers to forcibly enter the bathroom.[46]

---

[39] *E.g.*, Resps. & Objs. Pl.'s Interrogs. at 1 (Second Interrogatory); Crisis Intervention Team TASCI Triage Assessment Notes; EPPD Event Chronology at 51; Delgado Dep. at 30:11-17 ("Q. You were on the crisis intervention team that responded to that call, correct?  A. That's correct."); Delgado Aff. at 1 ("I am a peace officer for the City of El Paso and work for the El Paso Police Department on the Crisis Intervention Team ('CIT').  I am one of the officers who responded to the dispatch call involving E.C. on May 22, 2020."); *see also* CIT Officer Guidelines at 1–2.

[40] Briana Moya's name was Briana Monrreal at the time of the incident.  *See* Delgado Dep. at 30:14-16; Pl.'s Proposed Undisputed Facts, ECF No. 19-1 at 8.

[41] Crisis Intervention Team TASCI Triage Assessment Notes at 2; Delgado Dep. at 40:11-14; Gonzalez Dep. at 26:12-15 ("Q. After EC went into the bathroom, the CIT officer and specialist arrived and started trying to talk to EC, correct?  A. Yes."); Escobar Dep. at 20:10-25.

[42] Crisis Intervention Team TASCI Triage Assessment Notes at 2; Delgado Dep. at 41:3-15 ("Q. And at some point, [someone] told you or Ms. Monrreal that EC could hear you, but would only communicate through texting; is that accurate?  A. That's accurate."); *see also* Del Sol Medical Center Medical Report, Mot. Ex. L at 1, ECF No. 23.

[43] Delgado Dep. at 41:10-12; Crisis Intervention Team TASCI Triage Assessment Notes at 2.

[44] *E.g.*, Delgado Dep. at 42:10-16.

[45] Delgado Dep. at 42:23–43:11; Gonzalez Dep. at 27:5-8 ("Q. And so the decision to go into the bathroom, where EC was located, was Sgt. Grijalva's decision, then, as the ranking officer on the scene, correct?  A. Yes."); Crisis Intervention Team TASCI Triage Assessment Notes at 2.

[46] *See, e.g.*, Escobar Dep. at 21:9-13 (agreeing that Sergeant Grijalva "gave an order for officers to breach the bathroom"); Crisis Intervention Team TASCI Triage Assessment Notes at 2.

Officers entered the bathroom, and E.C., who still had a knife, potentially made quick and aggressive movements towards the officers.[47]  Officers shot E.C. with beanbags, tasers, and a bullet.[48]  At least one of the officers' beanbags hit E.C. in the left inner thigh,[49] and E.C. sustained non-fatal gunshot wounds to the left chest and hands.[50]

After learning that officers shot E.C. and that E.C. still had the knife, Sergeant Grijalva ordered all officers to clear the house.[51]  The CIT again began communicating with E.C. via text message, albeit with very short to no responses from E.C.[52]  Eventually, EPPD's SWAT team

---

Even after officers breached the bathroom their mission was "still to apprehend EC so that either [he] or one of [his] colleagues could take [E.C.] to a mental health facility under the magistrate's warrant for emergency detention."  Escobar Dep. at 21:20-25.

[47] The Court notes that E.C. "potentially" made movements towards the officers not because the evidence, viewed in the light most favorable to Pacillas, does not indicate E.C. did so—the evidence indicates E.C. did—but because it's not entirely clear from the timeline when E.C. did so.  *Compare* Incident / Investigation Report , Mot. Ex. J at 2, ECF No. 23 ("The officers gave loud verbal commands, but the offender disregarded the commands and went inside the bathroom.  The offender subsequently lunged at the officers with the knife."), *with* Event Information, Mot. Ex. H at 2, ECF No. 23 (indicating that EPPD officers injured E.C. early on in the timeline of events), *and id.* at 5–6 (describing EPPD's SWAT team's later interaction with E.C. during which time E.C. "stab[bed]" a "shield as [officers] were trying to move in").

[48] Gonzalez Dep. at 27:25–28:3; Escobar Dep. at 22:1-9; Event Information at 2 ("Subj[ect] was tazed and hit with bean bags but no effect when units first made c[ontac]t."); Incident / Investigation Report at 2 ("The officers used nonlethal and deadly force but it was ineffective."); Crisis Intervention Team TASCI Triage Assessment Notes at 2 ("Approximately 5 Patrol officers [] entered the room. [. . .] [E.C.] was then shot by officer Escobar, bean bagged twice by another patrol officer, and tasered twice by yet another patrol officer."); Del Sol Medical Center Medical Report at 6 ("[E.C.] sustained being tazed several times, being shot with a beanbag gun to the left inner thigh and then shot with a police side arm through the left anterior chest, left anterior axilla, left upper extremity and bilateral hands.").

[49] *See, e.g.*, Del Sol Medical Center Medical Report at 2 ("The patient was also found to have a large contusion to the left inner thigh from what appeared to be a beanbag gun.").

[50] *See, e.g.*, *id.* at 1 ("Chief complaint: Gunshot wound to left chest, axilla and arm as well as bilateral hands.").

[51] *See* Crisis Intervention Team TASCI Triage Assessment Notes at 2 ("Officer Escobar informed Sgt. Grijalva he had fired his gun at [E.C.].  Sgt. Grijalva immediately instructed everyone to clear the house."); Delgado Dep. at 43:12-19; Gonzalez Dep. at 28:4-9; Escobar Dep. at 22:10-13.

[52] Crisis Intervention Team TASCI Triage Assessment Notes at 2.

arrived and required the CIT to hand over the phone they had been using to communicate with E.C.[53]  At that point, the CIT's communications with E.C. ceased and they were "removed from the scene."[54]  EPPD's SWAT team then apprehended E.C.,[55] and noted in EPPD's records that they executed the outstanding 2019 arrest warrant for E.C., not the emergency detention order.[56]  Once in custody, E.C. "was transported to receive medical attention."[57]

### 3. DRTx Investigates and Requests Records

DRTx received a complaint within a few days after the incident.[58]  At that point, DRTx "had probable cause to believe E.C. was abused by EPPD officers,"[59] so DRTx opened an investigation into E.C.'s "possible abuse, neglect, or injury."[60]  On July 30, 2020, invoking its investigatory authority under the P&A Acts, DRTx asked EPPD to produce the following records:

> 1.  All records from El Paso Police Department from the incident on or around May 22, 2020 when officers responded to [E.C.] including but not limited to:
>
>     a.  The full police report,

---

[53] *Id.* at 2.

[54] *Id.*; *see also* Delgado Dep. at 43:22-24.

[55] Incident / Investigation Report at 2; Event Information at 5–7.

[56] Incident / Investigation Report at 2; El Paso Municipal Court Warrant Search (showing EPPD executed a 2019 probable cause warrant for "resist[ing] arrest[,] search or transport" on May 22, 2020 at 9:58 p.m. local time).

