UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **DISABILITY RIGHTS TEXAS**, | § | |
| | § | |
| *Plaintiff*, | § | |
| **v.** | § | |
| | § | |
| **PETER PACILLAS,** *in his official capacity* | § | **EP-21-CV-00211-DCG** |
| *as the interim Police Chief of the El Paso* | § | |
| *Police Department*, | § | |
| | § | |
| *Defendant.* | § | |

**AMENDED MEMORANDUM OPINION AND ORDER**

Plaintiff Disability Rights Texas ("DRTx") moves for summary judgment on its claim against Defendant Peter Pacillas in his official capacity as the interim Chief of the El Paso Police Department ("EPPD").[1]  Mot., ECF No. 19; Reply, ECF No. 33.  Invoking 42 U.S.C. § 1983, DRTx requests declaratory and injunctive relief for Pacillas's alleged violation of the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801–10851, the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"),[2] 42 U.S.C. §§ 15001–15045, and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e (collectively, the "Protection and Advocacy Acts" or "P&A Acts").[3] Mot. at 20; Compl., ECF No. 1 ¶¶ 32–44.  Pacillas opposes DRTx's Motion.  Resp., ECF No. 31.

---

[1] DRTx originally sued then-Chief of EPPD Greg Allen.  Chief Allen has since passed away. Under Federal Rule of Civil Procedure 20(d), the Court automatically substituted Peter Pacillas as the proper defendant.  FED. R. CIV. P. 20(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.").

[2] PADD stands for Protection and Advocacy for Persons with Developmental Disabilities.

[3] Pacillas does not challenge DRTx's implicit assertion that § 1983 supplies an appropriate avenue for relief.  For a discussion on why DRTx can seek relief for Pacillas's alleged violation of the P&A Acts under § 1983, see *Prot. & Advoc. for Pers. with Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 312–13 (D. Conn. 2003); *Advoc. Ctr. v. Stalder*, 128 F. Supp. 2d 358, 365–66 (M.D. La. 1999).

Like so many others, this case arises from an interaction-gone-wrong between law enforcement officers and an individual with mental illness.[4]  E.C., who is DRTx's client, was experiencing a mental health crisis.  At E.C.'s mother's request, EPPD dispatched officers to his home.  EPPD officers arrived intending to apprehend and transport E.C. to a mental health facility.  But that did not happen.  After a short standoff, EPPD officers discharged three different weapons, striking and injuring E.C. with tasers, beanbags, and a bullet.  DRTx, invoking its records-access authority and investigatory authority under the P&A Acts, is investigating this incident as probable abuse and neglect that EPPD officers committed against E.C.  As part of its investigation, DRTx has requested certain records from EPPD related to the incident.  EPPD is withholding those records and asserting that DRTx lacks the authority under the P&A Acts to obtain them.

On June 6, 2023, the Court issued a Memorandum Opinion and Order denying DRTx's Motion and indicating that it might enter summary judgment in Pacillas's favor under Federal Rule of Civil Procedure 56(f).[5]  Mem. Op., ECF No. 44, at 3, 38–39.  The parties have briefed

---

"[E]ven if [DRTx's] § 1983 claim was defective in some way, . . . there is ample case law to support [DRTx's] [ ] power . . . to pursue its claims in a judicial forum simply under [the P&A Acts]."  *See Armstrong*, 266 F. Supp. 2d at 313.

[4] *See, e.g.*, *Edmiston v. Culberson County*, 580 F. Supp. 3d 411, 418–20, 425 (W.D. Tex. 2022) (describing jail officers' alleged failure to administer a suicide screening for John Robert Schubert, Jr, an individual suspected of then-experiencing a mental health crisis; Mr. Schubert committed suicide while being held in jail); *Langiano v. City of Fort Worth*, No. 4:21-cv-00808-O, 2022 WL 6813630, at *3–4 (N.D. Tex. Sept. 10, 2022) (describing alleged incident where officers entered Tracy Langiano's motel room, a person who allegedly had a mental illness, was suicidal, and had a gun; an officer shot Mr. Langiano five times and he survived); *Sanchez v. Gomez*, EP-17-CV-133-PRM, 2020 WL 1036046, at *1–2 (W.D. Tex. Mar. 3, 2020) (describing alleged officer-involved killing of Erik Emmanuel Salas-Sanchez, an individual with mental illness); *Feliz v. El Paso County*, 441 F. Supp. 3d 488, 494–96 (W.D. Tex. 2020) (describing alleged failure of deputies and officers of the El Paso County Sherriff's Department to provide proper care, after a physical altercation, to Robert Gallegos, an individual whom the "Jail Annex psychologist [had] diagnosed" with a "cognitive disorder"; Mr. Gallegos died).

[5] Rule 56(f) allows a Court to issue summary judgment for a non-movant but only "[a]fter giving notice and a reasonable time to respond."  FED. R. CIV. P. 56(f).

the issue of whether the Court should do so.  *See generally* DRTx Rule 56(f) Objs., ECF No. 54;

Pacillas Rule 56(f) Resp., ECF No. 57; DRTx Rule 56(f) Reply, ECF No. 58.  After carefully

considering the parties' arguments, the Court **DENIES** DRTx's Motion, **GRANTS SUMMARY**

**JUDGMENT** for Pacillas under Rule 56(f), and **WITHDRAWS** its prior opinion and

**SUBSTITUTES** this one in its place.

## I.    BACKGROUND

DRTx is a federally-authorized, state-established organization that, broadly speaking,

works to protect and advocate for people with disabilities.  The Court refers to DRTx, and other

organizations like it, as protection and advocacy organizations ("P&A organizations") or

protection and advocacy systems ("P&A systems").

### A.  Protection and Advocacy Acts

Congress first established the framework for protection and advocacy systems in 1975 by

passing the Developmentally Disabled Assistance and Bill of Rights Act.  *See* Pub. L. No. 94-

103, Title II, § 113, 89 Stat. 486, 504 (1975).  Congress recognized that people with disabilities

were "often unreasonably and unnecessarily deprived of their rights and relegated to second class

status."  H.R. REP. NO. 94-58, at 7 (1975), *reprinted in* 1975 U.S.C.C.A.N. 919, 925.  It thus

"applaud[ed] [the] effort on the part of the developmental disabilities program [at the National

Center for Law and the Handicapped] to establish, assure, and preserve the rights of the

disabled."  *Id.*  Building off that, Congress later passed what has now become a collection of

laws—the P&A Acts—that give P&A organizations various powers to protect and advocate on

behalf of people with disabilities and mental illness.

In the 1980s, for example, acting in response to what Congress characterized as

widespread mistreatment of people with mental illness, Congress took several steps to better

understand the problem and enhance protections for those individuals.  *See, e.g.*, S. REP. No. 99-109, at 1–3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1361–63; *see also* Amanda Peters, *Lawyers Who Break the Law: What Congress Can Do to Prevent Mental Health Patient Advocates from Violating Federal Legislation*, 89 OR. L. REV. 133, 133–45 (2010) (reviewing history of treatment of people with mental illness and the enactment of PAIMI).  Included in those steps was a nine-month investigation into the "conditions in state-operated facilities" that provided inpatient services for people with mental illness.  S. REP. No. 99-109, at 1–3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1361–63.  After that investigation, Congress found, among other things, that "individuals with mental illness are vulnerable to abuse and serious injury" and that "State systems for monitoring compliance with respect to the rights of individuals with mental illness var[ied] widely and [we]re frequently inadequate."  42 U.S.C. § 10801(a)(1), (4).

So Congress identified a remedial measure.  Each of the state-operated facilities Congress investigated had some type of internal advocacy system for patients, but Congress found that some facilities "were unable to investigate complaints adequately for various reasons" and that advocates had "limited authority" to "investigate certain complaints under state definitions of abuse and neglect."  S. REP. No. 99-109, at 2–3 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1362–63.  Advocates' limited authority, according to Congress, was "a serious impediment to effective protection of patients."  *Id.* at 1363.  Congress thus concluded there was "a need for an advocacy system independent of any service provider."  *Id.* at 1362.

Enter PAIMI.  Under its Spending Clause authority, Congress enacted PAIMI to (1) "ensure that the rights of individuals with mental illness are protected" and (2) help states "establish and operate a protection and advocacy system for individuals with mental illness."  42

U.S.C. § 10801(b), Pub. L. No. 99-319, Title I, § 101 (1986).  To receive funding under the Act,

states must establish a protection and advocacy system.  42 U.S.C. § 10804; *see also Va. Off. for*

*Prot. & Advoc. v. Stewart*, 563 U.S. 247, 250 (2011).  A state may choose to establish either a

private nonprofit entity or a public institution as its P&A organization.[6]  42 U.S.C.

§§ 10805(c)(1), 15044.  P&A organizations have a mission to, among other things, "ensure the

protection of individuals with mental illness" and "investigate incidents of abuse and neglect of

individuals with mental illness if the incidents are reported to the [P&A] system or if there is

probable cause to believe that the incidents occurred."  *Id.* §§ 10801(b)(2)(B), 10805(a)(1)(A),

(B); *see also id.* § 15043(a)(2)(B); 29 U.S.C. § 794e(f).

     As originally enacted, PAIMI limited P&A organizations' mission to protecting and

advocating for people with mental illness living in residential or overnight facilities, such as

mental health hospitals.  Pub. L. No. 99-319, Title I, § 102(3)(B), 100 Stat. 478, 479 (1986)

(covering "an inpatient or resident in a facility rendering care or treatment").  But after PADD

and PAIMI's successes,[7] Congress twice expanded PAIMI's scope, once in 1988 and again in

2000.  In 1988, Congress added to P&A organizations' purview the protection and advocacy of

individuals with mental illness who are "in the process of being admitted" or are "being

transported" to a mental health facility.  *Compare* Pub. L. No. 99-319, Title I, § 102(3), 100 Stat.

---

[6] Texas established DRTx as its P&A organization.  Compl., ECF No. 1 ¶ 8 (alleging DRTx is Texas's P&A organization); Answer, ECF No. 5 ¶ 8 (admitting that fact); *see also* Disability Rights Texas, *How We Began*, https://disabilityrightstx.org/en/about-us/how-we-began/ (last visited Aug. 25, 2023).

[7] *See, e.g.*, S. REP. NO. 106-196, at 25 (1999) ("This program has, since its inception in 1986, improved services for [persons with serious mental illness] through its proactive work on behalf of [those] individuals."); *id.* at 25–26 (explaining that although "[o]ver the past twenty years tremendous advances in treatment services for mental illness have allowed persons with mental illness to receive needed treatment in the community," amendments were needed to "expand[] the authority of [P&A] systems" because "there ha[d] not been a mechanism to ensure that [persons living in the community] [we]re receiving the care and advocacy services they need[ed]").

478, 478–79 (1986), *with* Pub. L. No. 100-509, Title I, § 3(2)(C), 102 Stat. 2543, 2543 (1988).[8]

The 2000 amendment "extend[ed] the responsibilities of the Protection and Advocacy program"

to people with mental illness not living in inpatient or residential facilities.  *See* S. REP. NO. 106-

196, at 8 (1999); 42 U.S.C. § 10802(4)(B)(ii).  P&A organizations can now advocate for persons

with mental illness who "live[] in a community setting, including their own home."[9]  42 U.S.C.

§ 10802(4)(B)(ii).[10]

Meanwhile, in 1992, Congress passed PAIR to further expand P&A organizations'

authorities.  Pub. L. No. 102-569, Title V, § 510(a), 106 Stat. 4344, 4430–34 (1992).  Congress

wanted to "expand[] advocacy services to [individuals with disabilities], regardless of the age of

onset or the severity of the disability."  H.R. REP. NO. 102-822, at 122 (1992).  PAIR thus

ensures that P&A organizations may advocate for certain individuals with disabilities not

covered by PADD or PAIMI.  *See* Pub. L. No. 102-569, Title V, § 510(a) 106 Stat. 4344, 4430

---

[8] "The intent of these changes [wa]s simply to extend coverage under the Act . . . ."  S. REP. NO. 100-454, at 7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3217, 3223.

[9] To implement P&A organizations' expanded mission, Congress added to the definition of "mentally ill individual," now "individual with mental illness."  *Compare* Pub. L. No. 99-319, Title I, § 102(3), 100 Stat. 478, 479 (1986), *with* Pub. L. No. 106-310, Title XXXII, § 3206(b)(1)(B)(iv), 114 Stat. 1101, 1194 (2000).  Before 2000, that definition focused on long-term residents of facilities providing care or treatment to people with mental illness; or, more specifically, to persons who are an "inpatient or resident in a facility," persons "being admitted" or "being transported" to a facility, or persons "involuntarily confined in a municipal detention facility."  *Compare* Pub. L. No. 99-319, Title I, § 102(3), 100 Stat. 478, 478–79 (1986), *and* Pub. L. No. 100-509, Title I, § 3(2)(C), 102 Stat. 2543, 2543 (1988), *with* Pub. L. No. 106-310, Title XXXII, § 3206(b)(1)(B)(iv), 114 Stat. 1101, 1194 (2000).

[10] Regarding the 2000 amendment, the Senate Committee on Health, Education, Labor, and Pensions said that while "[t]he P&A systems would still give priority to those individuals residing in facilities that provide mental health services," the systems "would also be able to work on behalf of persons living at home" so long as the annual appropriation for the program is $30,000,000 or more.  S. REP. NO. 106-196, at 25–26 (1999).  The Act directly reflects the Committee's intention: "The definition of 'individual with mental illness' contained in section 10802(4)(B)(iii) [sic] of this title shall apply, and thus an eligible system may use its allotments under this subchapter to provide representation to such individuals, only if the total allotment under this subchapter for any fiscal year is $30,000,000 or more." 42 U.S.C. § 10804(d).  Although that subsection cross-references 42 U.S.C. § 10802(4)(B)(iii), that provision does not exist.  The Court assumes Congress intended to reference section 10802(4)(B)(ii). The Court has not found an unenacted section 10802(4)(B)(iii) in the legislative history.

(1992); *see also* S. REP. NO. 102-357, at 98 (1992); *Disability Rts. Wis., Inc. v. State of Wis. Dep't of Pub. Instruction*, 463 F.3d 719, 725 (7th Cir. 2006).