[57] Incident / Investigation Report at 2.

[58] Compl. ¶ 22.  Defendant does not dispute this fact.  *See generally* Resp.; Pl.'s Proposed Undisputed Facts; Pl.'s Facts Deemed Admitted, ECF No. 33-1.

[59] Compl. ¶ 22.  Defendant does not dispute this fact.  *See generally* Resp.; Pl.'s Proposed Undisputed Facts; Pl.'s Facts Deemed Admitted.

[60] Compl. ¶¶ 22, 37.  Defendant does not dispute that DRTx opened an investigation for these purposes.  *See generally* Resp.; Pl.'s Proposed Undisputed Facts; Pl.'s Facts Deemed Admitted.

  b. The dispatch call details and summary,

  c. The body camera footage from all officers who responded to the scene, and

  d. All emergency detention documents.[61]

EPPD continues to withhold many of the records DRTx requested because it maintains that the P&A Acts don't authorize DRTx to obtain them.[62]

## C. Procedural Background

DRTx filed this case on September 13, 2021, seeking declaratory and injunctive relief. Compl. ¶¶ 32–44. After failed settlement negotiations, *see* ECF No. 15, DRTx moved for summary judgment on its claim, *see generally* Mot.

## II. DISCUSSION

Pacillas argues the Court lacks jurisdiction to hear this case. Because the declaratory judgment standard incorporates jurisdictional considerations, the Court will begin there. The Court will then turn to DRTx's request for summary judgment and the question of whether DRTx has the authority under PAIMI to investigate the incident between E.C. and EPPD and therefore obtain the records it seeks from EPPD.

---

[61] Letter to EPPD re: Records of E.C. (July 23, 2020), Mot. Ex M at 1–2, ECF No. 23. For completeness, the Court notes that DRTx requested copies of this information "*whether written or in another medium, draft or final form,* including handwritten notes, electronic files, photographs or video or audio tape records." *Id.* (emphasis in original).

DRTx originally requested records from EPPD under 42 U.S.C. § 10805(a)(4)(B), which allows P&A organizations to access records of a client who "is unable to authorize" access to records and does not have a guardian who can authorize access to records. *See* Mot. at 6 n.31; Letter to EPPD re: Records of E.C. While this case was pending, E.C. regained capacity to authorize DRTx to obtain records and he consented to DRTx accessing his records. *See* Mot. at 6 n.31; Authorization to Release Confidential Information, Mot. Ex. N, ECF No. 23 (signed by E.C.); *see also* 42 U.S.C. § 10805(a)(4)(A) (permitting P&A organizations to access records of consenting clients).

[62] Rule 26(f) Joint Case Management Report, ECF No. 9 at 2. DRTx says that EPPD has only given DRTx "the limited public report" and "search warrants." Mot. at 7. Defendant does not dispute this. *See generally* Resp.

## A.  Declaratory Judgment

With certain exceptions not relevant here, the Declaratory Judgment Act authorizes a

court to enter a declaratory judgment so long as it has jurisdiction and there is an "actual

controversy" between the parties.  28 U.S.C. § 2201(a) ("In a case of actual controversy within

its jurisdiction . . . any court of the United States . . . may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is or could

be sought.").  "When considering a declaratory judgment action," a court must evaluate:

> (1) whether an actual controversy exists between the parties in the case;
>
> (2) whether [the court] has authority to grant declaratory relief; and
>
> (3) whether [the court should] exercise its broad discretion to decide or dismiss a
>     declaratory judgment action.

*Frye v. Anadarko Petrol. Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (cleaned up).

### 1.  *Whether There Is an Actual Controversy*

A case presents an "actual controversy" under the Declaratory Judgment Act if it

qualifies as a "case or controversy" under Article III of the U.S. Constitution.  *Aetna Life Ins. Co.

v. Hanworth*, 300 U.S. 227, 239–40 (1937); *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir.

2006) ("This circuit interprets the [28 U.S.C.] § 2201 'cases of actual controversy' requirement

to be coterminous with Article III's 'case or controversy' requirement.").  "To show an actual

controversy, the dispute at issue must be definite and concrete, real and substantial, and admit of

specific relief through a decree of a conclusive character."  *Frye*, 953 F.3d at 294 (quotation

omitted).  In other words, the dispute cannot be "abstract or hypothetical."  *See Orix Credit All.,

Inc. v. Wolfe*, 212 F.3d 891, 895–96 (5th Cir. 2000) (quotation omitted).  "Basically, the question

in each case is whether the facts alleged, under all the circumstances, show that there is a

substantial controversy, between parties having adverse legal interest, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotation omitted).

For instance, for there to be a "case or controversy" a plaintiff must have Article III standing. *E.g.*, *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). To establish Article III standing, a plaintiff must show:

> (1) it has "suffered an injury in fact;"
>
> (2) there is "a causal connection between the injury and the conduct complained of;" and
>
> (3) it's "likely . . . that the injury will be redressed by a favorable decision" from the court.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations omitted).

Pacillas argues this Court lacks jurisdiction because no actual controversy exists. Resp. at 10–13. Pacillas begins his argument by describing dictates of the *Texas* Constitution, which doesn't apply here.[63] *Id.* at 10–11. He then argues that this case does not present an actual controversy under the Declaratory Judgment Act, and if the Court were to issue an opinion it would be advisory. *Id.* at 10–13. But Pacillas says little about which, if any, federal jurisdictional doctrine he invokes, such as mootness, ripeness, political question, or sovereign immunity. *See id.*

Citing a case from the Supreme Court of Texas, Pacillas does drop a note about standing: "An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury." *Id.* at 11 (quoting *Tex. Assoc. of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)).

---

[63] While "Texas's test for constitutional standing parallels the federal test for Article III standing," *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 776 (Tex. 2020), the Court would *at most* look to the Supreme Court of Texas for *guidance* regarding standing analysis under Article III of the U.S. Constitution.

But Pacillas doesn't further develop his lack-of-standing argument.  He does not say *why* he thinks DRTx's alleged injury—that Pacillas has deprived DRTx of the records it argues PAIMI authorizes it to access—is hypothetical.

Pacillas instead suggests the underlying facts are hypothetical.  In Pacillas's eyes, DRTx's case is premised on the idea that EPPD officers executed an EDO when they apprehended E.C.[64]  Resp. at 12.  That premise is false, Pacillas argues, because EPPD actually executed an arrest warrant,[65] not an EDO.  *Id.*  It doesn't matter, according to Pacillas, that the officers dispatched to E.C.'s home believed they were acting under an EDO, which is a fact Pacillas appears to concede.[66]  *See id.* at 10–13.

It's not even clear that Pacillas's factual argument is a jurisdictional one.  Strip away all the hand-waving and the bottom line is this: Pacillas argues that during the incident between EPPD and E.C., EPPD was executing an arrest warrant, not an EDO, so the Department is not subject to DRTx's investigatory authority under PAIMI.  *See id.* at 10–14.  But that purported jurisdictional argument is merely a restatement of the question DRTx and EPPD dispute: Does DRTx have the authority under PAIMI to obtain EPPD's records of the incident between EPPD and E.C.?  And that question is one that directly implicates the merits of DRTx's action.