To ensure P&A organizations would effectively accomplish their missions, Congress specified their privileges and authorities by statute.  First, Congress made P&A organizations independent from state agencies that provide treatment or services to individuals with disabilities or mental illness.  42 U.S.C. §§ 10805(a)(2), 15043(a)(2)(G); 29 U.S.C. § 794e(f).  Second, Congress authorized P&A organizations to

> (1) "pursue administrative, legal, and other appropriate remedies" on behalf of individuals with disabilities or mental illness, 42 U.S.C. §§ 10805(a)(1)(B), 15043(a)(2)(A)(i); 29 U.S.C. § 794e(f)(3),
>
> (2) access facilities that provide care or treatment to individuals with mental illness, 42 U.S.C. § 10805(a)(3),
>
> (3) access any location that "services, supports, and [provides] other assistance" to any individual with disabilities, 42 U.S.C. § 15043(a)(2)(H); 29 U.S.C. § 794e(f)(2), and
>
> (4) access records related to their clients, 42 U.S.C. §§ 10805(a)(4), 10806, 15043(a)(2)(I), 15043(c); 29 U.S.C. § 794e(f)(2).

DRTx demands documents from EPPD under PAIMI's record-access provision, which gives P&A organizations "access to all records of any individual who is a client of the system." 42 U.S.C. § 10805(a)(4); *see also Stewart*, 563 U.S. at 250–51 ("[A P&A system] must be given access to all records of individuals who may have been abused as well as other records that are relevant to conducting an investigation." (quotations omitted)).  In the alternative, DRTx argues that PAIR authorizes it to obtain the records it wants from EPPD because PAIR fills gaps left by PAIMI and PADD and provides DRTx with "the same general authorities, including the authority to access records," that PADD provides.  *See* Mot. at 1, 12–13, 26; DRTx Rule 56(f) Objs. at 16; DRTx Rule 56(f) Reply at 4–7.

- 7 -

**B.  Factual Background[11]**

Because this case raises novel questions about the scope of P&A organizations'

authorities, some context is helpful.  The Court will discuss the role EPPD plays in the

community with respect to individuals with mental illness before turning to the incident that

brought about this case.

### 1.  EPPD's Role in the Community

In Texas, peace officers have the authority, under certain circumstances, to involuntarily

detain people with mental illness.[12]  Officers can detain people with mental illness with or

without a warrant, subject to certain statutory requirements.[13]  Officers' power is fairly broad.  In

the warrantless context, for example, only peace officers have the authority to detain someone

with a mental illness.[14]  Whenever an officer detains someone with a mental illness (with or

---

[11] The Court takes these facts from the summary judgment record and views them in the light most favorable to the nonmovant—here, Pacillas.  *E.g.*, *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020).

[12] TEX. HEALTH & SAFETY CODE §§ 573.001, 573.012(d)–(e).

[13] *Id.* §§ 573.001 (detention without a warrant), 573.012 (detention with a warrant); *see also* Officer Maria Delgado Dep., Mot. Ex. A, ECF No. 23 at 14:23–15:2, 16:5-9.

To detain someone with mental illness under a warrant, an officer must obtain that warrant from a judge or magistrate.  To issue such a warrant, the judge or magistrate must find that (1) the subject of the warrant has a mental illness, (2) there's a substantial risk they will seriously harm themselves or others, (3) the risk of harm is imminent, and (4) "restraint cannot be accomplished without emergency detention."  TEX. HEALTH & SAFETY CODE § 573.012(b).

To detain someone without a warrant, an officer must have "reason to believe," and actually believe, that the person has a mental illness and "because of that mental illness there is a substantial risk" the person will seriously harm themselves or others.  *Id.* § 573.001(a); *see also* Delgado Dep. at 15:3-14.

[14] *See* EPPD Procedures Manual § 409.9, Mot. Ex. D, ECF No. 20-4, *also available at* https://elpaso.municipalcodeonline.com/book?type=publicpolice#name=409_Mentally_Ill_Persons (last visited Aug. 29, 2023) ("Texas State law does not provide for any emergency detention of a person without a warrant except under the authority of a Peace Officer.").

without a warrant), that officer must immediately transport that person to a mental health facility.[15]  EPPD calls the detention of a person with mental illness "emergency detention" and a warrant authorizing an emergency detention an "emergency detention order" ("EDO").[16]

EPPD's own policies further explain how its officers should interact with people with mental illness.  The Department's Procedures Manual includes instructions on emergency detention: "When officers have reason to believe a person poses a substantial risk of harm to themselves or others . . . they may take that person into custody for the purpose of obtaining an evaluation of the person's mental health and potential need for involuntary hospitalization."[17] Consistent with Texas law, the Department's Procedures Manual instructs EPPD officers to transport the person to a "psychiatric facility."[18]

---

[15] TEX. HEALTH & SAFETY CODE §§ 573.001(d) (requiring officer to "immediately . . . transport the apprehended person to . . . the nearest appropriate inpatient mental health facility"), 573.012(e) (similar); *see also* Delgado Dep. at 15:15-19.

In the case of warrantless detention, peace officers also have the authority to "transfer the apprehended person to emergency medical services personnel of an emergency medical services provider."  TEX. HEALTH & SAFETY CODE § 573.001(d)(2).

[16] *See, e.g.*, TEX. HEALTH & SAFETY CODE § 573.012(a); EPPD Procedures Manual § 409.3 (describing procedures for "obtaining an emergency detention warrant" as well as procedures for "emergency detention without a warrant").

[17] EPPD Procedures Manual § 409.4.

[18] *Id.* §§ 409.3(B), 409.4, 409.7 (subsection specifically addressing transport of persons with mental illness).

EPPD also trains its officers on how to interact with people with mental illness.[19]  This training includes instruction on emergency detention (with and without a warrant),[20] as well as the responsibility to take the detained person to an appropriate mental health facility.[21]

EPPD also has Crisis Intervention Teams ("CITs"), which are specially trained to "respond to incidents involving citizens with behavioral or mental health problems."[22]  CITs are made up of an EPPD officer and a civilian from a local mental health authority, Emergence Health Network.[23]  Among their many responsibilities, CITs are expected to handle calls for emergency detention.[24]  Broadly, part of a CIT's mission is "to prevent somebody's mental

---

[19] Delgado Dep. at 13:16-19, 13:25–14:16; Officer Daisy Gonzalez Dep., Mot. Ex. B, ECF No. 23 at 11:4–12:13; Officer Richard Escobar Dep., Mot. Ex. C, ECF No. 23 at 10:13–11:21; Officer Richard Escobar Aff., Resp. Ex. E at 2, ECF No. 31 ("I received trainings involving how to manage distress calls of individuals who may have a mental illness.  Those trainings are provided as a reminder to focus on de-escalating and to reach out to [Crisis Intervention Teams] for assistance."); Officer Daisy Gonzalez Aff., Resp. Ex. F at 2, ECF No. 23 (same).

[20] Delgado Dep. at 18:17–19:4; Gonzalez Dep. at 12:2-13 (general training in interaction with people with mental illness), 16:11–19:18 (familiarity with emergency detention procedures); Escobar Dep. at 12:2–14:14.

[21] *E.g.*, Delgado Dep. at 15:15-19 ("Q. Okay.  And once an officer has detained someone under the peace officer's warrantless detention, the peace officer must transport the person to the nearest appropriate mental health facility; is that right?  A. Correct."), 16:17-21 ("Q. Okay.  And the magistrate's warrant directs a peace officer to apprehend and transport the individual to the nearest appropriate mental health facility, correct?  A. Correct."), 18:25–19:9; Gonzalez Dep. at 17:8–18:2, 19:14-18; Escobar Dep. at 12:25–13:4, 13:12-16.

[22] *E.g.*, Internal Position Announcement: Crisis Intervention Team Officer, Mot. Ex. G at 1–2, ECF No. 20-7 (requiring CIT officers to "complete the CIT Training Curriculum").

[23] *E.g.*, Delgado Dep. at 23:3-22.

[24] *Id.* at 22:8-14, 24:18-22 (explaining that CIT officers respond "only to calls that are about mental health"); CIT Officer Guidelines, Mot. Ex. F at 1–2, ECF No. 20-6; *see also* Internal Position Announcement: Crisis Intervention Team Officer at 1–2.

[health] crisis [from] turning into an incident."[25]   That said, EPPD officers, even CITs, do not

provide medical care or treatment when executing an EDO.[26]   Officers do, however, transport

any person they have detained under an emergency detention to a mental health facility.[27]

### 2.  *The Incident between EPPD and E.C.*

Having provided the necessary background, the Court turns to the facts of this case.  On

or around May 22, 2020, E.C. began experiencing a mental health crisis.[28]   Whatever was

happening led E.C.'s doctor to apply for an EDO from the El Paso County magistrate court,

which the court issued.[29]   E.C.'s mother then called 911 to ask EPPD officers to pick up E.C. on

the EDO and transport him to a hospital or mental health facility.[30]   Dispatch called officers to

---

[25] Delgado Dep. at 24:3-8; *see also* CIT Officer Guidelines at 2 ("CIT Officers are trained negotiators and may be the only trained negotiators in the field in a barricaded or crucial incident event and if they are aware of an incident unfolding should make it a priority to respond to the scene.").

[26] Officer Maria Delgado Aff., Resp. Ex. D at 2, ECF No. 23 ("When responding to a mental health crisis I am not there as a mental health provider, I am not there to provide care or treatment, and I am not there to diagnose."); Gonzalez Aff. at 2 (same).

[27] *E.g.*, Delgado Aff. at 2 ("When responding to a distress call by a person who suffers a mental illness my role in the process is to take them into custody so I can transport them to the appropriate facility where they can receive care and treatment."); Escobar Aff. at 3 (same); Gonzalez Aff. at 2 (same).

[28] *See* Compl. ¶ 19 (alleging E.C. had a "psychiatric crisis" to which EPPD responded); Answer, ¶ 19 (admitting that fact); Warrant for Emergency Detention, Resp. Ex. B, ECF No. 32.

[29] Warrant for Emergency Detention at 1–2 (indicating that the magistrate signed the warrant on May 21, 2022); Crisis Intervention Team TASCI Triage Assessment Notes, Mot. Ex. K, ECF No. 23 ("[E.C.'s mother] reported [E.C.'s] doctor filed an EDO due to [E.C.'s] psychotic episodes.").

[30] Resps. & Objs. Pl.'s Interrogs., Mot. Ex. E at 1, ECF No. 23 (First Interrogatory); EPPD Event Chronology, Mot. Ex. I at 1, ECF No. 23 (noting that E.C.'s mother called about an "emerg[ency] det[ention] order for [her] son [E.C.]" and that she "want[ed] him taken to UBH or Rio Vista" hospital); Delgado Dep. at 32:10-16 ("From what I remember, I believe the mom had called 911 requesting assistance, saying that her son's doctor filed for a warrant, and that it had gotten approved."); Escobar Dep. at 18:16-21 ("Q. Okay.  And dispatch also told you, at that time, when you were responding, that, in addition to there being a magistrate's warrant, that EC's mother had called to have EPPD transport her son to a mental health facility, correct?  A. Yes."); Delgado Aff. at 1–2 ("My partner and I were called to the scene because the family of E.C. called 911 requesting help with E.C.  They communicated to dispatch that they had requested an Emergency Detention Order from a magistrate."); Escobar Aff. at 1–2 ("E.C.'s family called and told dispatch about an EDO they had requested."); Gonzalez Aff. at 1–2

the scene and told them that the call was for a "PCO,"[31] a term EPPD officers previously used to

refer to an EDO.[32]

Apart from the EDO, E.C. had an outstanding arrest warrant from 2019 for resisting

arrest.[33]  Notably, however, the summary judgment record—even when construed in the light

most favorable to Pacillas—reflects that EPPD officers entered E.C.'s home to execute an EDO,

not the 2019 warrant, as the Court will further explain.

EPPD Officer Richard Escobar arrived at E.C.'s home first.[34]  EPPD Officer Daisy

Gonzalez and her partner arrived next.[35]  When all three entered the home to execute the EDO,

E.C., who had a knife, retreated to a bathroom.[36]  Still, the officers' mission was to transport E.C.

to a mental health facility.[37]

---

(describing that a "family member . . . made the call" to dispatch to inform dispatch of an emergency
detention order for E.C.).

[31] Delgado Dep. at 32:10-16; Gonzalez Dep. at 20:13-20 ("Q. And you were dispatched to the call
in reference to an emergency detention . . . is that correct?  A. Yes.  Q. Did dispatch provide you with any
other information about the call that day?  A. No, ma'am.").

[32] *See, e.g.*, Delgado Dep. at 17:7–18:2; Gonzalez Dep. at 18:3-12, 19:8-10.

[33] El Paso Municipal Court Warrant Search, Resp. Ex. C, ECF No. 32.

[34] Escobar Dep. at 18:22-24; *see also* Gonzalez Dep. at 20:21–21:4.

[35] Gonzalez Dep. at 20:21–21:4; *see also* Escobar Dep. at 18:25–19:3.

[36] Escobar Dep. at 19:4-19 (agreeing that he entered E.C.'s home "to apprehend E.C." and
"transport him to a mental health facility under" the emergency detention order and saying that he
intended to accomplish this "as calmly as possible" in accordance with his training); Gonzalez Dep. at
21:5-7, 25:6-11, 25:21-23.  In her deposition, Officer Gonzalez first disputed that she entered E.C.'s home
to execute the emergency detention order.  Gonzalez Dep. at 21:8-11; *see also id.* at 24:1-25.  She later
clarified, however, that she was there to "evaluat[e] [E.C.] for the emergency detention" and "take EC to
a mental health facility," and that she entered the house to support Officer Escobar, *id.* at 25:13-23; 26:1-
5, who was there to execute the emergency detention order, *e.g.*, Escobar Dep. at 19:4-19.

[37] *E.g.*, Delgado Dep. at 34:20-25:

In accordance with that mission and EPPD's policies, EPPD had dispatched a Crisis Intervention Team to E.C.'s home.[38]  The CIT, consisting of Officer Maria Delgado and mental health Specialist Briana Moya,[39] began communicating with E.C.[40]  Due to E.C.'s mutism he was experiencing at the time, the CIT communicated with him over text message.[41]  The CIT attempted to calm E.C. and convince him to exit the bathroom without the knife.[42]

Things took a turn once Sergeant Grijalva arrived on the scene.[43]  After the CIT had been talking with E.C. for 30 minutes (give or take), Sergeant Grijalva commanded the CIT to stop

---

Q. [. . .] So, even after you heard that EC had a knife and had gone into the bathroom, were you still – the purpose of your response was still to apprehend and transport him pursuant to that magistrate's warrant of emergency detention?

A. Yes.

[38] *E.g.*, Resps. & Objs. Pl.'s Interrogs. at 1 (Second Interrogatory); Crisis Intervention Team TASCI Triage Assessment Notes; EPPD Event Chronology at 51; Delgado Dep. at 30:11-17 ("Q. You were on the crisis intervention team that responded to that call, correct?  A. That's correct."); Delgado Aff. at 1 ("I am a peace officer for the City of El Paso and work for the El Paso Police Department on the Crisis Intervention Team ('CIT').  I am one of the officers who responded to the dispatch call involving E.C. on May 22, 2020."); *see also* CIT Officer Guidelines at 1–2.