In any event, the Court is independently satisfied that DRTx has standing to bring this case.  *United States v. Hays*, 515 U.S. 737, 742 (1995) (explaining that "standing is not subject to waiver" and courts must satisfy themselves that the plaintiff has standing because "federal courts

---

[64] DRTx vehemently disputes Pacillas's characterization.  Reply at 1–4.

[65] *See* El Paso Municipal Court Warrant Search.

[66] Resp. at 12 ("*The subjective belief by officers that an EDO existed somewhere*, does not in and of [itself] somehow change the character of what occurred, nor does it make an arrest for a criminal offen[s]e into medical care or mental health services." (emphasis added)).

are under an independent obligation to examine their own jurisdiction" (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–31 (1990))).  For the standing analysis, the Court must assume DRTx has the authority to obtain the records it wants from EPPD.  *See N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) ("When considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." (cleaned up)).[67]

As discussed, Congress provided P&A systems, like DRTx, with several investigatory powers, including the right to obtain certain records.  42 U.S.C. §§ 10805(a)(1)(4); 10806.  In line with its putative records-access authority, DRTx requested records from EPPD regarding E.C.'s possible abuse and neglect.  EPPD has refused to provide those records, which injures DRTx.  *See Advoc. Ctr. v. Stalder*, 128 F. Supp. 2d 358, 363–64 (M.D. La. 1999) (explaining that P&A Systems "ha[ve] standing to bring a lawsuit requesting records" and that if an entity denies the P&A system access to records related to "a claim it is investigating, it suffers a direct injury to its statutory interest"); *cf. Ala. Disabilities Advoc. Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312, 1322 (S.D. Ala. 2014) (noting, in a facility-access case, that the P&A system "ha[d] standing because it [sought] to establish that [the defendant's] actions [were] causing injury to the P & A system itself").

---

[67] Another principle regarding the overlap between standing and a merits dispute is at play here too.  As discussed, DRTx's alleged injury is EPPD's refusal to provide it with documents that DRTx asserts it has the authority to access under PAIMI.  *E.g.*, Mot. at 20.  When "a plaintiff's claim of injury in fact depends on legal rights conferred by statute, it is the particular statute and the rights it conveys that guide the standing determination."  *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) (quotation omitted).  In other words, a court determines whether a plaintiff has standing by evaluating whether the statute "grant[s] persons in the plaintiff's position a right to judicial relief."  *Id.*  To answer that question here, the Court must assess whether the P&A Acts give DRTx the right to obtain the documents it seeks, which is also the merits dispute.  Thus, the Court must conclude that it has jurisdiction and proceed to the merits.  *Cf. Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case.").

To sum it up, DRTx cannot access the records it asserts it has a right to access under PAIMI (the injury) because Pacillas refuses to provide them (the causal connection).  A favorable decision from the Court would redress DRTx's alleged injury because the Court would issue a declaratory judgment and permanent injunction in DRTx's favor requiring EPPD to produce the records DRTx seeks.  *See Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 292–93 (5th Cir. 2001).  DRTx thus has Article III standing.  *See Stalder*, 128 F. Supp. 2d at 363–64. And because DRTx has Article III standing, the Court's Opinion is not advisory.[68]  *See Carney*, 141 S. Ct. at 498, 501–02 (explaining that Article III standing "prevent[s] the federal courts from issuing advisory opinions").

### 2.   The Court's Authority and Its Discretion

Neither party disputes that the Court has authority to enter declaratory relief in this case for the purposes of the test's second prong.  The Court itself is unaware of any pending state court action that would deprive it of the authority to enter declaratory relief.  *See, e.g.*, *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776 (5th Cir. 1993) (describing when "the district court may not consider the merits of [a] declaratory judgment action"); *Disability Rts. Tex. v. Bishop*, 615 F. Supp. 3d 454, 460, 471 (W.D. Tex. 2022) (concluding same under similar circumstances).

### 3.   The Court's Discretion

Finally, the Court is satisfied that it should invoke its discretion to hear this declaratory judgment action, and the parties do not argue otherwise.  *See Pontchartrain Partners, LLC v. Tierra de Los Lagos, LLC*, 48 F.4th 603, 605 (5th Cir. 2022) (per curiam) (describing six factors

---

[68] While the advisory opinion doctrine implicates other Article III justiciability limitations on federal courts' jurisdiction, like mootness and ripeness, Pacillas did not argue that any other justiciability limitation on this Court's jurisdiction prevents it from hearing this case.  *See generally* Resp.

a court must consider when deciding whether to dismiss a declaratory judgment action).  The
Court thus proceeds to consider whether DRTx is entitled to summary judgment.

### B.  Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.
56(a).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the
lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir.
2009) (quotations omitted); *Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020).  And a
dispute about a material fact is genuine if "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986); *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357–58 (5th Cir. 2017).

"A party seeking summary judgment always bears the initial responsibility of informing
the district court of the basis for its motion and identifying those portions of the record which it
believes demonstrate the absence of a genuine issue of material fact."  *E.E.O.C. v. LHC Grp.,
Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986)) (cleaned up).  "Once the moving party has demonstrated the absence of a material fact
issue, the non-moving party must go beyond the pleadings and designate specific facts showing
that there is a genuine issue for trial."  *McCarty*, 864 F.3d at 357 (cleaned up).  The non-movant
cannot meet that burden by raising "some metaphysical doubt as to the material facts, by
conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  *Id.*
(cleaned up).

In ruling on a motion for summary judgment, "courts must view the evidence in the light
most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."

*Cadena*, 946 F.3d at 723.  Courts, however, "refrain from making credibility determinations or weighing the evidence."  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (internal quotations omitted).  That is, courts refrain from "determin[ing] the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, "the evidence of the nonmovant is to be believed."  *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018) (cleaned up).  Nonetheless, the court "need not credit evidence that is 'merely colorable' or not significantly probative."  *Id.* (quoting *Anderson*, 477 U.S. at 249–50).

## C.  There Are No Genuine Disputes of Material Fact

Nearly all the facts in this case are undisputed.  For the one fact that is disputed, the Court assumes, but does not decide, that the fact is material; whether it is or not, the dispute is not genuine.

To begin with, I have a Standing Order governing motions for summary judgment that requires a movant to list all proposed undisputed facts and then requires the nonmovant to respond to the movant's proposals.[69]  My Standing Order not only requires litigants to "provide specific citations to evidence in the record" as Federal Rule of Civil Procedure 56(c) and (e) require, it also provides that "[a]ll material facts set forth in [the movant's proposed undisputed facts] will be deemed admitted unless controverted by" the nonmovant's response, consistent with Rule 56(e)(2).[70]

---

[69] Standing Order Regarding Motions for Summary Judgment, *available at* https://www.txwd.usc ourts.gov/wp-content/uploads/Standing%20Orders/El%20Paso/Guaderrama/Standing%20Order%20Rega rding%20Motions%20for%20Summary%20Judgment.pdf (last visited June 1, 2023).