[39] Briana Moya's name was Briana Monrreal at the time of the incident.  *See* Delgado Dep. at 30:14-16; Pl.'s Proposed Undisputed Facts, ECF No. 19-1 at 8.

[40] Crisis Intervention Team TASCI Triage Assessment Notes at 2; Delgado Dep. at 40:11-14; Gonzalez Dep. at 26:12-15 ("Q. After EC went into the bathroom, the CIT officer and specialist arrived and started trying to talk to EC, correct?  A. Yes."); Escobar Dep. at 20:10-25.

[41] Crisis Intervention Team TASCI Triage Assessment Notes at 2; Delgado Dep. at 41:3-15 ("Q. And at some point, [someone] told you or Ms. Monrreal that EC could hear you, but would only communicate through texting; is that accurate?  A. That's accurate."); *see also* Del Sol Medical Center Medical Report, Mot. Ex. L at 1, ECF No. 23.

[42] Delgado Dep. at 41:10-12; Crisis Intervention Team TASCI Triage Assessment Notes at 2.

[43] *E.g.*, Delgado Dep. at 42:10-16.

- 13 -

trying to coax E.C. out of the bathroom[44] and ordered EPPD officers to forcibly enter the bathroom.[45]

Officers breached the bathroom to apprehend E.C., who remained armed with a knife.[46]

Officers shot E.C. with beanbags, tasers, and a bullet.[47]  At least one of the officers' beanbags hit

---

[44] Delgado Dep. at 42:23–43:11; Gonzalez Dep. at 27:5-8 ("Q. And so the decision to go into the bathroom, where EC was located, was Sgt. Grijalva's decision, then, as the ranking officer on the scene, correct?  A. Yes."); Crisis Intervention Team TASCI Triage Assessment Notes at 2.

[45] *See, e.g.*, Escobar Dep. at 21:9-13 (agreeing that Sergeant Grijalva "gave an order for officers to breach the bathroom"); Crisis Intervention Team TASCI Triage Assessment Notes at 2.

Even after officers breached the bathroom their mission was "still to apprehend EC so that either [he] or one of [his] colleagues could take [E.C.] to a mental health facility under the magistrate's warrant for emergency detention."  Escobar Dep. at 21:20-25.

[46] There's evidence in the summary judgment record that E.C. lunged at officers with the knife during the officers' initial breach of the bathroom.  But the record also contains evidence that suggests E.C. didn't lunge at officers with the knife until after the initial breach and did so instead when EPPD's SWAT Team apprehended E.C.  It's therefore not entirely clear from the timeline *when* E.C. lunged at officers with the knife, though the record, viewed in the light most favorable to Pacillas, shows that he did.  *Compare* Incident / Investigation Report , Mot. Ex. J at 2, ECF No. 23 ("The officers gave loud verbal commands, but the offender disregarded the commands and went inside the bathroom.  The offender subsequently lunged at the officers with the knife."), *with* Event Information, Mot. Ex. H at 2, ECF No. 23 (indicating that EPPD officers injured E.C. early on in the timeline of events), *and id.* at 5–6 (describing EPPD's SWAT team's later interaction with E.C. during which time E.C. "stab[bed]" a "shield as [officers] were trying to move in").  Nothing in DRTx's Motion turns on the timing of E.C.'s lunge toward officers, so that factual dispute is immaterial for the purposes of this Memorandum Opinion.

[47] Gonzalez Dep. at 27:25–28:3; Escobar Dep. at 22:1-9; Event Information at 2 ("Subj[ect] was tazed and hit with bean bags but no effect when units first made c[ontac]t."); Incident / Investigation Report at 2 ("The officers used nonlethal and deadly force but it was ineffective."); Crisis Intervention Team TASCI Triage Assessment Notes at 2 ("Approximately 5 Patrol officers [] entered the room. [ . . .] [E.C.] was then shot by officer Escobar, bean bagged twice by another patrol officer, and tasered twice by yet another patrol officer."); Del Sol Medical Center Medical Report at 6 ("[E.C.] sustained being tazed several times, being shot with a beanbag gun to the left inner thigh and then shot with a police side arm through the left anterior chest, left anterior axilla, left upper extremity and bilateral hands.").

E.C. in the left inner thigh,[48] and E.C. sustained non-fatal gunshot wounds to the left chest and hands.[49]

After learning that officers shot E.C. and that E.C. still had the knife, Sergeant Grijalva ordered all officers to clear the house.[50] The CIT resumed communications with E.C. via text message, albeit with very short to no responses from E.C.[51] Eventually, EPPD's SWAT team arrived and required the CIT to hand over the phone they had been using to communicate with E.C.[52] At that point, the CIT's communications with E.C. ceased and they were "removed from the scene."[53] EPPD's SWAT team then apprehended E.C.,[54] and noted in EPPD's records that they executed the outstanding 2019 arrest warrant for E.C., not the emergency detention order.[55] Once in custody, E.C. "was transported to receive medical attention."[56]

---

[48] *See, e.g.*, Del Sol Medical Center Medical Report at 2 ("The patient was also found to have a large contusion to the left inner thigh from what appeared to be a beanbag gun.").

[49] *See, e.g.*, *id.* at 1 ("Chief complaint: Gunshot wound to left chest, axilla and arm as well as bilateral hands.").

[50] *See* Crisis Intervention Team TASCI Triage Assessment Notes at 2 ("Officer Escobar informed Sgt. Grijalva he had fired his gun at [E.C.]. Sgt. Grijalva immediately instructed everyone to clear the house."); Delgado Dep. at 43:12-19; Gonzalez Dep. at 28:4-9; Escobar Dep. at 22:10-13.

[51] Crisis Intervention Team TASCI Triage Assessment Notes at 2.

[52] *Id.*

[53] *Id.*; *see also* Delgado Dep. at 43:22-24.

[54] Incident / Investigation Report at 2; Event Information at 5–7.

[55] Incident / Investigation Report at 2; El Paso Municipal Court Warrant Search (showing EPPD executed a 2019 probable cause warrant for "resist[ing] arrest[,] search or transport" on May 22, 2020 at 9:58 p.m. local time).

[56] Incident / Investigation Report at 2.

### 3. *DRTx Investigates and Requests Records*

DRTx received a complaint within a few days after the incident.[57]  At that point, DRTx

determined that it "had probable cause to believe E.C. was abused by EPPD officers,"[58] and

therefore opened an investigation into E.C.'s "possible abuse, neglect, or injury."[59]  On July 30,

2020, invoking its records-access and investigatory authority under the P&A Acts, DRTx asked

EPPD to produce the following records:

1.  All records from El Paso Police Department from the incident on or around
    May 22, 2020 when officers responded to [E.C.] including but not limited to:

    a.  The full police report,

    b.  The dispatch call details and summary,

    c.  The body camera footage from all officers who responded to the
        scene, and

    d.  All emergency detention documents.[60]

---

[57] Compl. ¶ 22.  Defendant does not dispute this fact.  *See generally* Resp.; Pl.'s Proposed Undisputed Facts; Pl.'s Facts Deemed Admitted, ECF No. 33-1.

[58] Compl. ¶ 22.  Defendant does not dispute this fact.  *See generally* Resp.; Pl.'s Proposed Undisputed Facts; Pl.'s Facts Deemed Admitted.

[59] Compl. ¶¶ 22, 37.  Defendant does not dispute that DRTx opened an investigation for these purposes.  *See generally* Resp.; Pl.'s Proposed Undisputed Facts; Pl.'s Facts Deemed Admitted.

[60] DRTx's Original Records Request (July 23, 2020), Mot. Ex. M at 1–2, ECF No. 23.  For completeness, the Court notes that DRTx requested copies of this information "*whether written or in another medium, draft or final form*, including handwritten notes, electronic files, photographs or video or audio tape records."  *Id.* (emphasis in original).

DRTx originally requested records from EPPD under 42 U.S.C. § 10805(a)(4)(B), which allows P&A organizations to access records of a client who "is unable to authorize" access to records and does not have a guardian who can authorize access to records.  *See* Mot. at 6 n.31; DRTx's Original Records Request.  While this case was pending, E.C. regained capacity to authorize DRTx to obtain records and he consented to DRTx accessing his records.  *See* Mot. at 6 n.31; Authorization to Release Confidential Information, Mot. Ex. N, ECF No. 23 (signed by E.C.); *see also* 42 U.S.C. § 10805(a)(4)(A) (permitting P&A organizations to access records of consenting clients).

EPPD continues to withhold many of the records DRTx requested because it maintains that the P&A Acts don't authorize DRTx to obtain them.[61]

## C. Procedural Background

DRTx filed this case on September 13, 2021, seeking declaratory and injunctive relief. Compl. ¶¶ 32–44.  After failed settlement negotiations, *see* ECF No. 15, DRTx moved for summary judgment on its claim, *see generally* Mot.

On June 6, 2023, the Court denied DRTx's Motion and informed the parties that it was considering entering summary judgment in Pacillas's favor.  Mem. Op. at 3, 38–39.[62]  DRTx objected.  DRTx Rule 56(f) Objs. at 3–17; DRTx Rule 56(f) Reply at 1–7.  After reviewing DRTx's objections, the Court thought it would be prudent and helpful for Pacillas to respond.  Rule 56(f) Briefing Order, ECF No. 55, at 1–2.  Pacillas responded, arguing that the Court should adhere to its plan and enter summary judgment in his favor.  *See* Pacillas Rule 56(f) Resp. at 2–9.

The Court now addresses DRTx's Motion in light of all the briefing it has before it. Among other things, DRTx clarified its arguments under all of the P&A Acts at issue—PAIMI, PADD, and PAIR—so the Court now discusses DRTx's authority to obtain the records it seeks under each of those statutes.  *See generally* DRTx Rule 56(f) Objs. at 3–17; DRTx Rule 56(f) Reply at 1–7.  But in the end, the Court still concludes that DRTx lacks the authority to obtain the records it wants from EPPD.  Because there are still no genuine disputes of material fact, the Court concludes that entering summary judgment for Pacillas is proper.

---

[61] Rule 26(f) Joint Case Management Report, ECF No. 9 at 2.  DRTx says that EPPD has only given DRTx "the limited public report" and "search warrants."  Mot. at 7.  Defendant does not dispute this.  *See generally* Resp.

[62] For the Court's initial, now-withdrawn Memorandum Opinion and Order, see *Disability Rts. Tex. v. Pacillas*, --- F. Supp. 3d ----, 2023 WL 3855082 (W.D. Tex. June 6, 2023).

II.    DISCUSSION

Pacillas argues the Court lacks jurisdiction to hear this case.  Because the declaratory judgment standard incorporates jurisdictional considerations, the Court will begin there.  The Court will then turn to DRTx's request for summary judgment and the question of whether the P&A Acts authorize DRTx to obtain the records it wants from EPPD.

**A.  Declaratory Judgment**

With exceptions not relevant here, the Declaratory Judgment Act authorizes a court to enter a declaratory judgment so long as it has jurisdiction and there is an "actual controversy" between the parties.  28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").  "When considering a declaratory judgment action," a court must evaluate:

(1) whether an actual controversy exists between the parties in the case;

(2) whether [the court] has authority to grant declaratory relief; and

(3) whether [the court should] exercise its broad discretion to decide or dismiss a declaratory judgment action.

*Frye v. Anadarko Petrol. Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (cleaned up).

*1.  Whether There Is an Actual Controversy*

A case presents an "actual controversy" under the Declaratory Judgment Act if it qualifies as a "case or controversy" under Article III of the U.S. Constitution.  *Aetna Life Ins. Co. v. Hanworth*, 300 U.S. 227, 239–40 (1937); *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006) ("This circuit interprets the [28 U.S.C.] § 2201 'cases of actual controversy' requirement to be coterminous with Article III's 'case or controversy' requirement.").  "To show an actual controversy, the dispute at issue must be definite and concrete, real and substantial, and admit of

- 18 -

specific relief through a decree of a conclusive character." *Frye*, 953 F.3d at 294 (quotation

omitted).  In other words, the dispute cannot be "abstract or hypothetical."  *See Orix Credit All.,*

*Inc. v. Wolfe*, 212 F.3d 891, 895–96 (5th Cir. 2000) (quotation omitted).  "Basically, the question

in each case is whether the facts alleged, under all the circumstances, show that there is a

substantial controversy, between parties having adverse legal interest, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech,*

*Inc.*, 549 U.S. 118, 127 (2007) (quotation omitted).

For instance, for there to be a "case or controversy," a plaintiff must have Article III

standing.  *E.g.*, *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).  To establish Article III standing, a

plaintiff must show:

(1) it has "suffered an injury in fact;"

(2) there is "a causal connection between the injury and the conduct complained
    of;" and

(3) it's "likely . . . that the injury will be redressed by a favorable decision" from
    the court.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations omitted).

Pacillas argues this Court lacks jurisdiction because no actual controversy exists.  Resp.

at 10–13.  Presumably making the implicit argument that Texas's justiciability rules apply in

federal court, Pacillas begins his argument by invoking the *Texas* Constitution's justiciability

rules, *id.* at 10–11, but they don't apply here.[63]  He then argues that this case does not present an

actual controversy under the Declaratory Judgment Act, and if the Court were to issue an opinion

it would be advisory.  *Id.* at 10–13.  But Pacillas says little about which, if any, federal

---

[63] While "Texas's test for constitutional standing parallels the federal test for Article III
standing," *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 776 (Tex. 2020), the Court would *at most*
look to the Supreme Court of Texas for *guidance* regarding standing analysis under Article III of the U.S.
Constitution.

jurisdictional doctrine he invokes, such as mootness, ripeness, political question, or sovereign immunity.  *See id.*

Citing a case from the Supreme Court of Texas, Pacillas does drop a note about standing: "An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury." *Id.* at 11 (quoting *Tex. Assoc. of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)). But Pacillas doesn't further develop his lack-of-standing argument.  He does not say *why* he thinks DRTx's alleged injury—that Pacillas has deprived DRTx of the records it argues the P&A Acts authorize it to access—is hypothetical.

Pacillas instead suggests the underlying facts are hypothetical.  In Pacillas's eyes, DRTx's case is premised on the idea that EPPD officers executed an EDO when they apprehended E.C.[64]  Resp. at 12.  That premise is false, Pacillas argues, because EPPD actually executed an arrest warrant,[65] not an EDO.  *Id.*  It doesn't matter, according to Pacillas, that the officers dispatched to E.C.'s home believed they were acting under an EDO, which is a fact Pacillas appears to concede.[66]  *See id.* at 10–13.