[70] *Id.* at 1–2; *see also* FED. R. CIV. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ."); FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); FED. R. CIV. P. 56(e)(2) ("If a party fails to properly support an

DRTx complied with my Standing Order by listing its proposed undisputed facts with citations to the record.[71]  Pacillas, however, failed to comply.  That alone is enough to consider the facts undisputed.  *See Gaspard v. Amerada Hess Corp.*, 13 F.3d 165, 166 n.1 (5th Cir. 1994).[72]  And that alone is enough to allow the Court to move forward and decide the legal questions in this case based on the undisputed facts.  FED. R. CIV. P. 56(e)(2); *cf. Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (en banc) ("We resolve factual controversies in favor of the nonmoving party, *but only when* there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." (emphasis added)).

Even so, the Court will consider the one fact that Pacillas disputes in the body of his Response to DRTx's Motion.[73]  Pacillas submits that DRTx mischaracterizes the facts by saying the officers executed an EDO against E.C.  Resp. at 3–4.  Instead, Pacillas says, officers entered

---

assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

[71] *See generally* Pl.'s Proposed Undisputed Facts.

[72] In *Gaspard*, the Fifth Circuit stated the following:

Many of the facts in this section come from the "Statement of Material Facts as to Which There is No Genuine Issue" filed by [the movant] with its Motion for Summary Judgment in accordance with Local Rule 2.10 of the Western District of Louisiana. [The nonmovant's] failure to file a response means that the facts in [the movant's] statement are admitted for purposes of [the movant's] summary judgment motion.

13 F.3d at 164 n.1.  While the parties' requirement to file a statement of proposed undisputed facts here is based on a standing order rather than a local rule, the Fifth Circuit's statement in *Gaspard* nonetheless applies.  By ignoring the Standing Order, Pacillas has failed to dispute any of the facts in this case.  *See Gaspard*, 13 F.3d at 164 n.1; *cf. Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 671–72 (7th Cir. 2006) (upholding district court's finding of no genuine material dispute of fact when response to proposed undisputed facts was "disjointed, convoluted, and hopeless mess"); *Morris v. Chase Home Fin., LLC*, No. EP-13-CV-132-KC, 2014 WL 517487, at *1 n.3 (W.D. Tex. Feb. 7, 2014) (after a party's failure to comply with a similar standing order, considering as undisputed facts that the party "only facially 'dispute[d],' [did] not properly address, and [did] not appear to truly contest"); *cf. also Candelaria v. United States*, 518 F. Supp. 2d 852, 853 (W.D. Tex. 2007) (admonishing parties to follow the court's standing orders or "be met with sanctions").

[73] *See Morris*, 2014 WL 517487, at *1 n.3 (taking a similar approach).

E.C.'s home to detain and transport him under an arrest warrant, not an EDO or a warrantless emergency detention.  *Id.*  The thing is, DRTx does not dispute that the officers did not *actually* have the EDO in hand when they went to and entered E.C.'s home.  Reply at 2 ("The truth is EPPD officers were in possession of *neither* the arrest warrant nor the EDO until after officers shot E.C.").  What DRTx says—and provides uncontradicted evidence to support—is that EPPD officers "universally believed" that they were dispatched to E.C.'s home "to effectuate an EDO."[74]  Reply at 2.

Pacillas offers zero evidence to the contrary.  In fact, the evidence Pacillas does offer supports DRTx's position:

> I was under the impression we were there on an Emergency Detention Order
> . . . because dispatch relayed this information via the family member who made the
> call, but it was not until after the incident that we determined the outstanding
> warrant was a criminal warrant.[75]

With that, there is no genuine dispute about the reason EPPD officers went to E.C.'s home.

Under the impression that there was a valid EDO, officers were there to detain E.C. and transport

---

[74] *See, e.g.*, Delgado Dep. at 32:21–33:9:

Q. Okay.  Do you recall if you ever – while you were on the scene, do you recall if you ever learned that there was, in fact, a magistrate's warrant for emergency detention?

A. I didn't confirm it, but I was told that they couldn't find it.

Q. So, if they couldn't find it, were you treating this as a call for a peace officer's warrantless detention, or how do you respond if that's the case?

A. Well, I believed that there was a warrant [for emergency detention], so that's how I responded.

[75] Delgado Aff. at 1; Gonzalez Aff. at 1–2 (same); Escobar Aff. at 1–2 (similar).

him to a mental health facility.[76]  Officers did not arrive there to execute an arrest warrant.[77]  No reasonable jury could find otherwise.

In response, Pacillas points out that EPPD apprehended E.C. under an arrest warrant. Resp. at 3–4.  True enough.  There is no dispute that EPPD executed a 2019 arrest warrant when they apprehended E.C.[78]  But that occurred around four hours after EPPD dispatched officers to E.C.'s home, and after EPPD officers shot E.C.[79]  E.C.'s eventual arrest simply does not change the undisputed fact that officers went to E.C.'s home under the impression there was a valid EDO.  Nor does it change the undisputed fact that EPPD officers tried to remove E.C. from the bathroom so that they could take him to a mental health facility.

Viewing the evidence in the light most favorable to Pacillas and drawing all reasonable inferences in his favor, *Cadena*, 946 F.3d at 723, the Court concludes there is no genuine issue about the reason EPPD officers were dispatched to E.C.'s home or the reason EPPD officers continued to engage with E.C. throughout the incident.  DRTx first met its burden of "identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact" about EPPD's purpose at E.C.'s home.  *LHC Grp.*, 773 F.3d at 694 (quoting *Celotex*, 477 U.S. at 323).  In response, Pacillas has failed to point to any specific facts that

---

[76] *See, e.g.*, Escobar Dep. at 19:4-19 (agreeing that he entered E.C.'s home "to apprehend E.C." and "transport him to a mental health facility under" the emergency detention order and saying that he intended to accomplish this "as calmly as possible" in accordance with his training); Delgado Dep. at 34:20-25 (similar); Delgado Aff. at 1; Gonzalez Aff. at 1–2; Escobar Aff. at 1–2.

[77] Delgado Aff. at 1 ("[I]t was not until *after* the incident that we determined the outstanding warrant was a criminal warrant." (emphasis added)); Gonzalez Aff. at 1–2 (same); Escobar Aff. at 1–2 (similar).

[78] El Paso Municipal Court Warrant Search; *compare* Mot., *and* Reply, *with* Resp.