It's not even clear that Pacillas's factual argument is a jurisdictional one.  Strip away all the hand-waving and the bottom line is this: Pacillas argues that during the incident between EPPD and E.C., EPPD was executing an arrest warrant, not an EDO, so the Department is not subject to DRTx's investigatory authority under the P&A Acts and is therefore not required to

---

[64] DRTx vehemently disputes Pacillas's characterization.  Reply at 1–4.

[65] *See* El Paso Municipal Court Warrant Search.

[66] Resp. at 12 ("*The subjective belief by officers that an EDO existed somewhere*, does not in and of [itself] somehow change the character of what occurred, nor does it make an arrest for a criminal offen[s]e into medical care or mental health services." (emphasis added)).

produce records of the incident.  *See id.* at 10–14.  But that purported jurisdictional argument is merely a restatement of the question DRTx and EPPD dispute: Does DRTx have the authority under the P&A Acts to obtain EPPD's records of the incident between EPPD and E.C.?  And that question is one that directly implicates the *merits* of DRTx's action—*not* whether this Court has *jurisdiction* to decide that question.

In any event, the Court is independently satisfied that DRTx has standing to bring this case.  *United States v. Hays*, 515 U.S. 737, 742 (1995) (explaining that "standing is not subject to waiver" and courts must satisfy themselves that the plaintiff has standing because "federal courts are under an independent obligation to examine their own jurisdiction" (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–31 (1990))).  For the standing analysis, the Court must assume DRTx has the authority to obtain the records it wants from EPPD.  *See N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) ("When considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." (cleaned up)).[67]

As discussed, Congress provided P&A systems, like DRTx, with several authorities, including the right to obtain certain records.  42 U.S.C. §§ 10805(a)(4), 10806, 15043(a)(2)(I), 15043(c); 29 U.S.C. § 794e(f)(2).  In line with its putative records-access authority, DRTx

---

[67] Another principle regarding the overlap between standing and a merits dispute is at play here too.  As discussed, DRTx's alleged injury is EPPD's refusal to provide it with documents that DRTx asserts it has the authority to access under the P&A Acts.  *E.g.*, Mot. at 20.  When "a plaintiff's claim of injury in fact depends on legal rights conferred by statute, it is the particular statute and the rights it conveys that guide the standing determination."  *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) (quotation omitted).  In other words, a court determines whether a plaintiff has standing by evaluating whether the statute "grant[s] persons in the plaintiff's position a right to judicial relief."  *Id.* To answer that question here, the Court must assess whether the P&A Acts give DRTx the right to obtain the documents it seeks, which is also the merits dispute.  Thus, the Court must conclude that it has jurisdiction and proceed to the merits.  *Cf. Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case.").

requested records from EPPD regarding E.C.'s possible abuse and neglect.  EPPD has refused to

provide those records, which injures DRTx.  *See Stalder*, 128 F. Supp. 2d at 363–64 (explaining

that P&A Systems "ha[ve] standing to bring a lawsuit requesting records" and that if an entity

denies the P&A system access to records related to "a claim it is investigating, it suffers a direct

injury to its statutory interest"); *cf. Ala. Disabilities Advoc. Program v. SafetyNet Youthcare,

Inc.*, 65 F. Supp. 3d 1312, 1322 (S.D. Ala. 2014) (noting, in a facility-access case, that the P&A

system "ha[d] standing because it [sought] to establish that [the defendant's] actions [were]

causing injury to the P & A system itself").

        To sum it up, DRTx cannot access the records it asserts it has a right to access under the

P&A Acts (the injury) because Pacillas refuses to provide them (the causal connection).  A

favorable decision from the Court would redress DRTx's alleged injury because the Court would

issue a declaratory judgment and permanent injunction in DRTx's favor requiring EPPD to

produce the records DRTx seeks.  *See Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 292–93

(5th Cir. 2001).  DRTx thus has Article III standing.  *See Stalder*, 128 F. Supp. 2d at 363–64.

And because DRTx has Article III standing, the Court's Opinion is not advisory.[68]  *See Carney*,

141 S. Ct. at 498, 501–02 (explaining that Article III standing "prevent[s] the federal courts from

issuing advisory opinions").

### 2.   *The Court's Authority and Its Discretion*

        Neither party disputes that the Court has authority to enter declaratory relief in this case

for the purposes of the test's second prong.  The Court itself is unaware of any pending state

---

[68] While the advisory opinion doctrine implicates other Article III justiciability limitations on federal courts' jurisdiction, like mootness and ripeness, Pacillas did not argue that any other justiciability limitation on this Court's jurisdiction prevents it from hearing this case.  *See generally* Resp.  In any event, the Court independently determines that no other justiciability doctrine deprives the Court of jurisdiction here.

court action that would deprive it of the authority to enter declaratory relief. *See, e.g.*, *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776 (5th Cir. 1993) (describing when "the district court may not consider the merits of [a] declaratory judgment action"); *Disability Rts. Tex. v. Bishop*, 615 F. Supp. 3d 454, 460, 471 (W.D. Tex. 2022) (concluding same under similar circumstances).

### 3. The Court's Discretion

Finally, the Court is satisfied that it should invoke its discretion to hear this declaratory judgment action, and the parties do not argue otherwise. *See Pontchartrain Partners, LLC v. Tierra de Los Lagos, LLC*, 48 F.4th 603, 605 (5th Cir. 2022) (per curiam) (describing six factors a court must consider when deciding whether to dismiss a declaratory judgment action). The Court thus proceeds to consider whether DRTx is entitled to summary judgment.

## B.  Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations omitted); *Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020).  And a dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357–58 (5th Cir. 2017).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *E.E.O.C. v. LHC Grp.,*

- 23 -

*Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (cleaned up).  "Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *McCarty*, 864 F.3d at 357 (cleaned up).  The non-movant cannot meet that burden by raising "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Id.* (cleaned up)*.*

In ruling on a motion for summary judgment, "courts must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena*, 946 F.3d at 723.  Courts, however, "refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (internal quotations omitted).  That is, courts refrain from "determin[ing] the truth of the matter." *Anderson*, 477 U.S. at 249.  Instead, "the evidence of the nonmovant is to be believed." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018) (cleaned up).  Nonetheless, the court "need not credit evidence that is 'merely colorable' or not significantly probative." *Id.* (quoting *Anderson*, 477 U.S. at 249–50).

## C.  There Are No Genuine Disputes of Material Fact

Nearly all the facts in this case are undisputed.  For the one fact that is disputed, the Court assumes, but does not decide, that the fact is material; whether it is or not, the dispute is not genuine.

To begin, I have a Standing Order governing motions for summary judgment that requires a movant to list all proposed undisputed facts and then requires the nonmovant to

respond to the movant's proposals.[69]  My Standing Order not only requires litigants to "provide specific citations to evidence in the record" as Federal Rule of Civil Procedure 56(c) and (e) require; it also provides that "[a]ll material facts set forth in [the movant's proposed undisputed facts] will be deemed admitted unless controverted by" the nonmovant's response, consistent with Rule 56(e)(2).[70]

DRTx complied with my Standing Order by listing its proposed undisputed facts with citations to the record.[71]  Pacillas, however, failed to comply.  That alone is enough to consider the facts undisputed.  *See Gaspard v. Amerada Hess Corp.*, 13 F.3d 165, 166 n.1 (5th Cir. 1994).[72]  And that alone is enough to allow the Court to decide the legal questions in this case

---

[69] Standing Order Regarding Motions for Summary Judgment, *available at* https://www.txwd.uscourts.gov/wp-content/uploads/Standing%20Orders/El%20Paso/Guaderrama/Standing%20Order%20Regarding%20Motions%20for%20Summary%20Judgment.pdf (last visited Aug. 25, 2023).

[70] *Id.* at 1–2; *see also* FED. R. CIV. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ."); FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); FED. R. CIV. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

[71] *See generally* Pl.'s Proposed Undisputed Facts.

[72] In *Gaspard*, the Fifth Circuit stated:

Many of the facts in this section come from the "Statement of Material Facts as to Which There is No Genuine Issue" filed by [the movant] with its Motion for Summary Judgment in accordance with Local Rule 2.10 of the Western District of Louisiana. [The nonmovant's] failure to file a response means that the facts in [the movant's] statement are admitted for purposes of [the movant's] summary judgment motion.

13 F.3d at 164 n.1.  While the parties' requirement to file a statement of proposed undisputed facts here is based on a standing order rather than a local rule, the Fifth Circuit's statement in *Gaspard* nonetheless applies.  By ignoring the Standing Order, Pacillas has failed to dispute any of the facts in this case.  *See Gaspard*, 13 F.3d at 164 n.1; *cf. Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 671–72 (7th Cir. 2006) (upholding district court's finding of no genuine material dispute of fact when response to proposed undisputed facts was "disjointed, convoluted, and hopeless mess"); *Morris v. Chase Home Fin., LLC*, No. EP-13-CV-132-KC, 2014 WL 517487, at *1 n.3 (W.D. Tex. Feb. 7, 2014) (after a party's failure to comply with a similar standing order, considering as undisputed facts that the party "only facially

based on the undisputed facts.  FED. R. CIV. P. 56(e)(2); *cf. Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (en banc) ("We resolve factual controversies in favor of the nonmoving party, *but only when* there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." (emphasis added)).

Even so, the Court will consider the one fact that Pacillas disputes in the body of his Response to DRTx's Motion.[73]  Pacillas submits that DRTx mischaracterizes the facts by saying the officers executed an EDO against E.C.  Resp. at 3–4.  Instead, Pacillas says, officers entered E.C.'s home to detain and transport him under an arrest warrant, not an EDO or a warrantless emergency detention.  *Id.*  The thing is, DRTx does not dispute that the officers did not *actually* have the EDO in hand when they went to and entered E.C.'s home.  Reply at 2 ("The truth is EPPD officers were in possession of *neither* the arrest warrant nor the EDO until after officers shot E.C.").  What DRTx says—and provides uncontradicted evidence to support—is that EPPD officers "universally believed" that they were dispatched to E.C.'s home "to effectuate an EDO."[74]  Reply at 2.

---

'dispute[d],' [did] not properly address, and [did] not appear to truly contest"); *cf. also Candelaria v. United States*, 518 F. Supp. 2d 852, 853 (W.D. Tex. 2007) (admonishing parties to follow the court's standing orders or "be met with sanctions").

[73] *See Morris*, 2014 WL 517487, at *1 n.3 (taking a similar approach).

[74] *See, e.g.*, Delgado Dep. at 32:21–33:9:

Q. Okay.  Do you recall if you ever – while you were on the scene, do you recall if you ever learned that there was, in fact, a magistrate's warrant for emergency detention?

A. I didn't confirm it, but I was told that they couldn't find it.

Q. So, if they couldn't find it, were you treating this as a call for a peace officer's warrantless detention, or how do you respond if that's the case?

A. Well, I believed that there was a warrant [for emergency detention], so that's how I responded.

Pacillas offers zero evidence to the contrary.  In fact, the evidence Pacillas does offer, from EPPD officers' affidavits, supports DRTx's position:

> I was under the impression we were there on an Emergency Detention Order . . . because dispatch relayed this information via the family member who made the call, but it was not until after the incident that we determined the outstanding warrant was a criminal warrant.[75]

With that, there is no genuine dispute about the reason EPPD officers went to E.C.'s home. Under the impression that there was a valid EDO, officers were there to detain E.C. and transport him to a mental health facility.[76]  Officers did not arrive there to execute an arrest warrant.[77]  No reasonable jury could find otherwise.

In response, Pacillas points out that EPPD apprehended E.C. under an arrest warrant. Resp. at 3–4.  True enough.  There is no dispute that EPPD executed a 2019 arrest warrant when they apprehended E.C.[78]  But that occurred around four hours after EPPD dispatched officers to E.C.'s home, and after EPPD officers shot E.C.[79]  E.C.'s eventual arrest simply does not change the undisputed fact that officers went to E.C.'s home under the impression there was a valid EDO.  Nor does it change the undisputed fact that EPPD officers tried to remove E.C. from the bathroom so that they could take him to a mental health facility.

---

[75] Delgado Aff. at 1; Gonzalez Aff. at 1–2 (same); Escobar Aff. at 1–2 (similar).

[76] *See, e.g.*, Escobar Dep. at 19:4-19 (agreeing that he entered E.C.'s home "to apprehend E.C." and "transport him to a mental health facility under" the emergency detention order and saying that he intended to accomplish this "as calmly as possible" in accordance with his training); Delgado Dep. at 34:20-25 (similar); Delgado Aff. at 1; Gonzalez Aff. at 1–2; Escobar Aff. at 1–2.

[77] Delgado Aff. at 1 ("[I]t was not until *after* the incident that we determined the outstanding warrant was a criminal warrant." (emphasis added)); Gonzalez Aff. at 1–2 (same); Escobar Aff. at 1–2 (similar).

[78] El Paso Municipal Court Warrant Search; *compare* Mot., *and* Reply, *with* Resp.

[79] *Compare* EPPD Event Chronology at 1, 7 (first entry at 5:42 p.m.), *with* El Paso Municipal Court Warrant Search (showing warrant executed at 9:59 p.m.).  *Compare* Mot., *and* Reply, *with* Resp.

Viewing the evidence in the light most favorable to Pacillas and drawing all reasonable inferences in his favor, *Cadena*, 946 F.3d at 723, the Court concludes there is no genuine issue about the reason EPPD dispatched officers to E.C.'s home or the reason EPPD officers continued to engage with E.C. throughout the incident. DRTx first met its burden of "identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact" about EPPD's purpose at E.C.'s home. *LHC Grp.*, 773 F.3d at 694 (quoting *Celotex*, 477 U.S. at 323). In response, Pacillas has failed to point to any specific facts that establish a genuine issue on this point. *McCarty*, 864 F.3d at 357. His unsupported assertions that "[i]t was via the arrest warrant that officers were able to gain entry in to [sic] the home and bring E.C. into custody," Resp. at 3, are insufficient to give rise to a genuine dispute of fact, *McCarty*, 864 F.3d at 357 (stating that the non-movant can't meet its burden "by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence").