[79] *Compare* EPPD Event Chronology at 1, 7 (first entry at 5:42 p.m.), *with* El Paso Municipal Court Warrant Search (showing warrant executed at 9:59 p.m.); *compare also* Mot., *and* Reply, *with* Resp.

establish a genuine issue on this point.  *McCarty*, 864 F.3d at 357.  His unsupported assertions

that "[i]t was via the arrest warrant that officers were able to gain entry in to [sic] the home and

bring E.C. into custody," Resp. at 3, are insufficient to give rise to a genuine dispute of fact,

*McCarty*, 864 F.3d at 357 (stating that the non-movant can't meet its burden "by some

metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence").

Because DRTx has shown there is no genuine dispute of material fact, all that remains is

for the Court to answer the legal questions about whether PAIMI gives DRTx the authority to

investigate EPPD and whether DRTx can obtain the records it wants from EPPD.  *See, e.g.*, FED.

R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law.").

**D.  Whether DRTx Has the Authority under PAIMI to Investigate EPPD**

This case raises novel questions about the scope of P&A organizations' authority to

investigate incidents of abuse and neglect of people with mental illness.  *Compare* Resp. at 4–10

(arguing EPPD is not subject to the P&A Acts), *with* Mot. at 8–18, *and* Reply at 2–9, *and* 42

U.S.C. § 10801(b)(2) (prescribing mission of P&A organizations).  DRTx says it has the

authority to investigate the incident between EPPD and E.C., which, DRTx contends, includes its

authority to access EPPD's records related to the incident.  Mot. at 8–18; Reply at 2–9.  Pacillas

argues that the incident is not even within the scope of DRTx's investigatory powers because

PAIMI limits DRTx's investigatory powers to alleged incidents of abuse and neglect perpetrated

by those providing medical care or treatment, which Pacillas says EPPD does not provide.  Resp.

at 5–9.  Even if DRTx could investigate the incident, Pacillas argues, PAIMI does not authorize

DRTx to obtain the specific records it is requesting from EPPD.  Resp. at 6–7, 10.

### 1.  *The Admissions Provision and Transport Clause*

To reiterate, P&A organizations have the authority to "investigate incidents of abuse and

neglect of individuals with mental illness."[80]  42 U.S.C. § 10801(b)(2)(B), 10805(a)(1)(A).

Congress defined the terms "abuse," "neglect," and "individual with mental illness" in ways that

limit P&A organizations' investigatory authority.  *See id.* § 10802.

Congress defined "individual with mental illness" as a person "who has a significant

mental illness or emotional impairment"[81] and:

(1) who is an inpatient or resident in a facility rendering care or treatment, even if
the whereabouts of such inpatient or resident are unknown;

(2) who is in the process of being admitted to a facility rendering care or treatment,
including persons being transported to such a facility; []

(3) who is involuntarily confined in a municipal detention facility for reasons other
than serving a sentence resulting from conviction for a criminal offense; or

(4) who . . . lives in a community setting, including their own home.[82]

*Id.* § 10802(4).  The Court refers to the portion of the definition that describes an individual

"who is in the process of being admitted to a facility rendering care or treatment, including

---

[80] Congress also authorized P&A organizations to pursue certain lawsuits on their clients' behalf.
42 U.S.C. § 10805(a)(1)(B) (granting P&A organizations "authority to . . . pursue administrative, legal,
and other appropriate remedies to ensure the protection of individuals with mental illness who are
receiving care or treatment in the State"); *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*,
603 F.3d 365, 374–81 (7th Cir. 2010).

[81] Pacillas does not dispute that E.C. meets this portion of the definition.  *See generally* Resp.; *see
also* Compl., ECF No. 1 ¶ 19 (alleging E.C. had a "psychiatric crisis" that EPPD responded to); Answer,
ECF No. 5 ¶ 19 (admitting that fact); Warrant for Emergency Detention.

[82] P&A organizations have the authority to advocate on behalf of people with mental illness who
are living in the community only when its total allotment under PAIMI is ≥ $30,000,000 for any fiscal
year.  42 U.S.C. § 10804(d).  Pacillas does not dispute that DRTx currently has the authority to advocate
on behalf of persons with mental illness who are living in the community.  *See generally* Resp.

persons being transported to such a facility" as the "Admissions Provision," and the last clause as the "Transport Clause."

Congress defined "abuse" as "any act or failure to act *by an employee of a facility rendering care or treatment* which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a[n] individual with mental illness," including striking the person or using excessive force against the person.  *Id.* § 10802(1) (emphasis added).

Congress defined "neglect," in relevant part, as "a negligent act or omission *by any individual responsible for providing services in a facility rendering care or treatment* which caused or may have caused injury or death to a[n] individual with mental illness or which placed [them] at risk of injury or death . . . ."  *Id.* § 10802(5) (emphasis added).

The threshold question is whether DRTx has the authority to investigate the incident between EPPD and E.C. that occurred at E.C.'s home.[83]  Pacillas argues DRTx does not have the authority to investigate the incident, and therefore obtain the records it seeks, because the incident is not within PAIMI's scope.  Resp. at 5.  Specifically, Pacillas suggests that the incident falls outside the definitions of "abuse" and "neglect" because EPPD officers are not "employee[s] of a facility rendering care or treatment" or "individual[s] responsible for

---

[83] DRTx mainly focuses on its argument that EPPD's records of the incident between EPPD and E.C. are within the scope of PAIMI's record-access provisions.  *See* Mot. at 10–18; Reply at 6–9; *see also* 42 U.S.C. §§ 10805(a)(4), 10806.  DRTx's records-access authority, however, is in furtherance of its investigatory mandate.  *Cf. Miss. Prot. & Advoc. Sys., Inc. v. Cotten*, 929 F.2d 1054, 1058–59 (5th Cir. 1991).  That means that DRTx must first have the authority to investigate before it can access records. Only once a P&A organization, like DRTx, has shown that PAIMI allows it to conduct an investigation should a court reach the question of whether the records the P&A organization requests are within the scope of PAIMI's record-access provisions.

providing services in a facility rendering care or treatment."[84]  *Id.* at 5, 7–9; *see also* 42 U.S.C. § 10802(1), (5).  DRTx counters that because EPPD was attempting to *transport* E.C. to a mental health facility when the alleged abuse or neglect occurred, DRTx has the authority to investigate the incident and obtain the records, and it does not matter whether EPPD officers render care or treatment.  Mot. at 8–10, 14–15; Reply at 4, 8–9.

Begin with the text of the statute.  *E.g.*, *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 242 (5th Cir. 2022) (quoting *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018)).  Both parties agree that Congress authorized P&A organizations to "investigate incidents of abuse and neglect" of "persons being transported to . . . a facility."  *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(4)(B)(i)(II); *see also* Mot. at 8–9; Resp. at 5.  From there, though, the parties part ways.  DRTx focuses on the above formulation of its investigatory authority—investigation of incidents

---

[84] To the extent Pacillas argues that DRTx is limited to investigating alleged abuse and neglect perpetrated by someone who "render[s] care or treatment" to a person with mental illness, *see* Resp. at 5–9; *see also* 42 U.S.C. § 10802(1), (5), that misses the mark, *see Bishop*, 615 F. Supp. 3d at 466 ("Congress sought to empower P&A organizations to investigate incidents of abuse and neglect of individuals with mental illness generally and not only those incidents that are in a therapeutic or investigatory context.  And given that abuse or neglect of individuals with mental illness can occur in many different settings, it is incredible that Congress would categorically exclude a broad range of non-therapeutic and non-investigatory conduct that constitutes abuse or neglect from a P&A organization's records-access authority." (quotation omitted)).