Because DRTx has shown there is no genuine dispute of material fact, all that remains is for the Court to answer the legal question about whether the P&A Acts authorize DRTx to obtain the records it wants from EPPD. *See, e.g.*, FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

**D.  DRTx's Authority under PAIMI**

In its Motion, DRTx principally argues that PAIMI authorizes it to obtain EPPD's records of the incident as part of DRTx's authority to investigate "abuse" and "neglect" of

individuals with mental illness.[80]  So in its prior opinion denying DRTx's Motion, the Court focused on the intersection between DRTx's records-access authority and investigatory authority under PAIMI.  *See Pacillas*, 2023 WL 3855082, at *15–21.  The Court determined that PAIMI does not authorize DRTx to investigate EPPD's conduct as "abuse" or "neglect" because the injuries EPPD officers inflicted on E.C. do not qualify as "abuse" or "neglect," as PAIMI defines those terms.  *See id.*  In its Rule 56(f) Objections, however, DRTx contends that its records-access authority is independent of its investigatory authority under PAIMI, so whether EPPD's conduct qualifies as "abuse" or "neglect" is immaterial to whether PAIMI authorizes DRTx to obtain the records it wants from EPPD.  *See* DRTx Rule 56(f) Objs. at 8–11.

To an extent, the Court agrees.  As the Court will explain, DRTx's records-access authority is *not entirely* dependent on its investigatory authority.  DRTx is correct that there are non-investigatory circumstances where it may access records related to its clients.  *See Disability Rts. Wis.*, 463 F.3d at 727 ("[E]ach federal P&A statute contains provisions pertaining to the release of records that are entirely separate from the provisions supplying the agencies with investigatory authority.").  DRTx's records-access authority, however, is still *linked* to its investigatory authority insofar as it seeks records pursuant to an investigation of alleged abuse or

---

[80] *See, e.g.*, Mot. at 7 (arguing that Pacillas "violat[ed] DRTx's federal right to access records *necessary to investigate a complaint of abuse* of a person with mental illness" and that Pacillas's "conduct has prevented and is preventing DRTx from conducting its federally-mandated *investigation into this alleged abuse* of an individual with a disability" (emphasis added)); *id.* at 12 (describing its mandate under the P&A Acts as one "to investigate complaints of abuse and/or neglect"); *id.* at 14 (explaining that "Congress . . . equipped P&As like DRTx to effectively fulfill their *investigative mandate* by providing them with two distinct *investigatory powers* subject to PAIMI: monitoring-access authority and *records-access authority*" (quotation omitted and emphasis added)); *id.* at 15 (explaining that Congress granted P&A organizations investigatory authority); *id.* at 16 (similar); *id.* at 19–20 (tying records-access authority to "DRTx['s] . . . mandate[] to investigate"); *id.* at 26 ("The Court should accordingly enter a permanent injunction enjoining [Pacillas] from continuing to refuse DRTx access to E.C.'s emergency detention records in pursuit of its *statutory obligation to investigate the complaint of abuse*." (emphasis added)); Reply at 5–6 (tying investigatory authority with records-access authority).  *But see* Mot. at 19–20 (making a broader records-access authority argument that is not tied to DRTx's investigatory authority).

neglect.  Ultimately, the Court concludes that PAIMI's records-access provision does not independently authorize DRTx to obtain the records from EPPD and that PAIMI does not allow DRTx to obtain the records as part of its investigation of EPPD's alleged abuse of E.C.

### 1.  PAIMI's Records-Access Provisions

"Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).  Structure, in other words, is one of several ways Congress communicates a statute's operation, meaning, and scope.  Indeed, "Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line."[81]  *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017).  The placement of any provision within that hierarchical structure can clarify that provision's operation, meaning, or scope.  *Cf. Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2289 (2021) (relying on the structure of a section's paragraphs and their relation to each other as evidence of the disputed provision's meaning).

The structure of § 10805 shows that a P&A organization's records-access authority is not entirely dependent on its investigatory authority.  Section 10805 sets out a P&A "[s]ystem['s] requirements."  *See generally* 42 U.S.C. § 10805.  It's structured this way:

(a) Authority; independent status; access to facilities and records; advisory council; annual report; grievance procedure

A [P&A] system . . . shall—

(1) have the authority to—

---

[81] Sections are typically identified by numbers, e.g., § 10805.  Subsections are typically identified by lowercase letters, e.g., (a).  Paragraphs are typically identified by Arabic numerals, e.g., (1).  Clauses are typically identified by small and large Roman numerals, e.g., (ii) and (II).  *See, e.g., Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 461–62 (D.D.C. 2020); *see also* M. Douglass Bellis, *Statutory Structure and Legislative Drafting Conventions: A Primer for Judges*, FEDERAL JUDICIAL CENTER (2008), https://www.fjc.gov/sites/default/files/2012/DraftCon.pdf.

(A) investigate incidents of abuse and neglect of individuals with mental illness  . . . .

(B) pursue administrative, legal, and other appropriate remedies . . . .

(4) in accordance with section 10806 of this title, have access to all records of—

(A) any individual who is a client of the system . . . .

*Id.* § 10805(a)(1), (4).  Subsection (a) sets out various requirements for P&A organizations, including several powers such organizations enjoy.  *See id.* § 10805.  Those requirements, in turn, are separately listed in paragraphs.  For example, paragraph (1) lists some of a P&A organization's authorities—including, as particularly relevant here, its authority to "investigate incidents of abuse and neglect."  *Id.* § 10805(a)(1).  Separately, paragraph (4) provides for a P&A organization's records-access authority.  *Id.* § 10805(a)(4).  Paragraph (4) is not nestled under paragraph (1); nor does paragraph (4) cross-reference paragraph (1).  At minimum, the structure of § 10805 shows that a P&A organization's records-access authority is not entirely dependent on its other authorities, including its authority to investigate abuse and neglect.

Had Congress wanted to make a P&A organization's records-access authority entirely dependent on whether a P&A organization had the authority to investigate an incident of abuse and neglect, it could have structured § 10805 differently.  When Congress wanted to link two of PAIMI's provisions, it did so.  For example, Congress cross-referenced § 10806 in § 10805(a)(4) and thereby provided greater detail about the scope of a P&A organization's records-access authority.  *See Pa. Prot. & Advoc., Inc. v. Houstoun*, 228 F.3d 423, 426 n.1 (3d Cir. 2000) (Alito, J.).  In the same manner, Congress could have cross-referenced a P&A organization's investigatory authority with the records-access authority.  Congress could have said, for example, "as necessary to carry out the authority in section 10805(a)(1)(A), a P&A organization

shall have access to all records of its client." But Congress didn't say that. That Congress did

not draft PAIMI in a "readily available and apparent alternative [way] strongly supports the

conclusion" that a P&A organization's investigatory authority does not cabin its records-access

authority—that is, the records-access authority is not entirely dependent on the investigatory

authority. *Cf. SW Gen.*, 580 U.S. at 300–01 (using similar logic to confirm the meaning of a

different statutory provision) (cleaned up).

       Context also confirms that a P&A organization's records-access authority is not entirely

dependent on its investigatory authority. Courts interpret statutory provisions "in their context

and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of*

*Treasury*, 489 U.S. 803, 809 (1989) (referring to this as "a fundamental cannon of statutory

construction"). Here, Congress gave P&A organizations a mandate that's broader than

investigating incidents of abuse and neglect. PAIMI also authorizes P&A organizations to, for

instance, "pursue administrative, legal, and other appropriate remedies to ensure the protection of

individuals with mental illness." 42 U.S.C. § 10805(a)(1)(B). This authority to pursue remedies

is independent of a P&A organizations investigatory authority. *Compare id.* § 10805(a)(1)(A),

*with* § 10805(a)(1)(B). And there is no reason to think—and no statutory hook for the

proposition—that Congress would have provided a P&A organization with records-access

authority to help investigate incidents of abuse and neglect but not to pursue legal remedies on

behalf of its clients. The Court thus concludes that PAIMI's records-access provision is not

entirely dependent on its investigatory authority provision. *See, e.g.*, *Disability Rts. Wis.*, 463

F.3d at 727; *Mich. Prot. & Advoc. Serv., Inc. v. Flint Cmty. Schs.*, 146 F. Supp. 3d 897, 907–08

(E.D. Mich. 2015) ("By the plain terms and structure of [PAIMI and PADD], the 'access to

records' provisions are not cabined by the 'abuse or neglect' provisions, and the right to access

records therefore is not restricted in scope to the records only of clients of the [P&A organization] who have allegedly been abused or neglected.").

So the next question is whether § 10805(a)(4)—the records-access provision—authorizes DRTx to obtain the records it seeks from EPPD.

On its face, the records-access provision allows P&A organizations "access to *all records*" of its clients. 42 U.S.C. § 10805(a)(4) (emphasis added). In a separate section, however, Congress elaborated on what types of records P&A organizations may access:

> As used in this section, the term "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, an injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

*Id.* § 10806(b)(3)(A).

The Court begins with the text. There's tension between Congress's authorization for P&A organizations to obtain "all records" of its clients, as § 10805 says, and Congress's decision to define "records" in another section with the prefatory phrase, "as used in this section." 42 U.S.C. §§ 10805, 18086. Did Congress really mean *all* records, as it said in § 10805? 42 U.S.C. § 10805(a)(4); *see also Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254, 266 (5th Cir. 2014) ("[W]e think Congress meant what it said. All means all." (quotation omitted)). Because Congress did not define "records" in the section giving P&A organizations records-access authority (but did in a separate section) there's a question about whether the definition of "records" in § 10806 applies to "records" as used in § 10805. *Compare* 42 U.S.C. § 10805 ("records" undefined), *with id.* § 10806 ("records" defined).

Upon first look, one might think it does not. Congress preceded the definition of records with "[a]s used in this section." *Id.* § 10806(b)(3)(A). The text seems to suggest that the

definition of records in § 10806 applies to *that section* and no another.  After all, "as used in this section" sounds of an express limitation on the reach of the definition of "records."  *See, e.g.*, *SW Gen.*, 137 S. Ct. at 938–39 (explaining "under this section" means the term's definition "applies to the entire section"); *Texas v. United States*, 809 F.3d 134, 182–83, 183 n.185 (5th Cir. 2015) (explaining that "unauthorized alien" as defined at 8 U.S.C. § 1324a(h)(3) is "expressly limited to § 1324a" because it uses the phrase "as used in this section").  Not only that, but the same term does not necessarily have to have the same meaning in different sections of a statute.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 343–44 (1997) (explaining that "employee" as used throughout Title VII "may have a plain meaning in [one] context of a particular section" but it does not necessarily follow "that the term has the same meaning in all other sections and in all other contexts").  "Records" in § 10805 could be different than in § 10806.

Congress, however, cross-referenced sections 10805 and 10806, which makes it exceedingly likely that Congress meant to qualify § 10805 with § 10806.  *Houstoun*, 228 F.3d at 426 n.1 (concluding same).  Indeed, § 10805 is fairly explicit on this point: P&A organizations "shall . . . *in accordance with section 10806 of this title*, have access to all" of a client's records. 42 U.S.C. § 10805(a)(4) (emphasis added).  What's more, § 10806(b)(3)—which provides, in part, the definition of "records"—cross-references other subsections of § 10806 that themselves refer to the records-access provision in § 10805.  *Id.* § 10806(b)(3)(B) (providing that a P&A organization "shall have access to the type of records [defined in § 10806] in accordance with . . . paragraph[] (1) . . . of subsection (b)," which references § 10805(a)(4)).  All this suggests that the definition of "records" in § 10806(b)(3) defines the term "records" in § 10805(a)(4).

That the definition of "records" applies to § 10805(a)(4), however, does not tell us about the scope of the records-access authority.  The definition of records specifically mentions three types of records P&A organizations may access: reports prepared by a facility's staff; reports prepared by a third party tasked with investigating incidents of abuse, neglect, and injury; and discharge papers.  *Id.* § 10806(b)(3)(A).  But that's not the full scope because the listed examples of records comes after the phrase: "the term 'records' *includes*."  *Id.* (emphasis added).

The ordinary meaning of "includes" strongly suggests that Congress intended the definition of records to be non-exhaustive.[82]  *See, e.g.*, *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 527 (5th Cir. 2005); *Cox v. City of Dallas*, 256 F.3d 281, 293 (5th Cir. 2001).  But it's not invariably the case that "includes" conveys an open-ended meaning.  Even if a list is "illustrative rather than exhaustive," it may be limited by the theme of the examples provided.  *Samantar v. Yousuf*, 560 U.S. 305, 316–17 (2010).  That limiting principle is known as *noscitur a sociis*, which is "lawyer Latin" for "a word may be known by the company it keeps."  *United States v. Koutsostamatis*, 956 F.3d 301, 307 (5th Cir. 2020) (quoting *Graham Cty. Soil & Water Conservation Dist. v. ex rel. Wilson*, 599 U.S. 280, 287 (2010)).

The common element of the examples in the definition of "records" is that they pertain or relate to a client of a P&A organization.  Courts have affirmed a broad reading of the definition, and explicitly rejected narrower ones.  The Third Circuit rejected the idea that "records" covers only records that *belong* to an individual with mental illness, as opposed to, for example, those

---

[82] Black's Law Dictionary defines "includes" as:

To contain as a part of something. The participle *including* typically indicates a partial list <the plaintiff asserted five tort claims, including slander and libel>.  But some drafters use phrases such as *including without limitation* and *including but not limited to*—which mean the same thing.

*Includes*, Black's Law Dictionary (10th ed. 2014).

that belong to a hospital.  *See Houstoun*, 228 F.3d at 427.  Similarly, the Tenth Circuit concluded

that "records" is broader than "patient records" or "hospital records," and "include[s] peer review

and quality assurance records relating to a patient and his or her care."  *Ctr. for Legal Advoc. v.

Hammons*, 323 F.3d 1262, 1270 (10th Cir. 2003)  To be sure, "records" may be even broader

still.  *Bishop*, 615 F. Supp. 3d at 462–64 (concluding that "records" includes video from a

detention facility).  Suffice it to say, courts read PAIMI's records-access authority broadly.[83]

    Nevertheless, a P&A organization's records-access authority is not limitless.  Its scope is

cabined by *why* Congress provided records-access authority in the first place, which brings us

back to why a P&A organization's records-access authority is linked with its other authorities,

including its authority to investigate abuse and neglect.  Consider a P&A organization's statutory

mandate: to "ensure that the rights of individuals with mental illness are protected" and to not

only "investigate incidents of abuse and neglect," but also "protect and advocate [for] the rights

of [individuals with mental illness] through activities to ensure the enforcement of the

Constitution and Federal and State statutes."  42 U.S.C. § 10801(b).  Records access is not *part*

of a P&A organization's mandate; it's a tool P&A organizations have to help them *meet* their

mandate, whether that be investigating abuse and neglect or pursuing remedies on behalf of their

clients.  *See* 42 U.S.C. § 10805(a)(1); *see also, e.g.*, *Miss. Prot. & Advoc. Sys., Inc. v. Cotten*,

929 F.2d 1054, 1058–59 (5th Cir. 1991); *Hammons*, 323 F.3d at 1264 ("[PAIMI] authorizes P &

A Systems . . . to have access to certain records *in order to conduct its investigation into

incidents involving mentally ill individuals*." (emphasis added)); *Advoc. Inc. v. Tarrant Cnty.*

---

[83] *See, e.g.*, *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 382–83 (7th Cir. 2010) ("[P]eer review records are 'records' under the PAIMI Act."); *Prot. & Advoc. for Persons with Disabilities, Conn. v. Mental Health & Addiction Servs.*, 448 F.3d 119, 124–28 (2d Cir. 2006) (Sotomayor, J.) (similar); *Hammons*, 323 F.3d at 1267–73 (similar); *Houstoun*, 228 F.3d at 426–28 (similar); *Bishop*, 615 F. Supp. 3d at 463–67 (holding "records" under PAIMI "include[s] videos" as a matter of ordinary meaning confirmed by precedent).