"Care or treatment" does not modify persons or actions.  "Care or treatment" helps define which *facilities* P&A organizations can investigate.  Look at the text: P&A organizations "have the authority to . . . investigate incidents of abuse and neglect of individuals with mental illness" committed by "an employee of *a facility rendering care or treatment*" or "an[] individual responsible for providing services in *a facility rendering care or treatment*."  *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(1), (5) (emphasis added).  That Act does *not* say P&A organizations have the authority to investigate incidents of abuse and neglect by an employee (or service provider) rendering care or treatment.  Rather, it says that P&A organizations have the authority to investigate abuse and neglect perpetrated, for instance, *at* facilities rendering care and treatment, or *during the process of admission* to facilities, or *during transport* to facilities.  *See id.* § 10802.  So, for example, P&A organizations have the authority to investigate abuse and neglect by an elementary school staff member, even though that staff member may not themselves render care or treatment.  *See Disability Rts. Wis., Inc. v. State of Wis. Dep't of Pub. Instruction*, 463 F.3d 719, 722–24 (7th Cir. 2006); *Disability Rts. N.Y. v. N. Colonie Bd. of Educ.*, 1:14-CV-0744, 2016 WL 1122055, at *1–2, 4–5 (N.D.N.Y. Mar. 21, 2016).

occurring during transport to a facility—while Pacillas points to what he argues are controlling limitations on PAIMI's scope.

Pacillas is right that DRTx's investigatory authority is more limited than DRTx suggests it is. To see why that's the case, add the definitions of "abuse" and "neglect" to DRTx's formulation of its investigatory authority:

| Authority | Scope of Authority |
|---|---|
| Investigate Alleged Abuse During Transport: | P&A organizations have the authority to "investigate incidents of" "any act or failure to act *by an employee of a facility rendering care or treatment* which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a" "persons being transported to . . . a facility." *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(1), (4)(B)(i)(II) (emphasis added). |
| Investigate Alleged Neglect During Transport: | P&A organizations have the authority to investigate "a negligent act or omission *by any individual responsible for providing services in a facility rendering care or treatment* which caused or may have caused injury or death to a [person[] being transported to . . . a facility] or which placed [that person] at risk of injury or death . . . ." *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(5), (4)(B)(i)(II) (emphasis added). |

In short, Congress limited P&A organizations' authority to investigate "abuse" and "neglect" allegedly committed by "employee[s] of a facility rendering care or treatment" or "individual[s] responsible for providing services in a facility rendering care or treatment," respectively. That E.C. may have been an "individual with mental illness" under PAIMI because EPPD officers were attempting to transport him to a mental health facility is not the beginning and the end of the analysis.[85] DRTx has not provide any evidence that EPPD officers—those

---

[85] Congress preceded "being transported" with "in the process of being admitted to a facility rendering care or treatment, *including* persons being transported." 42 U.S.C. § 10802(4)(B)(II) (emphasis added). Congress's use of "including" strongly suggests that it provided "being transported" as an

who allegedly abused or neglected E.C.—qualify as employees or service providers of a facility covered by PAIMI.

In fact, the record suggests otherwise. The record suggests that EPPD officers are employees of the City of El Paso.[86] Texas law may have required EPPD officers to "immediate[ly] apprehend" and "transport[]" E.C. to "the nearest appropriate inpatient mental health facility" "for a preliminary examination,"[87] TEX. HEALTH & SAFETY CODE § 573.012(d)–(e), but that does not make them "employees of," or "individual[s] responsible for providing services" in, "a facility rendering care or treatment," see 42 U.S.C. § 10802(1), (5).

DRTx responds that Congress intended "facility" to be read broadly and not to constrain P&A systems' investigatory authorities; thus suggesting that EPPD may be a facility that renders

_____

example of one of many steps "in the process of being admitted to a facility rendering care of treatment." *See Includes*, Black's Law Dictionary (10th ed. 2014) ("The participle *including* typically indicates a partial list."); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 527 (5th Cir. 2001) ("[W]e have held that the word 'includes' is usually a term of enlargement, and not of limitation." (cleaned up)). The ordinary meaning of "process"—which, among other things, means "[a] system of actions, changes, or functions that achieve an end result"—confirms that "being transported" is just one of many actions the admissions process provision covers. *E.g.*, *Process*, Webster's II New Riverside University Dictionary (1994). The Court therefore assumes, without deciding, that the fact EPPD officers injured E.C. before they were literally transporting him does not take the incident outside the scope of § 10802(4)(B)(II). *Contra* Resp. at 8.

[86] *See* Internal Position Announcement: Crisis Intervention Team Officer (describing the "position description" for a CIT opening as having "been prepared" by "*the City of El Paso* and the El Paso Municipal Police Officers Association" (emphasis added)); Delgado Dep. at 13:3-6 (explaining that she is "employe[d] with the El Paso Police Department"); Escobar Dep. at 10:6-16 (explaining that he had attend "the City of El Paso police academy" before being licensed as an EPPD officer); *cf.* EPPD Procedures Manual § 100 (stating that the City of El Paso's Charter and laws prevail over any conflict with the provisions of the EPPD Procedures Manual).

[87] As discussed, the record shows that not only were EPPD officers required to take E.C. to a mental health facility under the EDO, but that was also the EPPD officers' stated intent. *See, e.g.*, Delgado Dep. at 40:11-18, 41:25–42:6 ("Q. And you also told [E.C.] that the reason that you were there was to help him? A. That's correct. Q. And did you mean, help him get mental health treatment under the magistrate's warrant for emergency detention? A. Yes."); Escobar Dep. at 19:4-19 (agreeing that he entered E.C.'s home "to apprehend E.C." and "transport him to a mental health facility under" the emergency detention order and saying that he intended to accomplish this "as calmly as possible" in accordance with his training).

care or treatment within PAIMI's meaning.  *See* Reply at 6.  It's true that Congress provided a somewhat open-ended definition of "facilities": the term "*includes, but [is] not limited to*, hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters and jails and prisons."  42 U.S.C. § 10802(3) (emphasis added);[88] *see also Includes*, Black's Law Dictionary (10th ed. 2014) ("The participle *including* typically indicates a partial list."); *Budden*, 420 F.3d at 527 ("[W]e have held that the word 'includes' is usually a term of enlargement, and not of limitation." (cleaned up)).