*Hosp. Dist.*, No. 4:01-CV-062-BE, 2001 WL 1297688, at *2 (N.D. Tex. Oct. 11, 2001) ("*In support of that function*"—that is, a P&A organization's authorities under § 10805(a)(1)— "federal law and supporting regulations mandate that the P & A system have access to certain records." (emphasis added)).

DRTx contends that PAIMI authorizes it to access EPPD's records of the incident with E.C. because its review of those records falls within its mandate to "protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution." DRTx Rule 56(f) Objs. at 15–16 (quoting 42 U.S.C. § 10801(b)(2)(A)). That mandate, however, comes from Congress's statement of purpose in PAIMI. *See* 42 U.S.C. § 10801(b). It does not provide P&A organizations with some independent authority; rather, Congress "provide[d] the tools through which [PAIMI's purpose] is to be accomplished" elsewhere in the Act. *Cf. United States v. Turkette*, 452 U.S. 576, 589 (1981) (distinguishing between "the declared purpose of Congress" and provisions meant to actualize that purpose); *United States v. Bryant*, 996 F.3d 1243, 1260 (11th Cir. 2021) (explaining that prefatory material generally "does not limit or expand the scope of the operative clause").

PAIMI's purpose is realized, at least in part, through a P&A organization's investigatory authority and authority to pursue remedies on behalf of individuals with mental illness. *See* 42 U.S.C. § 10805(a)(1). In turn, as explained, the records-access provision supports those functions. *See Hammons*, 323 F.3d at 1264; *Advoc. Inc.*, 2001 WL 1297688, at *2. The records-access provision does not, contrary to what DRTx argues, sit entirely independent of its other authorities such that PAIMI authorizes DRTx to obtain any records related broadly to the protection of, or advocacy for, a client, so long as that client provides DRTx with consent to access them. *Contra* DRTx Rule 56(f) Objs. at 11. There must be a reason DRTx has the

authority to obtain records and, as relevant here, Congress provided those reasons in § 10805(a)(1): investigation of abuse and neglect and the pursuit of remedies on behalf of clients.[84]  42 U.S.C. § 10805(a)(1).

This brings the Court back to DRTx's argument that it has the authority to access EPPD's records as part of its authority to investigate the incident between EPPD and E.C. as probable abuse and neglect.  If DRTx has the authority to investigate the incident under PAIMI, then it would likely have the authority to access the records its seeks.  If it does not have investigatory authority under PAIMI, then it likely does not have the authority to access the records.

### 2.  DRTx's Authority to Investigate Abuse and Neglect

This case raises novel questions about the scope of P&A organizations' authority to investigate incidents of abuse and neglect of people with mental illness.  *Compare* Resp. at 4–10 (arguing EPPD is not subject to the P&A Acts), *with* Mot. at 8–18, *and* Reply at 2–9, *and* 42 U.S.C. § 10801(b)(2) (prescribing mission of P&A organizations).  DRTx says it has the authority to investigate the incident between EPPD and E.C., which, DRTx contends, includes its authority to access EPPD's records related to the incident.  Mot. at 8–18; Reply at 2–9.  Pacillas argues that the incident is not even within the scope of DRTx's investigatory powers because PAIMI limits DRTx's investigatory powers to alleged incidents of abuse and neglect perpetrated by those providing medical care or treatment, which Pacillas says EPPD does not provide.  Resp.

---

[84] The Court will not address whether DRTx has the authority to obtain the records from EPPD in furtherance of its authority to pursue remedies on behalf of E.C.  DRTx never meaningfully argues that it is pursuing EPPD's records as part of its authority to seek remedies for E.C.  Instead it argues either that its records-access authority is completely independent of its other authorities, *see* DRTx Rule 56(f) Objs. at 8–11, or that it has access to the records as part of its investigation of EPPD's alleged abuse of E.C., *see generally* Mot.; *supra* note 80 and accompanying text.

at 5–9.  Even if DRTx could investigate the incident, Pacillas argues, PAIMI does not authorize

DRTx to obtain the specific records it is requesting from EPPD.  Resp. at 6–7, 10.

### a.  The Admissions Provision and Transport Clause

To reiterate, P&A organizations have the authority to "investigate incidents of abuse and

neglect of individuals with mental illness."[85]  42 U.S.C. §§ 10801(b)(2)(B), 10805(a)(1)(A).

Congress defined the terms "abuse," "neglect," and "individual with mental illness" in ways that

limit P&A organizations' investigatory authority.  *See id.* § 10802.

Congress defined "individual with mental illness" as a person "who has a significant

mental illness or emotional impairment"[86] and who:

> (1) is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown;
>
> (2) is in the process of being admitted to a facility rendering care or treatment, including persons being transported to such a facility; []
>
> (3) is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or
>
> (4) who . . . lives in a community setting, including their own home.[87]

*Id.* § 10802(4).  The Court refers to the portion of the definition that describes an individual

"who is in the process of being admitted to a facility rendering care or treatment, including

---

[85] Congress also authorized P&A organizations to pursue certain lawsuits on their clients' behalf. 42 U.S.C. § 10805(a)(1)(B) (granting P&A organizations "authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State"); *Ind. Prot. & Advoc. Servs.*, 603 F.3d at 374–81.

[86] Pacillas does not dispute that E.C. meets this portion of the definition.  *See generally* Resp.; *see also* Compl., ECF No. 1 ¶ 19 (alleging E.C. had a "psychiatric crisis" that EPPD responded to); Answer, ECF No. 5 ¶ 19 (admitting that fact); Warrant for Emergency Detention.

[87] P&A organizations have the authority to advocate on behalf of people with mental illness who are living in the community only when its total allotment under PAIMI is ≥ $30,000,000 for any fiscal year.  42 U.S.C. § 10804(d).  Pacillas does not dispute that DRTx surpasses that threshold and thus has the authority to advocate on behalf of persons with mental illness who are living in the community.  *See generally* Resp.

persons being transported to such a facility" as the "Admissions Provision," and the last clause as the "Transport Clause."

Congress defined "abuse" as "any act or failure to act *by an employee of a facility rendering care or treatment* which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a[n] individual with mental illness," including striking the person or using excessive force against the person.  *Id.* § 10802(1) (emphasis added).

Congress defined "neglect," in relevant part, as "a negligent act or omission *by any individual responsible for providing services in a facility rendering care or treatment* which caused or may have caused injury or death to a[n] individual with mental illness or which placed [them] at risk of injury or death . . . ."  *Id.* § 10802(5) (emphasis added).

The threshold question here is whether DRTx has the authority to investigate the incident between EPPD and E.C. that occurred at E.C.'s home.  Pacillas argues DRTx does not have the authority to investigate the incident, and therefore obtain the records it seeks, because the incident is not within PAIMI's scope.  Resp. at 5.  Specifically, Pacillas suggests that the incident falls outside the definitions of "abuse" and "neglect" because EPPD officers are not "employee[s] of a facility rendering care or treatment" or "individual[s] responsible for providing services in a facility rendering care or treatment."[88]  *Id.* at 5, 7–9; *see also* 42 U.S.C.

---

[88] To the extent Pacillas argues that DRTx is limited to investigating alleged abuse and neglect perpetrated by someone who "render[s] care or treatment" to a person with mental illness, *see* Resp. at 5–9; *see also* 42 U.S.C. § 10802(1), (5), that misses the mark.  "Care or treatment" does not modify persons or actions.  "Care or treatment" helps define which *facilities* P&A organizations can investigate.  Look at the text: P&A organizations "have the authority to . . . investigate incidents of abuse and neglect of individuals with mental illness" committed by "an employee of *a facility rendering care or treatment*" or "an[] individual responsible for providing services in *a facility rendering care or treatment*."  *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(1), (5) (emphasis added).  That Act does *not* say P&A organizations have the authority to investigate incidents of abuse and neglect by an employee (or service provider) rendering care or treatment.  Rather, it says that P&A organizations have the authority to investigate

§ 10802(1), (5).  DRTx counters that because EPPD was attempting to *transport* E.C. to a mental health facility when the alleged abuse or neglect occurred, DRTx has the authority to investigate the incident and obtain the records, and it does not matter whether EPPD officers rendered care or treatment.  Mot. at 8–10, 14–15; Reply at 4, 8–9.

Begin with the text of the statute.  *E.g.*, *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 242 (5th Cir. 2022) (quoting *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018)).  Both parties agree that Congress authorized P&A organizations to "investigate incidents of abuse and neglect" of "persons being transported to . . . a facility."  *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(4)(B)(i)(II); *see also* Mot. at 8–9; Resp. at 5.  From there, though, the parties part ways.  DRTx focuses on the above formulation of its investigatory authority—investigation of incidents occurring during transport to a facility—while Pacillas points to what he argues are controlling limitations on the scope of DRTx's investigatory authority.

Pacillas is right that DRTx's investigatory authority is more limited than DRTx suggests it is.  To see why that's the case, add the definitions of "abuse" and "neglect" to DRTx's formulation of its investigatory authority:

---

abuse and neglect perpetrated, for instance, *at* facilities rendering care and treatment, or *during the process of admission* to facilities, or *during transport* to facilities.  *See id.* § 10802.  So, for example, P&A organizations have the authority to investigate abuse and neglect by an elementary school staff member, even though that staff member may not themselves render care or treatment.  *See Disability Rts. Wis.*, 463 F.3d at 722–24; *Disability Rts. N.Y. v. N. Colonie Bd. of Educ.*, 1:14-CV-0744, 2016 WL 1122055, at *1–2, 4–5 (N.D.N.Y. Mar. 21, 2016).

| Authority | Scope of Authority |
|---|---|
| Investigate Alleged Abuse During Transport: | P&A organizations have the authority to "investigate incidents of" "any act or failure to act *by an employee of a facility rendering care or treatment* which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a" "persons being transported to . . . a facility." *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(1), (4)(B)(i)(II) (emphasis added). |
| Investigate Alleged Neglect During Transport: | P&A organizations have the authority to investigate "a negligent act or omission *by any individual responsible for providing services in a facility rendering care or treatment* which caused or may have caused injury or death to a [person[]] being transported to . . . a facility] or which placed [that person] at risk of injury or death . . . ." *See* 42 U.S.C. §§ 10805(a)(1)(A), 10802(5), (4)(B)(i)(II) (emphasis added). |

In short, Congress limited P&A organizations' authority to investigate "abuse" and "neglect" allegedly committed by "employee[s] of a facility rendering care or treatment" or "individual[s] responsible for providing services in a facility rendering care or treatment," respectively. That E.C. was an "individual with mental illness" under PAIMI because EPPD officers were attempting to transport him to a mental health facility is not the beginning and the end of the analysis.[89] DRTx has not provided any evidence that EPPD officers—those who

---

[89] Congress preceded "being transported" with "in the process of being admitted to a facility rendering care or treatment, *including* persons being transported." 42 U.S.C. § 10802(4)(B)(II) (emphasis added). Congress's use of "including" strongly suggests that it provided "being transported" as an example of one of many steps "in the process of being admitted to a facility rendering care of treatment." *See Includes*, Black's Law Dictionary (10th ed. 2014) ("The participle *including* typically indicates a partial list."); *Budden*, 420 F.3d at 527 ("[W]e have held that the word 'includes' is usually a term of enlargement, and not of limitation." (cleaned up)). The ordinary meaning of "process"—which, among other things, means "[a] system of actions, changes, or functions that achieve an end result"—confirms that "being transported" is just one of many actions the admissions process provision covers. *E.g.*, *Process*, Webster's II New Riverside University Dictionary (1994). The Court therefore assumes, without deciding, that the fact EPPD officers injured E.C. before they were literally transporting him does not alone take the incident outside § 10802(4)(B)(II)'s scope. *Contra* Resp. at 8.

allegedly abused or neglected E.C.—qualify as employees or service providers of a facility covered by PAIMI.

In fact, the record suggests otherwise.  The record suggests that EPPD officers are employees of the City of El Paso.[90]  Texas law may have required EPPD officers to "immediate[ly] apprehend" and "transport[]" E.C. to "the nearest appropriate inpatient mental health facility" "for a preliminary examination,"[91] TEX. HEALTH & SAFETY CODE § 573.012(d)–(e), but that does not make them "employees of," or "individual[s] responsible for providing services" in, "a facility rendering care or treatment," *see* 42 U.S.C. § 10802(1), (5).

DRTx responds that Congress intended "facility" to be read broadly and not to constrain P&A systems' investigatory authorities, thus suggesting that EPPD may be a facility that renders care or treatment within PAIMI's meaning.  *See* Reply at 6.  It's true that Congress provided a somewhat open-ended definition of "facilities;" the term "*includes, but [is] not limited to*, hospitals, nursing homes, community facilities for individuals with mental illness, board and care

---

[90] *See* Internal Position Announcement: Crisis Intervention Team Officer (describing the "position description" for a CIT opening as having "been prepared" by "*the City of El Paso* and the El Paso Municipal Police Officers Association" (emphasis added)); Delgado Dep. at 13:3-6 (explaining that she is "employe[d] with the El Paso Police Department"); Escobar Dep. at 10:6-16 (explaining that he had attend "the City of El Paso police academy" before being licensed as an EPPD officer); *cf.* EPPD Procedures Manual § 100 (stating that the City of El Paso's Charter and laws prevail over any conflict with the provisions of the EPPD Procedures Manual).