But it's not invariably the case that "includes" conveys an open-ended meaning.  Even if a list is "illustrative rather than exhaustive," it may be limited by the theme of the examples provided.  *Samantar v. Yousuf*, 560 U.S. 305, 316–17 (2010).  That limiting principle is known as *noscitur a sociis*, which is "lawyer Latin" for "a word may be known by the company it keeps."  *United States v. Koutsostamatis*, 956 F.3d 301, 307 (5th Cir. 2020) (quoting *Graham Cty. Soil & Water Conservation Dist. v. ex rel. Wilson*, 599 U.S. 280, 287 (2010)).  The common thread in PAIMI's illustrative list of facilities is that they provide care or treatment services to people with mental illness.  *See, e.g.*, *Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 240 (2d Cir. 2006) (Sotomayor, J.) (deferring to the "reasonable interpretation advanced by [Health and Human Services] . . . that the term 'facilities' for purposes of PAIMI includes non-residential facilities that provide care or treatment to individuals with mental illness"); *Disability Rts. Wis.*, 463 F.3d at 726 (citing what is now 42 C.F.R. § 51.2); *see also supra* footnote 84.

---

[88] *See also* H.R. REP. NO. 99-576, at 15 (1986) (Conf. Rep.), 1986 U.S.C.C.A.N. 1377, 1377 ("The intent of the legislation is to focus on abuse and neglect of mentally ill individuals and not on the particular residential facility in which they reside.").

On the record before it, the Court cannot conclude that EPPD (or the City of El Paso) is a facility under PAIMI.  Put differently, there is no evidence that EPPD officers are employees or service providers of a facility that provides care or treatment to people with mental illness.

That EPPD officers must "evaluate" a person for possible mental illness and whether they might be a danger to themselves or others, TEX. HEALTH & SAFETY CODE § 573.001(a), does not mean EPPD officers are employees or service providers of a facility providing care or treatment, *contra* Mot. at 12–13, 12 n.41, 13 n.43.  Texas's Health and Safety Code recognizes as much.  It requires peace officers, like EPPD officers, to immediately transport an individual detained under a warrant-authorized EDO, like the one at issue here, to a mental health facility "for a preliminary examination."  TEX. HEALTH & SAFETY CODE § 573.012(e).  In a sense, this code provision recognizes that a peace officer's only role is to get the person he or she suspects might have a severe mental illness, that puts them or others in danger, to a mental health facility so that the person can get care or treatment.  In other words, evaluation and apprehension of a person with mental illness is not care or treatment.

An EPPD officer's (or a magistrate's) evaluation of an individual like E.C. is a due process limitation; it ensures that EPPD doesn't apprehend individuals without consideration of whether their mental health status warrants it.  *Cf. Campbell v. State*, 68 S.W.3d 747, 760 (Tex. App.—Houston 2001).  Beyond the initial evaluation of a person with mental illness, there is no indication that EPPD provides care or treatment services under PAIMI.  *Cf.* 42 C.F.R. § 51.2 ("Care or treatment means services provided to prevent, identify, reduce or stabilize mental illness or emotional impairment such as mental health screening, evaluation, counseling,

biomedical, behavioral and psychotherapies, supportive or other adjunctive therapies, medication supervision, special education and rehabilitation.").[89]

This conclusion does not, as DRTx argues, render superfluous P&A organizations' authority to investigate incidents of abuse and neglect perpetrated while transporting a person with mental illness. *Contra* Mot. at 14–15. The Court's conclusion only means that DRTx's investigatory authority is bound by the definitions of "abuse" and "neglect." That leaves open, for example, DRTx's authority to investigate possible abuse or neglect committed by an employee of a facility who was involved in transporting a person with mental illness. *See Armstrong*, 266 F. Supp. at 308 (P&A organization investigated the death of an inmate "who died while being transported"). The Court's interpretation of the Admissions Provision and Transport Clause does not render them inoperative.[90] *Cf., e.g., United States v. Hamilton*, 46 F.4th 389, 397 (5th Cir. 2022) ("[O]ur approach does not read the term 'reward' out of the statute, as it continues to serve a valuable purpose under certain circumstances."); *Cazorla v. Koch Foods of Miss., LLC*, 838 F.3d 540, 554 & n.41 (5th Cir. 2016).

---

[89] When promulgating PAIMI's implementing regulations, the Secretary of Health and Human Services explained that "care" "include[s] elements of traditional support services such as case management; accompanying patients to outpatient centers; medical appointments or day treatment centers; vocational training services; *transportation*; education programs; employment programs; and provision of food, water and clothing" *"to the extent that any" of these services "are provided to individuals with mental illness in eligible care or treatment facilities."* 62 Fed. Reg. 53548-01, 53551 (Oct. 15, 1997) (emphasis added). While the Secretary's understanding of "care" is broad, the Secretary recognized there must be a nexus between the "elements of traditional support services" and a facility. So even if transporting E.C. to a mental health facility is properly understood as "care"—a question the Court does not decide—that does not make EPPD officers employees or service providers of a facility rendering care or treatment.

[90] DRTx also points to the fact, in Texas, "*only* peace officers . . . have the authority to detain and transport individuals for mental health treatment." Mot. at 14–15 (emphasis in original). But "the authority to detain *and* transport" does not mean that peace officers are the only entity with the authority to transport people with mental illness. That no other entity can detain a person with mental illness is of no moment; that does not limit the world of investigable abuse and neglect occurring during any other instance of transporting a person with mental illness.

The Court's interpretation of DRTx's investigatory authority under the Admissions Provision and Transport Clause ends where it began: with the statutory text.  *Cf., e.g.*, *Luna Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859, 865 (2023) ("We cannot replace the actual text with speculation as to Congress' intent." (cleaned up)); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous" (quotation omitted)).  Because nothing in the record indicates that EPPD officers are employees or service providers of a facility that renders care or treatment to people with mental illness, DRTx has no power to investigate the incident between EPPD officers and E.C.  Thus, DRTx does not have the authority to access the records it seeks, whatever the scope of its records-access authority might otherwise be.

## 2.  *The Community and Home Provision*

P&A organizations have "the authority to investigate incidents of abuse and neglect of individuals with mental illness" who "live[] in a community setting, including their own homes." 42 U.S.C. §§ 10805(a)(1)(A), 10802(4)(B)(ii).  Like the Admissions Provision and Transport Clause, however, a P&A organization's authority to investigate incidents of abuse and neglect perpetrated against someone living in the community or in their own home is cabined by the limitations in the definitions of "abuse" and "neglect."

Admittedly, Congress's addition of the Community and Home Provision raises questions about the scope of P&A organizations' investigatory authority.  When Congress amended PAIMI in 2000 to expand the definition of "individual with mental illness" to include someone who "lives in a community setting, including their own home," 42 U.S.C. § 10802(3)(B)(ii), it did not make any corresponding changes to the definitions of "facilities," "abuse," or "neglect," *compare* Pub. L. No. 99-319, Title I, 100 Stat. 478, 479 (1986), *with* Pub. L. No. 106-310, Title

XXXII, 114 Stat. 1101, 1194 (2000). Congress thus retained a facilities-focused approach in the definitions of "abuse" and "neglect" but broadened P&A organizations' investigatory authority by allowing them to investigate abuse and neglect perpetrated against someone living outside of a mental health facility.