[91] As discussed, the record shows that not only were EPPD officers required to take E.C. to a mental health facility under the EDO, but that was also the EPPD officers' stated intent. *See, e.g.*, Delgado Dep. at 40:11-18, 41:25–42:6 ("Q. And you also told [E.C.] that the reason that you were there was to help him?  A. That's correct.  Q. And did you mean, help him get mental health treatment under the magistrate's warrant for emergency detention?  A. Yes."); Escobar Dep. at 19:4-19 (agreeing that he entered E.C.'s home "to apprehend E.C." and "transport him to a mental health facility under" the emergency detention order and saying that he intended to accomplish this "as calmly as possible" in accordance with his training).

homes, homeless shelters and jails and prisons."  42 U.S.C. § 10802(3) (emphasis added);[92] *see also Includes*, Black's Law Dictionary (10th ed. 2014) ("The participle *including* typically indicates a partial list."); *Budden*, 420 F.3d at 527 ("[W]e have held that the word 'includes' is usually a term of enlargement, and not of limitation." (cleaned up)).

But as the Court explained earlier, it's not invariably the case that "includes" conveys an open-ended meaning.  Even if a list is "illustrative rather than exhaustive," it may be limited by the theme of the examples provided.  *Samantar*, 560 U.S. at 316–17; *see also supra* at p. 35.  The common thread in PAIMI's illustrative list of facilities is that they provide care or treatment services to people with mental illness.  *See, e.g.*, *Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 240 (2d Cir. 2006) (Sotomayor, J.) (deferring to the "reasonable interpretation advanced by [Health and Human Services] . . . that the term 'facilities' for purposes of PAIMI includes non-residential facilities that provide care or treatment to individuals with mental illness"); *Disability Rts. Wis.*, 463 F.3d at 726 (citing what is now 42 C.F.R. § 51.2); *see also supra* note 88.

On the record before it, the Court cannot conclude that EPPD (or the City of El Paso) is a facility under PAIMI.  Put differently, there is no evidence that EPPD officers are employees or service providers of a facility that provides care or treatment to people with mental illness.

That EPPD officers must "evaluate" a person for possible mental illness and whether they might be a danger to themselves or others, TEX. HEALTH & SAFETY CODE § 573.001(a), does not mean EPPD officers are employees or service providers of a facility providing care or treatment, *contra* Mot. at 12–13, 12 n.41, 13 n.43.  Texas's Health and Safety Code recognizes as much.  It

---

[92] *See also* H.R. REP. NO. 99-576, at 15 (1986) (Conf. Rep.), 1986 U.S.C.C.A.N. 1377, 1377 ("The intent of the legislation is to focus on abuse and neglect of mentally ill individuals and not on the particular residential facility in which they reside.").

requires peace officers, like EPPD officers, to immediately transport an individual detained

under a warrant-authorized EDO, like the one at issue here, to a mental health facility "for a

preliminary examination."  TEX. HEALTH & SAFETY CODE § 573.012(e).  In a sense, this code

provision recognizes that a peace officer's only role is to get the person he or she suspects might

have a severe mental illness that puts them or others in danger to a mental health facility so that

the person can get care or treatment.  In other words, evaluation and apprehension of a person

with mental illness is not care or treatment.

An EPPD officer's (or a magistrate's) evaluation of an individual like E.C. is a due

process limitation; it ensures that EPPD doesn't apprehend individuals without considering

whether their mental health status warrants it.  *Cf. Campbell v. State*, 68 S.W.3d 747, 760 (Tex.

App.—Houston 2001).  Beyond that non-medical evaluation meant to ensure an individual's due

process is respected, there is no indication that EPPD provides care or treatment services under

PAIMI.  *Cf.* 42 C.F.R. § 51.2 ("Care or treatment means services provided to prevent, identify,

reduce or stabilize mental illness or emotional impairment such as mental health screening,

evaluation, counseling, biomedical, behavioral and psychotherapies, supportive or other

adjunctive therapies, medication supervision, special education and rehabilitation.").[93]

---

[93] When promulgating PAIMI's implementing regulations, the Secretary of Health and Human Services explained that "care" "include[s] elements of traditional support services such as case management; accompanying patients to outpatient centers; medical appointments or day treatment centers; vocational training services; *transportation*; education programs; employment programs; and provision of food, water and clothing" *"to the extent that any" of these services "are provided to individuals with mental illness in eligible care or treatment facilities."*  62 Fed. Reg. 53548-01, 53551 (Oct. 15, 1997) (emphasis added).  While the Secretary's understanding of "care" is broad, the Secretary recognized there must be a nexus between the "elements of traditional support services" and a facility.  So even if transporting E.C. to a mental health facility is properly understood as "care"—a question the Court does not decide—that does not make EPPD officers employees or service providers of a facility rendering care or treatment.

This conclusion does not, as DRTx argues, render superfluous P&A organizations' authority to investigate incidents of abuse and neglect perpetrated while transporting a person with mental illness.  *Contra* Mot. at 14–15.  The Court's conclusion only means that DRTx's investigatory authority under PAIMI is bound by the definitions of "abuse" and "neglect."  That leaves open, for example, DRTx's authority to investigate possible abuse or neglect committed by an employee of a facility who was involved in transporting a person with mental illness.  *See Armstrong*, 266 F. Supp. at 308 (P&A organization investigated the death of an inmate "who died while being transported").  The Court's interpretation of the Admissions Provision and Transport Clause does not render them inoperative.[94]  *Cf., e.g.*, *United States v. Hamilton*, 46 F.4th 389, 397 (5th Cir. 2022) ("[O]ur approach does not read the term 'reward' out of the statute, as it continues to serve a valuable purpose under certain circumstances."); *Cazorla v. Koch Foods of Miss., LLC*, 838 F.3d 540, 554 & n.41 (5th Cir. 2016).

The Court's interpretation of DRTx's investigatory authority under the Admissions Provision and Transport Clause ends where it began: with the statutory text.  *Cf., e.g.*, *Luna Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859, 865 (2023) ("We cannot replace the actual text with speculation as to Congress' intent." (cleaned up)); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous" (quotation omitted)).  Because nothing in the record indicates that EPPD officers are employees or service providers of a facility that renders care or treatment to people with mental illness, DRTx has no power under PAIMI to

---

[94] DRTx also points to the fact, in Texas, "*only* peace officers . . . have the authority to detain and transport individuals for mental health treatment."  Mot. at 14–15 (emphasis in original).  But "the authority to detain *and* transport" does not mean that peace officers are the only entity with the authority to transport people with mental illness.  That no other entity can detain a person with mental illness is of no moment; that does not limit the world of investigable abuse and neglect occurring during any other instance of transporting a person with mental illness.

investigate the incident between EPPD and E.C.  Thus, DRTx does not have the authority to

access the records it seeks, whatever the scope of its records-access authority might otherwise be

under PAIMI's investigatory or other mandate.

**b.  The Community and Home Provision**

P&A organizations have "the authority to investigate incidents of abuse and neglect of

individuals with mental illness" who "live[] in a community setting, including their own homes."

42 U.S.C. §§ 10805(a)(1)(A), 10802(4)(B)(ii).  Like the Admissions Provision and Transport

Clause, however, a P&A organization's authority to investigate incidents of abuse and neglect

perpetrated against someone living in the community or in their own home is cabined by the

limitations in the definitions of "abuse" and "neglect."

Admittedly, Congress's addition of the Community and Home Provision raises questions

about the scope of P&A organizations' investigatory authority.  When Congress amended PAIMI

in 2000 to expand the definition of "individual with mental illness" to include someone who

"lives in a community setting, including their own home," 42 U.S.C. § 10802(3)(B)(ii), it did not

make any corresponding changes to the definitions of "facilities," "abuse," or "neglect,"

*compare* Pub. L. No. 99-319, Title I, 100 Stat. 478, 479 (1986), *with* Pub. L. No. 106-310, Title

XXXII, 114 Stat. 1101, 1194 (2000).  Congress thus retained a facilities-focused approach in the

definitions of "abuse" and "neglect" but broadened P&A organizations' investigatory authority

by allowing them to investigate abuse and neglect perpetrated against someone living outside of

a mental health facility.

But as broad as P&A organizations' authorities are,[95] PAIMI does not provide limitless

authority to investigate incidents of abuse and neglect occurring in the community.  *Contra*

---

[95] *See, e.g.*, *Disability Rts. Wis.*, 463 F.3d at 725 ("Each of the three federal P&A statutes supplies
state P&A agencies with broad investigatory authority."); *In re Disability Rts. Idaho Request for Ada*

Reply at 5 (arguing DRTx has records-access authority in this case because PAIMI's "mandate requires [it to] investigat[e] [ ] abuse of persons in the community").  Rather, Congress expanded the scope of P&A organizations' authority to include investigation of abuse and neglect committed by employees or service providers of a facility, where that facility provides care or treatment to individuals who live somewhere other than an inpatient or residential facility.  *See State of Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 658 (D. Conn. 2005), *aff'd*, 464 F.3d 229 (2d Cir. 2006) ("[A] protection and advocacy system must serve the needs of both mentally ill individuals who are institutionalized or otherwise treated in residential facilities and individuals who are mentally ill and live in their own home."); *SafetyNet Youthcare*, 65 F. Supp. 3d at 1323 ("Congress designed [PAIMI] to protect individuals with mental illness who live and receive treatment outside of inpatient treatment facilities.").  For the reasons already discussed, DRTx has not shown that EPPD officers are employees or service providers of facilities that provide care or treatment.  *Supra*

---

*Cnty. Coroner Recs. Relating to the Death of D.T.*, 168 F. Supp. 3d 1282, 1292 (D. Idaho 2016) ("Under PAIMI, P&As are given broad authority to investigate incidents of abuse and neglect of individuals with mental illness. . . ."); *SafetyNet Youthcare*, 65 F. Supp. 3d at 1328 (noting P&A Acts have a "broad remedial framework").

    When Congress amended PAIMI in 2000 it noted that while there had been "tremendous advancements in treatment services for mental illness" that allowed people to live "in the community," it found that "there has not been a mechanism to ensure that they are receiving the care and advocacy they need."  S. Rep. No. 106-196, at 25–26 (1999) (explaining the 2000 amendment would allow P&A organizations "to work on behalf of persons living at home," whether they are "subject to abuse or neglect or discrimination in housing, health care, employment or benefits").  Courts have accordingly held that PAIMI's coverage includes individuals with mental illness who live outside of inpatient or residential facilities.  *E.g.*, *Hartford Bd. of Educ.*, 464 F.3d at 240 (explaining that "Congress's clearly expressed intent [was] to provide protection and advocacy services for individuals with mental illness *living in their own homes*" (emphasis added)); *Disability Rts. Wash. v. Penrith Farms*, No. CV-09-024-JLQ, 2009 WL 777737, at *2 (E.D. Wash. Mar. 20, 2009) (noting that "the investigatory power is couched in terms of protection of individual rights in any context" and concluding that the P&A organization "is explicitly empowered to investigate allegations of abuse within a home").

Section II.D.1.a.  So the mere fact that E.C. was in his own home when EPPD officers allegedly injured him has no bearing on DRTx's authority to investigate the incident.

The Court's conclusion here too does not render the Community and Home Provision mere surplusage.  *Contra* Mot. at 5.  A P&A organization's investigatory authority would still cover abuse and neglect committed against a person who, for example, participates in a partial hospitalization program, such as out-patient care.  42 U.S.C. § 10802(3), (4)(B)(ii) (including persons "liv[ing] in a community setting" or in "their own home" as "individual[s] with mental illness").  It might also cover work release programs, *cf. id.* (including "jails and prisons" in the list of covered "facilities"), homeless shelters, *id.* (including "community facilities" in the list of covered "facilities"), or a visit to the Emergency Department, *id.* (including "hospitals" in the list of covered "facilities").  It may cover any situation where a facility's employees provide at-home care.  *See id.*  In sum, by adding the Community and Home Provision Congress did expand the scope of P&A organizations' authority to investigate incidents of abuse and neglect, but it retained a limitation by leaving the definitions of "abuse" and "neglect" unchanged.  DRTx must still show that an employee or service provider of a facility that provides care or treatment allegedly committed the abuse or neglect, and it has not done so.  DRTx cannot access the records it wants from EPPD pursuant to its authorities under PAIMI.

## E.  DRTx's Authority under PADD

The Court will not address the scope of DRTx's authority under PADD because DRTx concedes—and the Court independently concludes—that DRTx does not have the authority to obtain the records it wants from EPPD under PADD.  *Compare* DRTx Rule 56(f) Reply at 5 ("[E.C.] does not qualify for the PADD Act of 2000 because neither his mental illness nor his

speech disability manifested before the age of 22."), *with* 42 U.S.C. § 15002(8)(A) (defining

"developmental disability" in part as "manifest[ing] before the individual attains age 22").

## F.  DRTx's Authority under PAIR

DRTx argues that if PAIMI doesn't authorize it to obtain the records, PAIR does.  *See,*

*e.g.*, DRTx Rule 56(f) Objs. at 16; DRTx Rule 56(f) Reply at 4–7.  PAIR fills gaps between

PAIMI, PADD, and a program called the Client Assistance Program ("CAP").[96]  29 U.S.C.

§ 794e(a)(1); *see also* S. REP. NO. 102-357, at 98 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3712,

3809.  PAIR empowers P&A organizations to protect and advocate on behalf of individuals with

disabilities who "are ineligible for protection and advocacy programs" under PADD, who "are

ineligible for services under the Protection and Advocacy for Mentally Ill Individuals Act *of*

*1986*," and need services that CAP doesn't provide.  29 U.S.C. § 794e(a)(1) (emphasis added).

PAIR, in other words, creates a protection and advocacy system that kicks in when other

protection and advocacy systems are inapplicable.  *See, e.g.*, *Charlotte-Mecklenburg Bd. of*

*Educ. v. Disability Rts. of N.C.*, 430 F. Supp. 3d 74, 81 (W.D.N.C. 2019) ("Under PAIR,

[PADD's] protections were extended to people with disabilities generally.").[97]  As relevant here,

DRTx may protect and advocate on behalf of E.C. under PAIR's authorities if E.C. is ineligible

for, among other things,

> (i) protection and advocacy programs under subtitle C of the Developmental
> Disabilities Assistance and Bill of Rights Act of 2000 because [E.C.] do[es] not
> have a developmental disability, as defined in section 102 of such Act; and

---

[96] The Client Assistance Program does not apply in this case; that is, E.C. is not eligible for
assistance under the CAP.  *See* DRTx Rule 56(f) Reply at 5 n.19; 29 U.S.C. § 732.

[97] *See also N. Colonie Bd. of Educ.*, 2016 WL 1122055, at *3 (explaining that "PAIR applies to a
broader segment of the population of individuals with disabilities" than those covered by PADD or
PAIMI, and that "it allows the P&A systems the same breadth of investigative and advocacy authority
allowed under the [PA]DD Act").

(ii) services under the Protection and Advocacy for Mentally Ill Individuals Act *of 1986* (42 U.S.C. § 10801 et seq.) because [E.C.] [is] not [an] individual[] with mental illness, as defined in section 102 of such Act (42 U.S.C. [§] 10802).