But as broad as P&A organizations' authorities are,[91] PAIMI does not provide limitless authority to investigate incidents of abuse and neglect occurring in the community. *Contra* Reply at 5 (arguing DRTx has records-access authority in this case because PAIMI's "mandate requires [it to] investigat[e] [ ] abuse of persons in the community"). Rather, Congress expanded the scope of P&A organizations' authority to include investigation of abuse and neglect committed by employees or service providers of a facility, where that facility provides care or treatment to individuals who live somewhere other than an inpatient or residential facility. *See State of Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 658 (D. Conn. 2005), *aff'd*, 464 F.3d 229 (2d Cir. 2006) ("[A] protection and

---

[91] *See, e.g.*, *Disability Rts. Wis.*, 463 F.3d at 725 ("Each of the three federal P&A statutes supplies state P&A agencies with broad investigatory authority."); *In re Disability Rts. Idaho Request for Ada Cnty. Coroner Recs. Relating to the Death of D.T.*, 168 F. Supp. 3d 1282, 1292 (D. Idaho 2016) ("Under PAIMI, P&A's are given broad authority to investigate incidents of abuse and neglect of individuals with mental illness. . . ."); *SafetyNet Youthcare*, 65 F. Supp. 3d at 1328 (noting P&A Acts have a "broad remedial framework").

When Congress amended PAIMI in 2000 it noted that while there had been "tremendous advancements in treatment services for mental illness" that allowed people to live "in the community," it found that "there has not been a mechanism to ensure that they are receiving the care and advocacy they need." S. REP. NO. 106-196, at 25–26 (1999) (explaining the 2000 amendment would allow P&A organizations "to work on behalf of persons living at home," whether they are "subject to abuse or neglect or discrimination in housing, health care, employment or benefits"). Courts have accordingly held that PAIMI's coverage includes individuals with mental illness who live outside of inpatient or residential facilities. *E.g.*, *Hartford Bd. of Educ.*, 464 F.3d at 240 (explaining that "Congress's clearly expressed intent [was] to provide protection and advocacy services for individuals with mental illness *living in their own homes*" (emphasis added)); *Disability Rts. Wash. v. Penrith Farms*, No. CV-09-024-JLQ, 2009 WL 777737, at *2 (E.D. Wash. Mar. 20, 2009) (noting that "the investigatory power is couched in terms of protection of individual rights in any context" and concluding that the P&A organization "is explicitly empowered to investigate allegations of abuse within a home").

advocacy system must serve the needs of both mentally ill individuals who are institutionalized or otherwise treated in residential facilities and individuals who are mentally ill and live in their own home."); *SafetyNet Youthcare*, 65 F. Supp. 3d at 1323 ("Congress designed [PAIMI] to protect individuals with mental illness who live and receive treatment outside of inpatient treatment facilities.").  For the reasons already discussed, DRTx has not shown that EPPD officers are employees or service providers of facilities that provide care or treatment.  *Supra* Section II.D.1.  So the mere fact that E.C. was in his own home when EPPD officers allegedly abused or neglected him does not authorize DRTx to investigate the incident.

The Court's conclusion here too does not render the Community and Home Provision mere surplusage.  *Contra* Mot. at 5.  A P&A organization's investigatory authority would still cover instances of abuse and neglect committed against a person who, for example, participates in a partial hospitalization program.  42 U.S.C. § 10802(3), (4)(B)(ii) (including persons "liv[ing] in a community setting" or in "their own home" as "individual[s] with mental illness").  It might also cover work release programs, *cf. id.* (including "jails and prisons" in the list of covered "facilities"), homeless shelters, *id.* (including "community facilities" in the list of covered "facilities"), or a visit to the Emergency Department, *id.* (including "hospitals" in the list of covered "facilities").  It may cover any situation where a facility's employees provide at-home care.  *See id.*  In sum, by adding the Community and Home Provision Congress did expand the scope of P&A organizations' authority to investigate incidents of abuse and neglect, but it retained a limitation by leaving the definitions of "abuse" and "neglect" unchanged.  DRTx must still show that an employee or service provider of a facility that provides care or treatment committed the abuse or neglect, and it has not done so.

### E.  Whether Congress Authorized DRTx to Obtain Records from EPPD

Because DRTx does not have the authority to investigate the incident between EPPD and E.C. in the first place, the Court does not need to address whether PAIMI provides DRTx with the authority to obtain the specific records it wants.  The Court stresses, however, that no reader should interpret the discussion above as commenting on the scope of P&A organizations' records-access authority after it has shown it has the authority to conduct the investigation in the first instance.  Courts read PAIMI's record-access authority broadly.  *See, e.g.*, *Ind. Prot. & Advoc. Servs.*, 603 F.3d at 382–83 ("[P]eer review records are 'records' under the PAIMI Act."); *Prot. & Advoc. for Persons with Disabilities, Conn. v. Mental Health & Addiction Servs.*, 448 F.3d 119, 124–28 (2d Cir. 2006) (Sotomayor, J.) (similar); *Ctr. for Legal Advoc. v. Hammons*, 323 F.3d 1262, 1267–73 (10th Cir. 2003) (similar); *Pa. Prot. & Advoc., Inc. v. Houstoun*, 228 F.3d 423, 426–28 (3d Cir. 2000) (Alito, J.) (similar); *Bishop*, 615 F. Supp. 3d at 463–67 (holding "records" under PAIMI "include[s] videos" as a matter of ordinary meaning confirmed by precedent).  This Court simply need not comment further on the scope of PAIMI's record-access provisions.

### III.    CONCLUSION

DRTx lacks the authority to investigate the incident between EPPD and E.C., and so it lacks the right to obtain the records it has asked for.  PAIMI's text and the undisputed record before the Court commands this outcome.  Accordingly, the Court **DENIES** Plaintiff Disability Rights Texas's "Motion for Summary Judgment" (ECF No. 19).

Because the Court concludes there is no genuine dispute of material fact, the Court is considering entering summary judgment in Pacillas's favor under Federal Rule of Civil Procedure 56(f)(1).  FED. R. CIV. P. 56(f)(1).  Before doing so, however, the Court will provide

the parties with an opportunity to file any objections to the Court's proposed plan.[92]  The Court

**ORDERS** that any party wishing to file any such objections must do so by **June 20, 2023**.

      **So ORDERED and SIGNED this 6th day of June 2023.**

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

---

[92] FED. R. CIV. P. 56(f) (allowing courts to *sua sponte* issue "summary judgment for a nonmovant" but only "[a]fter giving notice and a reasonable time to respond"); *see also Doubleback Transp.*, 2019 WL 1993547, at *9 (discussing the court's plan to enter summary judgment in favor of the nonmovant and providing the nonmovant "an opportunity to respond").