29 U.S.C. § 794e(a)(1)(B) (emphasis added).

DRTx argues that PAIR's reference to PAIMI "*of 1986*" means the Court must ask whether E.C. is an "individual with mental illness," as PAIMI then defined the term, not as it does now.  *See* DRTx Rule 56(f) Reply at 4–7.  If the correct question is whether E.C. is as an "individual with mental illness" under the 1986 version of PAIMI, then the answer is E.C. is not. Congress limited the 1986 definition to people with mental illness living in residential or overnight facilities, such as mental health hospitals, Pub. L. No. 99-319, Title I, § 102(3)(B), 100 Stat. 478, 479 (1986) (covering "an inpatient or resident in a facility rendering care or treatment"), and there is no dispute that E.C. was not residing in a long-term care facility when EPPD injured him.  So, E.C. would instead be eligible for DRTx's services under PAIR.  But if the correct question is instead whether E.C. is as an "individual with mental illness" under the current version of PAIMI, then E.C. is eligible for DRTx's services under PAIMI because E.C. "ha[d] a significant mental illness or emotional impairment," *see* 42 U.S.C. § 10802(4)(A),[98] and E.C. either (or both) was someone who EPPD was "in the process of [] admit[ting] to a facility rendering care or treatment" or was someone who "lives in . . . their own home," 42 U.S.C. § 10802(4)(B)(i)(II), (4)(B)(ii).[99]

PAIR is ambiguous as to whether it incorporates PAIMI as it exists now or as it existed in 1986.  On one hand, PAIR's text explicitly cross-references "1986," as well as "section 102 of [the Protection and Advocacy for Mentally Ill Individuals Act of 1986]," which, as a textualist

---

[98] *See also supra* note 86 and accompanying text.

[99] *See also supra* at Sections I.B.2, II.C., and p. 42.

matter, may mean Congress intended to refer to only the 1986 version of PAIMI.  *Cf., e.g.*, *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) ("We must presume that Congress says in a statute what it means and means in a statute what it says there." (quotation omitted)).  On the other hand, and also as a textualist matter, PAIR explicitly cross-references the provisions in the United States Code where PAIMI is codified, which are updated with Congress's post-1986 amendments to PAIMI.  *See* 29 U.S.C. § 794e(a)(1)(B)(ii) (referencing 42 U.S.C. § 10801, *et seq.*, and 42 U.S.C. § 10802).  Because the plain text is ambiguous, the Court turns to canons of statutory construction.  *See, e.g.*, *United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015).

"Under long-established canons of statutory construction, statutes which incorporate other statutes by reference are considered either 'statutes of specific reference' or 'statutes of general reference.'"  *See, e.g.*, *Pearce v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Labor*, 603 F.2d 763, 767 (9th Cir. 1979).  Statutes of specific reference—which generally "refer[] to another statute by specific title or section number"—freeze the cross-referenced statute "as it existed when the referring statute was enacted, without any subsequent amendments."[100]  *E.g.*, *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019).  Conversely, statues of general reference—which typically "refer[] to a general subject"—"adopt[] the law on that subject as it exists whenever a question under the statute arises."  *Id.*

As is often the case with statutory interpretation, what appears to perhaps be a simple question with a simple answer—Does PAIR refer to a specific provision in a specific statute? Yes.—is, in fact, more complicated.  At least one court has explained that Congress rarely

---

[100] This specific-reference canon is sometimes called the "*Hassett* canon" after *Hassett v. Welch*, 303 U.S. 303, 314 (1938) ("Where one statute adopts the particular provision of another by a specific and descriptive reference to the statute or provisions adopted, the effect is the same as though the statute or provisions adopted had been incorporated bodily into the adopting statute.  Such adoption takes the statute as it exists at the time of adoption and does not include subsequent additions or modifications by the statute so taken unless it does so by express intent."  (cleaned up)).

intends to freeze a cross-referenced statute in time.  *See Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 983 (7th Cir. 1992).  And several courts have explained that the reference canon (general or specific) may be overcome by clear indication that Congress intended the contrary outcome.  *See, e.g.*, *United States v. Anderson*, 46 F.4th 1000, 1008 (9th Cir. 2022); *N.Y. ex rel. N.Y. State Off. of Child. & Fam. Servs. v. U.S. Dep't of Health & Hum. Servs.' Admin. for Child. & Families*, 556 F.3d 90, 97–98 (2d Cir. 2009) ("[T]he *Hassett* canon is not a categorical rule that compels courts to always read statutory cross-references as pointing to their original targets." (quotation omitted)); *United States v. Rodriguez-Rodriguez*, 863 F.2d 830, 831 (11th Cir. 1989) (per curiam) ("A provision which, in terms . . . reads as a specific reference may, in context, be construed as a general reference.").

Take *United States v. Rodriguez-Rodriguez* as an example.  There, the defendant pleaded guilty under a drug possession statute that required his penalties "to be assessed under 'the Comprehensive Drug Abuse Prevention and Control Act *of 1970* (21 U.S.C. § 960)."  863 F.2d at 830 (quoting 46 U.S.C. § 1903) (emphasis added).  The defendant argued that because the drug possession statute made specific reference to the 1970 Act, it incorporated the penalty provisions that then-existed, which were much lower than those that existed when the district court sentenced the defendant.  *Id.* at 830–31.  The Eleventh Circuit held that the Congress's subsequent amendments—the stiffer penalty provisions—were incorporated in the drug possession statute, in part, because the drug possession statute and the penalty provisions were "both part of a larger legislative scheme aimed at increasing the penalties for those violating federal narcotics laws."  *See id.* at 831 ("Indeed, the enhanced penalties . . . cited in the possession statute recodification . . . and the possession statute recodification itself were both parts of the Anti-Drug Abuse Act of 1986.").  So the Eleventh Circuit concluded that irrespective

of the reference to the 1970 Act, the drug possession statute made a general, not specific reference to the penalty provisions and thus incorporated Congress's later amendments to the penalty provisions.  From *Rodriguez-Rodriguez*, the Court takes the proposition that in a complex statutory scheme, what is "facially [a] specific reference [may] actually operate[] as a general one."  *Id.* (quoting *EEOC v. Chrysler Corp.*, 546 F. Supp. 54, 74 (E.D. Mich. 1982)); *see also Herrmann*, 978 F.2d at 983.

As in *Rodriguez-Rodriguez*, so too here.  PAIR is part of a larger complex set of statutes that work together to ensure P&A organizations can work on behalf of people with disabilities or mental illness.  *See, e.g.*, 29 U.S.C. § 794e(a)(1); *see also* 42 U.S.C. §§ 10801–10851; 42 U.S.C. §§ 15001–15045; 29 U.S.C. § 732.  Congress intended PAIR to fill gaps in coverage from the services authorized under PADD, PAIMI, and the CAP.  *See* 29 U.S.C. § 794e(a)(1); S. Rep. No. 102-357, at 98 (1992) ("The Committee intends the PAIR program to provide advocacy services to individuals with disabilities who are not eligible for services under the existing P and A and [Client Assistance] programs."); H.R. Rep. No. 102-822, at 122 (1992).  With respect to PAIMI, Congress has expanded its scope so that P&A organizations may advocate on behalf of people with mental illness in circumstances outside of inpatient facilities, which was the focus of the 1986 version.  *Compare* Pub. L. No. 99-319, Title I, § 102(3), 100 Stat. 478, 478–79 (1986), *with* Pub. L. No. 100-509, Title I, § 3(2)(C), 102 Stat. 2543, 2543 (1988), *and* Pub. L. No. 106-310, Title XXXII, § 3206(b)(1)(B)(iv), 114 Stat. 1101, 1194 (2000).

Because Congress has expanded PAIMI's coverage, and PAIR is intended to fill gaps left in part by PAIMI, it makes little sense that Congress would have intended PAIR to fill coverage gaps created by only the 1986 version of PAIMI.  In other words, why would Congress have PAIR fill gaps that PAIMI's later amendments fill?  For example, it's unclear why Congress

would have wanted PAIR to provide P&A organizations with the authority to investigate abuse and neglect perpetrated during the transport of an individual with mental illness when the current version of PAIMI provides that authority.  Seeing as PAIR is part of a larger statutory scheme that includes PAIMI, and is specifically intended to fill gaps in that larger statutory scheme, the Court concludes that PAIR's reference to "section 102" of the "Protection and Advocacy for Mentally Ill Individuals Act of 1986" is a general, rather than specific reference.  *Cf. Rodriguez-Rodriguez*, 863 F.2d at 830–32.

        This conclusion is buttressed by the fact that Congress not only cross-referenced the 1986 version of PAIMI, but also cross-referenced PAIMI's codified provisions.  *See* Pub. L. No. 102-569, Title V, § 510(a), 106 Stat. 4344, 4430–34 (1992); 29 U.S.C. § 794e(a)(1)(B)(ii).  With each amendment to PAIMI, these codified provisions are updated to include the amendments. The Court presumes that Congress was aware that its decision to cross-reference PAIMI in PAIR would therefore automatically include Congress's later amendments to PAIMI.  *Cf. Stone v. INS*, 514 U.S. 386, 397–98 (1995) (generally explaining that Congress is presumed to have understood the context and effect of its amendments to statutes).

        Legislative history also supports the Court's conclusion that PAIR's reference to PAIMI is a general one meant to carry PAIMI's amendments with it.  When Congress amended PAIMI in 1988, it stated that "whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or a repeal of, a section or other provision, *the reference shall be considered to be made to a section or other provision of the Protection and Advocacy for Mentally Ill Individuals Act of 1986* (42 U.S.C. § 10801 et seq.)."  Pub. L. No. 100-509, Title I, § 2, 102 Stat. 2543, 2543 (1988) (emphasis added).  In other words, PAIMI's 1988 amendments merely updated the original, 1986 version.  Likewise, when Congress again updated PAIMI in 2000 it prefaced its

updates as "amendments," not as, for instance, a repeal and replace.  *See* Pub. L. No. 106-310,

Title XXXII, § 3206(b)(1)(B)(iv), 114 Stat. 1101, 1194 (2000).  So, in 1992, when Congress

passed PAIR and referenced the "Protection and Advocacy for Mentally Ill Individuals Act of

1986," it likely understood that reference to include amendments to PAIMI—that is, the

Protection and Advocacy for Mentally Ill Individuals of 1986 *as amended*.  So too in 2000 when

Congress amended PAIMI again.

It's true that Congress kept PAIR's reference to the 1986 version of PAIMI even when it

updated PAIR's reference to the newest version of PADD in 2000.  *See* Pub. L. No. 106-402,

Title IV, § 401, 114 Stat. 1677, 1738 (2000).  And when Congress last amended § 794e in 2014,

it did not change PAIR's reference to the 1986 version of PAIMI.  *See* Workforce Innovation

and Opportunity Act, Pub. L. No. 113-128, Title IV, § 457, 128 Stat. 1425, 1676 (2014).  Of

course, Congress could have done so.  From this, one could argue that Congress intentionally

kept PAIR's reference to the 1986 version of PAIMI and thus intended PAIR's reference to be

specific to the 1986 version.  But Congress's choice can also be explained another way.  In 2000,

Congress repealed and replaced the old version of PADD.  *See* Pub. L. No. 106-402, Title IV,

§ 401, 114 Stat. 1677, 1738 (2000) ("The Developmental Disabilities Assistance and Bill of

Rights Act (42 U.S.C. § 6000 et seq.) is repealed.").  So in contrast with PAIMI's amendments,

Congress's repeal of the Developmental Disabilities Assistance and Bill of Rights Act and its

replacement of it with PADD required Congress to make confirming amendments to PAIR's

cross-reference.

Because PAIR's reference to PAIMI incorporates all of Congress's amendments to

PAIMI, including the full, current definition of "individual with mental illness," the question is

whether E.C. qualifies as an "individual with mental illness" under 42 U.S.C. § 10802(4).  E.C.

is an "individual with mental illness" under PAIMI.[101]  E.C. is thus eligible for services under

PAIMI, which makes E.C. ineligible for services under PAIR.  *See* 29 U.S.C. § 794e(a)(1)(B)(ii).

PAIR, therefore, does not authorize DRTx to obtain the records it wants from EPPD.[102]

### III.    CONCLUSION

There's no doubt the P&A Acts establish and support much-needed services for people

with disabilities and mental illness.  But the Acts also appear, to this Court, to be flawed in some

ways.  It's not clear, for example, why Congress expanded PAIMI's coverage to people who

"live in a community setting" or "their own home" but retained the same definition of "facilities"

that existed when PAIMI covered only individuals associated with long-term care facilities.  *See*

*supra* Section II.D.  As just one of many other examples, it's also not clear why PAIMI defines

"abuse" as something committed "by an employee of a facility" but defines "neglect" as being

committed by "any individual responsible for providing services in a facility."  As confounding

as many of the P&A Acts' provisions are, to say nothing of their relationship to each other, this

Court is bound to interpret them as Congress has written them.  There may be a remedy here, but

it is with Congress.

Under the P&A Acts, DRTx lacks the authority to obtain the records it seeks from

Pacillas.  PAIMI's and PAIR's text, as well as the undisputed record before the Court, command

this outcome.  Accordingly, the Court **DENIES** Plaintiff Disability Rights Texas's "Motion for

Summary Judgment" (ECF No. 19).

---

[101] *See supra* at notes 98–99 and accompanying text.

[102] The Court emphasizes that the question of whether someone is eligible for services under PAIMI because they are (or are not) an "individual with mental illness" is separate from the question of whether a P&A organization has the authority to access records.  A P&A organization's client must, as a prerequisite under PAIMI, be an "individual with mental illness"—true—but that does not answer the question of whether the P&A organization can obtain records pursuant to its records-access authority under PAIMI.  *See supra* Section II.D.1.

Having given the parties notice and the opportunity to respond to the Court's plan to enter summary judgment for Pacillas under Federal Rule of Civil Procedure 56(f), *see* Mem. Op. at 3, 38–39, and having concluded that there are no genuine disputes of material fact, *see supra* Section II.C., the Court now **ENTERS SUMMARY JUDGMENT** in Defendant Peter Pacillas's favor.  The Court **WITHDRAWS** its prior opinion, Mem. Op., ECF No. 44; *Disability Rts. Tex. v. Pacillas*, --- F. Supp. 3d ----, 2023 WL 3855082 (W.D. Tex. June 6, 2023), and **SUBSTITUTES** this one in its place.

The Court **CLOSES** this case and will separately issue a final and appealable judgment.

**So ORDERED and SIGNED this 1st day of September 2023.**

_____
**DAVID C. GUADERRAMA**
**SENIOR U.S. DISTRICT JUDGE**